IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

DAVID BROWNE, ANTONIO CALDWELL and LUCRETIA HALL, on behalf of themselves and all those similarly situated,

       Plaintiffs,

vs.                                                          No. 5:16-CV-05366-TLB

P.A.M. TRANSPORT, INC. and JOHN DOES 1-10,

       Defendants.

_____

VIDEO DEPOSITION OF LANCE STEWART
TAKEN ON BEHALF OF THE PLAINTIFFS
ON DECEMBER 19, 2017, BEGINNING AT 10:25 A.M.
IN FAYETTEVILLE, ARKANSAS
REPORTED BY KERRI PIANALTO, CCR

APPEARANCES:

By web conference on behalf of the PLAINTIFFS

       Justin L. Swidler
       SWARTZ SWIDLER, LLC
       1101 Kings Hwy N., Suite 402
       Cherry Hill, New Jersey 08034
       856-685-7420
       jswidler@swartz-legal.com

On behalf of the DEFENDANTS

       Robert L. Jones, III
       Kerri Kobbeman
       CONNER & WINTERS
       4375 Vantage Drive, Suite 405
       Fayetteville, Arkansas 72703
       479-462-1841
       bjones@cwlaw.com
       kkobbeman@cwlaw.com

Also present:  Angela Clark

Videographer:  David Whisel



Page 14

```
 1     Q   Okay.  So first of all, is there any -- just to
 2  kind of get -- I mean, I know you're not here to testify
 3  about what a driver does on which duty status, but because
 4  A4 deals with who decided which types of time in the log
 5  system will be designated as compensable, do you
 6  understand generally speaking, and I'm not going to ask
 7  you this activity for that if it's somebody else, but do
 8  you understand generally speaking that driver's log their
 9  time in one of four duty statuses when they're over the
10  road with P.A.M.?
11     A   I do.
12     Q   Okay.  And I'm not -- I'm not here to trick you
13  and say what is one, two, three and four, that's somebody
14  else, but do you understand with sort of that general
15  understanding whether there's any duty statuses that
16  P.A.M. does consider to be compensable time that must be
17  paid at least minimum wage?
18     A   Please repeat that question.
19     Q   Sure.  Do you understand which of the four
20  statuses P.A.M. -- if any, P.A.M. contends are legally
21  compensable time?
22     A   No.
23     Q   Okay.  So -- but you do know who made those
24  decisions because you're prepared to tell me about A4?
25     A   Yes.
```

Page 15

```
 1     Q   Okay.  So who decided which duty statuses were
 2  compensable?
 3         MR. JONES:  Objection, he's not said anybody.
 4         MR. SWIDLER:  I'm sorry, Bobby, I'm not -- I
 5  just didn't understand what you said.
 6     A   I mean, I don't know if this answer is
 7  appropriate, but I guess that the Federal Motor Carrier
 8  Administration decided which statuses qualified as on duty
 9  and which ones did not.
10     Q   (BY MR. SWIDLER)  Okay.  But you said you were
11  prepared to testify about A4, so let me just ask who
12  decided which types of time the driver log system would
13  designate as compensable?
14     A   I believe at the time because that fell in that
15  two year period when I was absent from the company, but I
16  do know that it was Bobby Caldwell in conjunction with
17  Allen West, the CFO.
18         And if I can answer -- ask a question back to
19  you, when you ask me that, are you asking in reference to
20  the true up that we do to adjust to hours?
21     Q   Potentially -- I mean, I -- you know, I --
22  usually you don't get to ask me questions, but I think
23  you're asking for clarification so I'll give you an
24  answer.  It may be that P.A.M. uses compensable time to do
25  a true up, but that's -- that's not really what I'm
```

Page 16

```
 1  asking, although it may be the same answer.  I'm asking
 2  for any driver at P.A.M., whether a true up was performed
 3  or not, what time P.A.M. considers compensable and you
 4  told me you don't know that, but you do know who made
 5  those decisions and so that's what I'm now asking you and
 6  I think you've identified Caldwell and West, so --
 7         MR. JONES:  I'm going to object to the question.
 8  You might want to ask him first did anybody at P.A.M. make
 9  a decision as to whether or not any of these times were
10  compensable or if they had some other method of
11  compensation.
12     Q   (BY MR. SWIDLER)  Well, I think he's already
13  identified the two individuals.
14         Is there anyone else other than Mr. Caldwell and
15  Mr. West?
16     A   No.
17     Q   And you think that those decisions were made
18  during your two year absence from the company?
19     A   Yes.
20     Q   And you came back in, I think you said '16?
21     A   January 4th of 2016.
22     Q   So you said you're prepared to discuss A6 which
23  is how defendants compensate a driver when the computation
24  demonstrates the pay would be under the applicable minimum
25  wage, so -- but somehow you're not prepared to testify
```

Page 17

```
 1  about A5 and this kind of creates to me a strange
 2  predicament because I don't know how you can answer five
 3  if you don't know six.
 4     A   I know --
 5     Q   Or how you can answer six if you don't know
 6  five.
 7     A   I know how we are truing up student drivers.  I
 8  don't necessarily know how we determined the hours or the
 9  duty statuses that would go into that calculation
10  initially.
11     Q   Okay.  So other than with student drivers, is
12  there any true up performed at P.A.M.?
13     A   Yes.
14     Q   Okay.  So is the true up performed on all
15  drivers each work week or are there some drivers excluded
16  from the true up?
17     A   There are some drivers excluded from the true
18  up.
19     Q   What types of drivers are excluded from the true
20  up?
21     A   Experienced drivers after their first 60 days as
22  a solo driver.
23     Q   So drivers who are paid on the mileage rate are
24  excluded from the true up?
25     A   No.
```



## Page 18

1  Q  Okay. Okay. So the way -- we'll get to the
2  trainee pay in a second, but there's this period where
3  they graduate from the training program where they have a
4  guaranteed minimum payment, correct?
5  A  That's one of the true ups that we do, that's
6  correct. They're a first seat driver and we true them up.
7  Q  When you say true them up, aren't you -- explain
8  to me how those drivers are paid.
9  A  Okay.
10 Q  So they just graduated the development program
11 and it's their first 60 days over the road as a solo.
12 A  Okay. We determine whether that solo driver is
13 available for work, so they're not on time off, and if
14 they're available five days, then we will pay them $500 at
15 minimum. If their earnings exceed $500, then they make
16 what they earned, but at minimum it's $500.
17 Q  So when you say true up for those drivers,
18 that's what you're referring to?
19 A  Yes.
20 Q  So it's not a comparison of these are the number
21 of hours a driver has logged on a certain duty status
22 multiplied by minimum wage?
23 A  No.
24 Q  It's not that, okay. It's you are available for
25 work at least five days, you're getting $500 or your

## Page 19

1  mileage rate, whichever is higher?
2  A  Correct.
3  Q  Got it. Okay. Is that the same true up process
4  that happens with the trainee drivers?
5  A  No.
6  Q  Okay. And what is the true up process for the
7  trainee drivers?
8  A  The true up, do you want me to describe the
9  entire process?
10 Q  To the best of your ability, yes, I think it
11 would be helpful.
12 A  Okay. The student drivers earn $42.86 a day
13 which equates to $300 a week and then we also measure
14 according to the criteria that were put into the program
15 that define the on duty hours, we multiply those on duty
16 hours times the Arkansas minimum wage of $8.50. We
17 determine what that number is and we compare it to their
18 actual earnings. If their actual earnings exceed that --
19 that number computed on minimum wage times hours worked,
20 then they keep what they've actually earned. If the hours
21 worked times minimum wage exceed their earnings, then we
22 pay them what it takes to bring them up to that minimum
23 wage.
24 Q  Has that true up process, was that implemented
25 during -- was that implemented since 2014?

## Page 20

1  A  It was May 19th of 2015 that process was
2  installed.
3  Q  Okay. And the Arkansas minimum wage has changed
4  during that time?
5  A  I believe so.
6  Q  So -- but do you understand that P.A.M. always
7  utilized the Arkansas minimum wage when doing the
8  calculation?
9  A  I do not know the answer to that. I don't know
10 if the -- I know currently it's $8.50.
11 Q  Okay.
12 A  That might be a question for Paul Bagwell, when
13 you get to him.
14 Q  Got it. And you said that you're multiplying by
15 the on duty hours, do you know how it's determined what
16 are on duty hours?
17 A  No.
18 Q  Do you know which deponent today is going to
19 know the answer to that?
20 A  I believe that's Paul Bagwell as well. He would
21 know what the program is doing.
22 Q  Okay. And just to make sure that -- but you
23 wouldn't know, for example, whether P.A.M. determines that
24 time logged on line three counts as on duty, that would be
25 a different deponent than you?

## Page 21

1  A  Yes, it would be someone other than me.
2  Q  Okay. Are trainee drivers able to participate
3  in the per diem program?
4  A  Can you ask that again? There was some
5  background noise there that I couldn't hear you well.
6     MR. JONES:  Now we have --
7     MR. SWIDLER:  No problem.
8     MR. JONES:  In addition to children, we now have
9  a dog that joined us apparently.
10    MR. SWIDLER:  No there's -- not from my side.
11 It must just be the muffling of the children.
12    MS. KOBBEMAN:  It sounded like a dog.
13    MR. JONES:  It did, it sounded like a dog
14 barking.
15 Q  (BY MR. SWIDLER) No, what I asked was are
16 trainee drivers able to participate in the per diem
17 program?
18 A  No. I would like to actually qualify that
19 answer a little bit.
20 Q  Okay.
21 A  When the trainee is still going through the
22 driver development process, they spend five days receiving
23 training. They receive a per diem during that period of
24 time. When that five days is over and they go over the
25 road with a mentor, they do not participate.



Page 22

1   Q   Okay.  So do you mean when they're in the
2   orientation part of the program, is that what you're
3   referring to?
4   A   Yes.
5   Q   Okay.  And what is the per diem the trainee
6   drivers in the orientation program receive -- well, let me
7   rephrase it so that we're clear.
8       What is the per diem that the drivers who are
9   still in orientation receive from P.A.M.?
10  A   During orientation, they receive $25 per day for
11  four days for a total of $100 and then on the fifth day,
12  which is Friday, they receive $200.  Those amounts are
13  loaded on a debit card so that they've got living expense
14  money to spend while they're participating in the
15  orientation program in addition to the $300 that they're
16  also compensated for that week, so they receive $600
17  total.
18  Q   And how long has it been the case that drivers
19  in orientation receive $600?
20  A   Since the inception of the program to my
21  knowledge.
22  Q   Okay.  Because would it surprise you that the
23  manual that is given to the drivers explains they only
24  receive $200 for orientation?
25  A   I'm not familiar with that part of the manual.

Page 23

1   Q   And would it surprise you to know that the pay
2   records we have from the plaintiffs in this case are
3   consistent with what the manual states?
4   A   I would be surprised if the plaintiffs
5   participated in our orientation program, if they received
6   anything other than $25 a day for four days and then $200
7   on Friday on a debit card and then 300 -- and then $300 of
8   regular pay for that same week.
9   Q   Are drivers in the orientation program
10  considered employed by P.A.M. for purposes of receiving
11  regular weekly pay?
12  A   Yes.
13      MR. JONES:  Which drivers?
14  Q   (BY MR. SWIDLER)  The drivers in -- oh, the
15  drivers in the driver development program who are in
16  orientation.
17  A   Yes.
18  Q   How do you know that?
19  A   Because we start paying them that daily rate of
20  $42.86 the day that they start the driver development
21  program as well as they also get the $25 per diem that
22  first day.
23  Q   And just so that I'm clear, sir, I just want to
24  make sure you and I are talking about the same time
25  periods.  A driver when he is hired by P.A.M., he'll get

Page 24

1   told to come to Tontitown or another location where P.A.M.
2   provides orientation, correct?
3   A   Tontitown.
4   Q   Tontitown, okay.  But that's correct what I
5   said, right?
6   A   Yes, they -- they come to Tontitown -- they came
7   to Tontitown during part of the period.  That program is
8   no longer in place.
9   Q   Okay.  And you -- a lot of times, for example,
10  they're bussed to that location by P.A.M.?
11  A   Okay.
12  Q   Is that true?  I mean, I'm not -- I'm saying it
13  because I understand, but I want you to confirm it if you
14  know.
15  A   Yes.
16  Q   Okay.  And you're saying that the moment they
17  arrive at that location they're considered an employee of
18  P.A.M. and they start receiving the weekly pay?
19  A   They are.  Not all of them stay an employee for
20  very long if they don't qualify and pass the orientation
21  program to become a driver.
22  Q   Okay.  Can you go to tab two in the binder in
23  front of you and I'll have the court reporter mark tab two
24  as Exhibit 2.
25      (WHEREUPON, Exhibit 2 was marked for

Page 25

1   identification.)
2   A   It's marked.
3   Q   Tab two -- are you there?
4   A   I am.
5   Q   Okay.  And tab two is not the entire, it's some
6   extractions, but we kept the first several pages just so
7   you would know what we're looking at.  And this is -- do
8   you understand this is the driver manual at P.A.M.
9   Transport?
10  A   As of 1/6 of '16, correct.
11  Q   Is that the current manual?
12  A   I would suspect that it's been updated since
13  then.
14  Q   I will tell you we have another manual, but it's
15  undated and there's been two driver manuals produced,
16  basically.  You're looking at one and the other one is tab
17  -- I would like you to look at it and try to tell me which
18  one you think is newer.  The other one is tab four and
19  this one does not have a date on it.  It does say on --
20  and I'm just going to help you --
21      (WHEREUPON, Exhibit 4 was marked for
22  identification.)
23      MR. JONES:  Excuse me just a second.  Justin, if
24  you will look at P.A.M. Bates number 294, which is the
25  second page of that driver's manual you're referring to,


Page 34

1  of time because the mileage rate and the average velocity
2  that they travel at far exceeds the minimum wage required.
3  I think the drivers would have to go like 30 miles an hour
4  to not attain minimum wage.
5      Q   While they're driving, right?
6      A   While they're driving, but generally they're --
7      Q   Well, then -- but, of course, sometimes a lot of
8  driving -- a lot of the job duties of a driver is actually
9  not driving; would you agree with that?
10     A   I don't know if I would say a lot, no.
11     Q   Okay.
12     A   Some.
13     Q   Well, planning, is that a job requirement of
14 drivers?  Do you know?
15     A   I'm sorry, I didn't hear you.  Can you repeat?
16     Q   Do you know if trip planning is one of the
17 requirements that P.A.M. has of their drivers?
18     A   Less so now than it used to be.  We send them a
19 planned route that gives them the route of travel and
20 where to stop and buy fuel so they're not like working it
21 out on the road atlas nowadays.
22     Q   Is that a requirement that they do trip planning
23 or not, or do you not know?
24     A   I don't know that, but I do know that we provide
25 a planned route for them, so --

Page 35

1      Q   Do you know if it's the driver's responsibility
2  to go through that route to make sure it works for the
3  truck they're driving?
4      A   We encourage them to take that route.  We can't
5  hold them solidly to it because there may be reasons that
6  they need to deviate from it.
7      Q   And part of -- part of driving a truck for
8  P.A.M. is monitoring, someone is actually -- could be
9  monitoring the loading process, correct, and counting
10 pallets?
11     A   Occasionally.  It's definitely not the majority
12 of the time.
13     Q   It's your testimony that the majority of the
14 time the driver is not responsible for making sure his
15 trailer is loaded properly?
16     A   That's correct.  Most of our freight would be
17 categorized as drop and hook, so when they pull in and
18 make a delivery and then they go pick up another trailer,
19 it's generally preloaded, ready for them to hook onto and
20 leave.
21     Q   And there's paperwork that's required that they
22 have to get signed when they get that trailer, correct?
23     A   Yes.
24     Q   And --
25     A   A lot of times that paperwork is already signed,

Page 36

1  actually, when they pick up the trailer, signed by the
2  shipper.
3      Q   Right.  And would you also agree that part of
4  the requirement of driving for P.A.M. is performing pre
5  and post-trip inspections?
6      A   Definitely.
7      Q   Would you also agree that part of the
8  requirement of driving for P.A.M. is fueling a vehicle?
9      A   Yes.
10     Q   Would you also agree that a part of the
11 requirements for driving for P.A.M. sometimes is going to
12 weigh stations?
13     A   We do some, but we've got a device called a
14 pre-pass device that allows them to bypass the majority of
15 those stations.
16     Q   Although sometimes they're still going to get
17 pulled into the weigh station even though they have that
18 device, correct?
19     A   Yes, occasionally.
20     Q   And in some states such as Arkansas, the device
21 does nothing, correct?
22     A   I don't know that.
23     Q   Do you know how many different parts of the
24 vehicle or how many different steps P.A.M. tells its
25 drivers the pre-trip and post-trip inspection should be?

Page 37

1      A   I do not.
2      Q   Do you know if it's more than 100?
3      A   I do not.
4      Q   Do you know how much fuel usually -- well, you
5  do accounting so you might.  Do you know the average
6  amount of fuel that's purchased when a driver purchases
7  fuel?
8      A   I do not know.
9      Q   Do you understand there's an entire duty status
10 for drivers when there's -- when they claim to be on duty
11 but not driving?
12     A   I do.
13     Q   That's one of the four duty statuses?
14     A   I do.
15     Q   So when you say a driver would have to go
16 30 miles per hour, are you saying that that would -- that
17 includes also the all other time that is compensable that
18 isn't driving time?
19     A   I would have to do the math, but I guess my
20 quick math on that was to take -- if you took the federal
21 rate of $7.25 and you divided it by our -- even our lowest
22 pay rate for the new beginning driver of $.26, I think it
23 came out to be 27 miles per hour would be the velocity,
24 and so I would say that there is an allowance built into
25 that rate to compensate them for the on duty not driving

Page 42

```
 1      A   We contend that those drivers are working on
 2  piecework and that that piecework, the criteria for having
 3  generated a piece is that they turn in the paperwork to
 4  prove that they performed the service that they're getting
 5  paid for and we pay them when they turn in their
 6  paperwork.
 7      Q   Right.  And I don't know if you're trying to be
 8  evasive.  I'm not asking --
 9      A   I'm trying to be exact.
10      Q   I'm not asking you to repeat that again.  I
11  think you said it differently, but you're saying the same
12  thing, which is that this does occur, the drivers are
13  required to turn in paperwork before we're going to pay
14  them and that they know that and that's basically what --
15  and you're also saying they may have their reasons that
16  are entirely their own as to why they didn't turn in the
17  paperwork?
18      A   Correct.
19      Q   I'm not going to ask about those reasons because
20  you haven't been designated to tell me about those, but
21  you have been designated to tell me about efforts P.A.M.
22  has taken to determine if simply because a driver has not
23  turned in his paperwork it is then permitted to pay that
24  driver less than minimum wage on payday and that's what I
25  want to focus on.  So not factually that it happens, we've
```

Page 43

```
 1  established -- you told me it has happened, but efforts,
 2  if any, that P.A.M. has taken to determine if that payment
 3  policy of P.A.M. is legal?
 4      A   No.
 5      Q   Okay.  No means P.A.M. hasn't done anything to
 6  determine whether that's legal, correct?
 7      A   We have not.  We do not true up those drivers,
 8  if that's what you're asking.
 9      Q   No, I think -- I think -- I think you -- no,
10  it's not.  To be clear, my question wasn't -- you told me
11  you didn't true up those drivers and I'm not trying to get
12  you to repeat yourself today.  Both of us want to do this
13  efficiently.  My question is sort of that decision not to
14  true up those drivers, has P.A.M. done any research or has
15  it done anything to determine if that complies with
16  federal and state minimum wage law?  That's the question.
17      A   I don't know.
18      Q   But you're the witness who's here to testify
19  about these things, so P.A.M.'s answer is it can't think
20  of anything?
21          MR. JONES:  Object to form.
22      A   Did you hear Bobby?
23      Q   (BY MR. SWIDLER)  I did, and he's letting you
24  answer.
25          MR. JONES:  You can still answer.
```

Page 44

```
 1      A   Okay.  I guess I would answer it that I know
 2  from my experience with dealing with this situation that
 3  the Department of Labor's standing is that you have to pay
 4  minimum wage for a week true up period, that's my
 5  understanding.
 6      Q   But P.A.M. isn't doing that?
 7      A   Excuse me?
 8      Q   Okay.  Your understanding is the DOL would say
 9  you have to pay minimum wage each week?
10      A   Yes, I would agree.
11      Q   But there's weeks P.A.M. is not doing that?
12      A   That's correct.
13      Q   And you don't know of any legal authority that
14  P.A.M. has that says we can do that or anything P.A.M. has
15  done to determine that they can do that?
16      A   I do not.
17      Q   And then in B1, and this gets confusing because
18  you're not here to tell me which time is compensable but
19  yet you're here to tell me about legal authority relating
20  to the compensability, so the first question is legal
21  authority relied upon in determining the compensability of
22  sleeper berth time, that's B1.  And I know you're not here
23  to testify about it, but do you know if P.A.M. considers
24  time a driver spends in the sleeper berth to be
25  compensable?
```

Page 45

```
 1      A   We do not.
 2      Q   You do not.  Okay.  P.A.M. does not.  And do you
 3  know what legal authority P.A.M. has to support that
 4  position?
 5      A   The Federal Motor Carrier Administration's law
 6  that says that's off duty time.
 7      Q   And do you -- and so does P.A.M. determine
 8  compensability by the Federal Motor Carrier Safety
 9  Administration standards versus -- is that how they
10  determine compensability of time?
11          MR. JONES:  Objection.  You're asking for a
12  legal question.
13      Q   (BY MR. SWIDLER)  Let me ask -- I'm going to
14  withdraw and try to say it a little better.
15          You understand the Federal Motor Carrier Safety
16  Administration designates in a broad picture certain time
17  that they say is on duty and certain time they say is off
18  duty, fair?
19      A   Fair.
20      Q   And is it P.A.M.'s position that the FMCSA's
21  definitions of on duty and off duty also determine
22  compensability of the time under federal and state minimum
23  wage law?
24          MR. JONES:  Object, you're asking for a legal
25  conclusion.  You can answer.
```

