# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| DAVID BROWNE, ANTONIO CALDWELL, and LUCRETIA HALL, on behalf of themselves and all those similarly situated, | ) ) ) ) | |
| | ) | Case No. 5:16-cv-05366, TLB |
| Plaintiffs, | ) ) | |
| | ) | |
| v. | ) ) | |
| P.A.M. TRANSPORT, INC., 297 West Henri de Tonti Blvd. Tontitown, AR 72770 | ) ) ) ) | |
| And | ) ) | |
| JOHN DOES, 1-10 c/o P.A.M. TRANSPORT, INC. 297 West Henri de Tonti Blvd. Tontitown, AR 72770 | ) ) ) ) ) | |
| Defendants. | ) | |

---

## BRIEF IN SUPPORT OF P.A.M. TRANSPORT, INC.'S MOTION TO DECERTIFY CONDITIONAL COLLECTIVE FLSA ACTION

---

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ iii

I.    STATEMENT OF FACTS ..........................................................................................1

    A.    Introduction ................................................................................................1

    B.    Relevant Operative Facts ...........................................................................2

        1.    Department of Transportation Regulation of Commercial Drivers ..........3

        2.    Department of Labor ("DOL") Regulations Specifically Applicable to Truck Drivers ...................................................................................6

        3.    Reporting and Logging Hours of Service through Qualcomm ................6

        4.    PAM's Policies for Logging Hours of Service .......................................7

    C.    The Present Motion to Decertify Collective Action .............................................9

II.   ARGUMENT ............................................................................................................10

    A.    The Legal Standard for Decertifying FLSA Collective Actions ......................10

    B.    The Collective Action Should Be Decertified Because the Named and Opt-In Plaintiffs Are Not Similarly Situated .......................................13

        1.    Plaintiffs' Initial Orientation Claim .....................................................13

        2.    Plaintiffs' Minimum Wage Claims for Solo and Team Drivers ............18

            a.    Facts regarding Named Plaintiffs .............................................19

            b.    Individual facts regarding Opt-In Plaintiffs .............................20

                (1)    Variation Among Plaintiffs In Falsifying Duty Status Logs ...............................................................20

                (2)    Variation Among Plaintiffs Regarding Pre-Trip Inspections ...................................................................24

                (3)    Variation Among Plaintiffs Regarding Fueling .............25

                (4)    Variation Among Plaintiffs Regarding Processing Paperwork ................................................................28

i

(5)     Variation Among Plaintiffs Regarding Providing
        "Security" While Off Duty or in Sleeper Berth ............. 29

(6)     Variation Among Plaintiffs Regarding Driving
        Time ........................................................................ 32

(7)     Variation Among Plaintiffs Regarding Time in
        Sleeper Berth ......................................................... 33

(8)     Variation Among Plaintiffs Regarding Loading,
        Unloading and Waiting for Loads ................................. 37

(9)     Variation Among Plaintiffs Regarding Short Breaks ..... 39

c.      These Claims Cannot Be Resolved Collectively ....................... 39

3.      Plaintiffs' Claim Regarding Use of Comdata Pay System .................... 41

4.      Plaintiffs' Claim Regarding Deductions ................................................. 45

5.      Even Under Plaintiff's View of Proper Compensation, Many Opt-
        In Plaintiffs Never Incurred An FLSA Minimum Wage Violation ........ 47

III.    CONCLUSION ........................................................................................................ 48

## **TABLE OF AUTHORITIES**

**Cases**

*Baxter v. Palmigiano*, 425 U.S. 308 (1976).............................................................................. 22

*Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791 (8th Cir. 2014), *aff'd* 136 S. Ct. 1036
    (2016) ...................................................................................................................................... 11

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) ....................................................................... 10

*Douglas v. First Student, Inc.*, 888 F. Supp. 2d 929 (E.D. Ark. 2012)...................... 11, 17, 39, 40

*Ezell v. Acosta, Inc.*, 2018 WL 3763834 (E.D. Mo., Aug. 8, 2018) ............................................. 40

*Fox v. Summit Kings Mine*, 143 F.2d 926 (9th Cir. 1944) ............................................................ 16

*Harris v. Express Courier Int'll, Inc.*, 2017 WL 5606751 (W.D. Ark., Nov. 21, 2017).. 10, 12, 14

*Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)........................................... 10, 12

*Kellar v. Summit Seating, Inc.*, 664 F.3d 169 (7th Cir. 2011) ..................................................... 16

*Lochridge v. Lindsey Mgmt. Co., Inc.*, 2013 WL 12069066, at *2 (W.D. Ark. Dec. 10,
    2013) ...................................................................................................................................... 11

*Mooney v. Aramco Servs. Co.*, 54 F.3d, 1207 (5th Cir. 1995)...................................................... 10

*Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233 (11th Cir. 2008)........................................ 10

*Porteous v. Capital One Serv. II, LLC*, 2018 WL 3469016 (D. Nev., July 17, 2018)................. 40

*Saleen v. Waste Mgmt., Inc.*, 2009 WL 1664451, at *8 (D. Minn. June 15, 2009) ..................... 12

*SEC v. Brown*, 658 F.3d 863 (8th Cir. 2011).............................................................................. 22

*Shady Grove Orthopedic Assoc., P.A. v. Allstate Insur. Co.*, 559 U.S. 393 (2010) .................... 12

*Smith v. Heartland Automotive Serv., Inc.*, 404 F. Supp. 2d 1144 (D Minn. 2005) .................... 10

*Watson v. Surf-Frac Wellhead Equip. Co., Inc.*, 2013 WL 5524122 (E.D. Ark., Oct. 3,
    2013) ...................................................................................................................................... 41

*White v. 14051 Manchester Inc.*, 301 R.F.D. 368 (E.D. Mo. May 30, 2014)............................... 11

*Zavala v. Wal-Mart Stores, Inc.*, 691 F.3d 527 (3d Cir. 2012).................................................... 11

**Regulations**

29 C.F.R. §785.33 ................................................................................................................ 6

29 C.F.R. §785.41 ................................................................................................................ 6

49 C.F.R. §395.1(a)(2) ........................................................................................................ 5

49 C.F.R. §395.1(g) ............................................................................................................ 5

49 C.F.R. §395.2 ................................................................................................................. 5

49 C.F.R. §395.3(a) ............................................................................................................ 4

49 C.F.R. §395.8 ................................................................................................................. 4

49 C.F.R. §395.9(e)(1) ........................................................................................................ 4

49 C.F.R. §395.9(f)(1) ........................................................................................................ 4

49 C.F.R.§395.8(a)(1) ......................................................................................................... 4

49 C.F.R.§395.8(a)(2) ......................................................................................................... 4

**Statutes**

29 U.S.C.§203(g) .............................................................................................................. 16

# I.    STATEMENT OF FACTS

## A.    Introduction

Named Plaintiffs David Browne, Antonio Caldwell and Lucretia Hall (collectively "the Named Plaintiffs") are former over-the-road truck drivers of Defendant P.A.M. Transport, Inc. ("PAM" or "Defendant") who claim that PAM did not pay them the minimum hourly wages that the Fair Labor Standards Act ("FLSA") requires.

PAM stipulated to a May 8, 2017 Order Conditionally Certifying Collective Action and Approving Notice.  (R. 19, 05/08/17 Order, Page ID #151-158).  The order provided:

> The instant matter shall be conditionally certified as a collective action, pursuant to §216(b) of the FLSA, on behalf of all over-the-road truck drivers who were employed by Defendant P.A.M. Transport, Inc. at any time from May 5, 2014 through May 5, 2017.[1]

(*Id*., Page ID #151).  Approximately 3000 over-the-road truck drivers filed consents to join this action ("the Opt-In Plaintiffs").

Phase I certification discovery ended August 31, 2018, during which PAM deposed all Named Plaintiffs and 30 Opt-In Plaintiffs.  Crucial differences between the Named and the Opt-In Plaintiffs, as well as factual differences among the Opt-In Plaintiffs themselves, preclude maintaining this matter as a collective action.  The Named and the Opt-In Plaintiffs are not similarly situated because there are fundamental differences concerning how they were compensated by PAM, how they recorded and reported their "compensable time" to PAM, how long it took them to perform various work duties, how many hours they worked at orientation and training, whether they were charged fees, whether they purposefully and falsely mis-logged their duty status in violation of PAM policies and Department of Transportation ("DOT") regulations, and a host of other factual disparities that require individual examination of each

---

[1] The period from May 5, 2014 to May 5, 2017 is referred to in this Brief as the "Collective Action Period."

Opt-In Plaintiff to determine whether, and to what extent, they incurred any FLSA violation. Because the Opt-In and Named Plaintiffs are not similarly situated, the Court should enter an order decertifying this matter as a collective action.

### B.   Relevant Operative Facts

PAM truck drivers are generally "paid [based on] a per-mileage rate for each mile driven." (R. 7, Complaint, ¶74). Drivers are required, both by PAM and by federal regulations, to account for and log all of their time in one of four categories: (1) "Off-Duty;" (2) "Sleeper Berth;" (3) "On-Duty, Driving'" and (4) "On-Duty, Not Driving." 49 C.F.R. §395.8(b). Every driver (including both "solo" and "team" drivers) must report his or her duty status, and each change of status, to PAM "via [PAM's] Qualcomm system to [PAM's] headquarters in Arkansas." (Complaint, ¶38). That is how Plaintiffs "reported their hours worked" to PAM, as well as their hours not worked. (*Id.*)

Many drivers testified they understood PAM would not pay them for time logged "off-duty" or in "sleeper berth." For example, Opt-In Plaintiff Ricotta testified:

> Q.      . . . Did anyone at P.A.M. ever tell you that you would be compensated for time spent that you were logged off duty?
> A.      No.
> Q.      . . . And did you have any expectation of whether you would be?
> A.      Not really. I know it's a trucking standard.
> Q.      . . . Did anybody at P.A.M. tell you that you'd be paid for time that you spent in a sleeper berth?
> A.      No.
> Q.      . . . Did you have any expectation that . . . you would be paid for time in a sleeper berth?
> A.      No.

Ricotta Dep. at 54 (Exhibit 1).[2]  *See also* Eischens Dep. at 140 ("Q. . . . Do you believe you should be paid for the time you were in the sleeper berth?  A. Oh, do I believe?  Do I

---

[2] Exhibits are attached to the Appendix filed with this Brief.

believe?  No."), and 83 ("Q. . . . [Y]ou don't think you should be compensated for that? . . . THE WITNESS: For being off duty, no.") (Exhibit 2); Hamdan Dep. at 103 ("Q.  Did anyone at PAM ever tell you that you would be paid for your time in the sleeper berth? . . . No.") (Exhibit 3); Garcia Dep. at 74-75 ("Q.  When you came to work for P.A.M., you knew that you would only get paid for miles driven; is that correct?  When the wheels were rolling?  A.  Yes.  Q.  And you agreed to that?  A. Yes.  Q.  And you knew when you took the job you would not be paid for time in the sleeper berth, correct?  A.  Yes.") (Exhibit 4).

The  gravamen of Plaintiffs' FLSA minimum wage claim is that "Plaintiffs were 'on duty' . . . continually for days and weeks on end" when driving their routes (R. 7, Complaint, ¶¶57 and 78), that the maximum number of compensable worktime hours that PAM can deduct in each 24-hour period "for time spent in a sleeper berth is 8 hours per day," and the "remaining amount of time (16 hours per day) is work time and must be paid, less bona fide meal periods." (R. 7, Complaint, ¶¶58 and 79).  Plaintiffs allege that PAM should have paid them the applicable federal minimum wage rate for 16 hours per day (R. 7, Complaint, ¶¶61, 63-65, 86-89), but their pay regularly fell "below the federal and state minimum wage" (R. 7, Complaint, ¶¶72 and 93) when they "did not drive enough miles to receive minimum wage by virtue of their mileage rate" (R. 7, Complaint, ¶¶71 and 92).

### 1.     Department  of  Transportation  Regulation  of Commercial Drivers

Although the Court held in its October 19, 2018 Memorandum Opinion and Order that "DOT regulations have little, if any, bearing" in defining terms under DOL regulations, commercial vehicle owners and drivers must nonetheless comply with them.  Regulations specifically regarding drivers' obligations on how to report duty status are summarized as follows.

DOT regulations govern a commercial driver's "on-duty" and "off-duty" status.  In any 24-hour period, a driver *must* be logged "off-duty" for at least 10 consecutive hours before driving, and can drive no more than 11 hours in the remaining 14-hour period.  A driver thus can be logged "on-duty" no more than 14 hours in such period.  Moreover, DOT regulations specifically provide that *all* time in a sleeper berth is *not* "on-duty" time.  Those regulations are set out below.

49 C.F.R. §395.8 ("Driver's record of duty status") provides that a motor carrier "must require each driver used by the motor carrier to record the driver's duty status for each 24-hour period," and a "driver operating a commercial motor vehicle must . . . [r]ecord the driver's duty status . . .."  §395.8(a)(1) and (2) .

49 C.F.R. §395.8(b) provides:

> The duty status shall be recorded as follows:
> (1) "Off duty" or "OFF."
> (2) "Sleeper berth" or "SB" (only if a sleeper berth is used).
> (3) "Driving" or "D."
> (4) "On-duty not driving" or 'ON."

49 C.F.R. §395.9(e)(1) provides that "[n]o *driver* or motor carrier may make a false report in connection with duty status," and "[d]*rivers* shall keep their records of duty status current to the time shown for the last change of duty status."  §395.8(f)(1) (emphasis added).

49 C.F.R. §395.3(a) sets a minimum number of hours drivers must be "off duty" in every 24-hour period.

> . . . [N]o motor carrier shall permit or require any driver used by it to drive a property-carrying commercial motor vehicle, nor shall any such driver drive a property-carrying commercial vehicle . . . unless the driver complies with the following requirements:
> (1)    *Start of work shift*.  A driver may not drive without first taking 10 consecutive hours off duty.
> (2)    *14-hour period*.  A driver may drive only during a period of 14 consecutive hours after coming on duty following 10 consecutive hours

off duty.  The driver may not drive after the end of the 14-consecutive-hour period without first taking 10 consecutive hours off duty.

(3)    *Driving time and rest breaks.*

    (i)    *Driving time.*  A driver may drive a total of 11 hours during the 14-hour period specified in paragraph (a)(2) of this section.

    (ii)    *Rest breaks.* . . . [D]riving is not permitted if more than 8 hours have passed since the end of the driver's last off-duty or sleeper-berth period of at least 30 minutes.

49 C.F.R. §395.1(g) applies to sleeper berth trucks and provides:

. . . A driver who operates a property-carrying commercial motor vehicle equipped with a sleeper berth . . .

    (A)    Must, before driving, accumulate

        (1)    At least 10 consecutive hours off duty;

        (2)    At least 10 consecutive hours of sleeper-berth time;

        (3)    A combination of consecutive sleeper-berth and off-duty time amounting to at least 10 hours; or

        (4)    The equivalent of at least 10 consecutive hours off duty if the driver does not comply with [the three preceding] paragraph[s] of this section;

    (B)    May not drive for more than [11 hours in a 14-hour period] . . . after coming on duty following one of the 10-hour off-duty periods . . .; and

    (C)    May not drive more than [11 hours during a period of 14 consecutive hours after coming on duty] following one of the 10-hour off-duty periods specified in paragraphs (g)(1)(i)(A) through (4) of this section; and

    (D)    Must exclude from the calculation of the 14-hour period in §395.3(a)(2) any sleeper-berth period of at least 8 but less than 10 consecutive hours.

Lastly, 49 C.F.R. §395.2 specifically defines what is, and what is not, "on-duty time":

*On-duty time* means all time from the time a driver begins to work or is required to be in readiness to work until the time the driver is relieved from work and all responsibility for performing work.  *On-duty time* shall include:

    (1)    All time at a plant, terminal, facility, or other property of a motor carrier or shipper, or on any public property, waiting to be dispatched, unless the driver has been relieved from duty by the motor carrier;

    (2)    All time inspecting, servicing, or conditioning any commercial motor vehicle at any time;

    (3)    All driving time as defined in the term *driving time*;

    (4)    All time in or on a commercial motor vehicle, other than:

        (i)    Time spent resting in or on a parked vehicle . . .;

        (ii)    Time spent resting in a *sleeper berth*; or

5

> (iii)    Up to 2 hours riding in the passenger seat of a property-carrying vehicle moving on the highway immediately before or after a period of at least 8 consecutive hours in a sleeper berth.

(italics in original).

## 2.    Department of Labor ("DOL") Regulations Specifically Applicable to Truck Drivers

DOL regulation 29 C.F.R. §785.22 generally provides in relevant part:

> Where an employee is required to be on duty for 24 hours or more, the employer and employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep.  If sleeping period is of more than 8 hours, only 8 hours will be credited.

Under DOL 29 C.F.R. §785.33, the "principles which apply in determining whether or not time spent traveling is working time depend upon the kind of travel involved."

DOL regulation 29 C.F.R. §785.41 applies specifically to the kind of travel the Plaintiff truck drivers engage in, and provides in relevant part:

> Any work which an employee is required to perform while traveling must, of course, be counted as hours worked.  *An employee who drives a truck* . . . or an employee who is required to ride therein as an assistant or helper, *is working* while riding, *except* during bona fide meal periods or *when he is permitted to sleep in adequate facilities furnished by the employer*.[3]  (emphasis added).

## 3.    Reporting and Logging Hours of Service through Qualcomm

PAM's only knowledge of when, and for how long, a driver is working is from the driver's reports of his or her work activities to PAM through each driver's electronic logging device.  Pursuant to federal regulations, all Plaintiffs during the Collective Action Period

---

[3] As a matter of law, truck sleeper berths are "adequate facilities."  *See* U.S. Department of Labor Field Operations Handbook, Chapter 31 Hours Worked, Section 31b09(a) (Dec. 15, 2000) (sleeper berths "are regarded as adequate sleeping facilities for the purpose of . . . [section] 785.41[.]")  (http://www.dol.gov./whd/FOH).

recorded and reported their hours of service status to PAM through an electronic logging device known as "Qualcomm."  (PAM Driver's Manual at 93) (Exhibit 5).  It automatically records "Driving" status when the truck moves,[4] and for the other three statuses the operator must affirmatively select "On-Duty Not Driving," "Off-Duty" or "Sleeper Berth."

### 4.      PAM's Policies for Logging Hours of Service

PAM's Driver's Manual (Exhibit 5) sets out PAM's policies and provides that "[t]he performance standards for uniform rules and regulations outlined in this manual are mandatory and govern the actions and status of the drivers of all [PAMs] divisions . . .."  (*Id*. at Preface). Moreover, "[o]nly the Chief Executive Officer or his representative can amend, modify or cancel these policies in writing."  (*Id*. at 1).

The "[f]ailure to meet DOT guidelines . . . may result in automatic termination of any driver" at PAM.  (*Id*. at 5).  Every driver certified as a condition of employment with PAM that they received, among other documents, PAM's Driver's Manual and the Federal Motor Carrier Safety Regulation Handbook, and that they "agree to comply with all federal regulations and company policies and procedures contained therein."  (*Id*. at 15).

PAM's policies for how drivers must log their hours of service are stated in the Driver's Manual, which provides that '[i]t is a company requirement that all drivers shall comply with Part 395 of the Federal Motor Carrier Safety Regulations."  (PAM Driver's Manual, at 83) (Exhibit 5).

The Driver's Manual sets out PAM's policies regarding how to log time for various work activities as follows:

---

[4] "Idle driving" occurs when a truck is driven below approximately 5 mph.  In that case, the Qualcom does not automatically switch to "Driving" status.

(a)      **Logging Pre-Trip Inspections**

PAM's policy for logging pre-trip inspections is as follows:

> A driver must complete a pre-trip inspection prior to placing his truck and/or truck and trailer in operation.  *This time must be recorded as on duty time.  The amount of time shown is the amount of time the inspection takes*.  Keep in mind a proper pre-trip for a truck and trailer has 108 points to check.  You are required to log the amount of time it takes you to do the pre-trip (log it as you do it).  Under no circumstances can you show less than fifteen minutes.

(PAM Driver's Manual, at 93) (Exhibit 5) (emphasis added).

It is contrary to PAM's policy to log and report any time performing a pre-trip inspection as "off duty" or "sleeper berth."

(b)      **Logging Fuel Stops, Drop and Hooks,[5] Loading and Unloading, Paperwork, And Similar "On-Duty, Not Driving" Activities**

PAM's policy for on-duty, not driving activities as follows:

> How do you log loading and unloading?  *The entire time spent must be logged on-duty not driving* (waiting to back in, paperwork, pulling out, etc.). If you physically load or unload the truck, show the entire time on line #4.  How much time needs to be logged depends on how much time was taken to load or unload.  **In other words, log it as you do it.**
>
> On duty time will also cover all fuels, drops, hooks, accidents, D.O.T. inspections, being towed, calling in breakdowns, etc.  *On duty is any time you are required by the company to complete work*.
>
> On duty time does not include any time resting in a parked vehicle.  For team situations in a moving vehicle, 2 hours in passenger seat immediately before or after 8 consecutive hours in the sleeper berth may be considered as off duty time.

(*Id*. at 84) (italics added) (bold in original).

It is contrary to PAM's policy to log and report any of those activities, or any work activity, as "off-duty" or "sleeper berth."

---

[5] A "drop and hook" is where a driver drops off a trailer at a destination and picks up another trailer in its place.

(c)    **Logging Driving Time**

Pam's policy for logging driving time is as follows:

<u>LOGGING DRIVE TIME WHILE OPERATING VEHICLE</u>

> All drive time is to be logged as driving.  This includes being stuck
> in traffic behind an accident.  Idle time can cause the [Qualcomm]
> unit to default your duty status to On-Duty, which must be changed
> to drive time.

(PAM Driver's Manual at 93) (Exhibit 5).

It is contrary to PAM's policy to log and report any time spent driving, even while not moving in traffic, as "off-duty" or "sleeper berth."

## C.    The Present Motion to Decertify Collective Action

Phase I discovery has shown fundamental and extreme differences regarding how drivers logged and reported their duty status to PAM, whether they complied with, or expressly disregarded, PAM's policies and DOT regulations for logging duty status, and many other factual differences, detailed below, that require individual consideration of each Opt-In Plaintiff to determine *when* they were actually performing compensable work activity, *how long* they performed compensable work activity, and whether the per-mile pay they received was ever less than the hourly federal minimum wage when compared to the number of compensable hours worked.  That individual consideration necessarily precludes collective treatment of their alleged claims.  In short, the Named and Opt-In Plaintiffs are not similarly situated, none of the claims stem from any company-wide policy or practice of PAM, and the Court should therefore decertify the collective action.

## II.    ARGUMENT

### A.    The Legal Standard for Decertifying FLSA Collective Actions

Certifying a collective action under the FLSA is a two-step process which this Court

recently summarized in *Harris v. Express Courier Int'll, Inc*., 2017 WL 5606751 (W.D. Ark.,

Nov. 21, 2017), as follows:

> The first determination is made at the so-called "notice stage."  At the notice
> stage, the district court makes a decision – usually based only on the pleadings
> and any affidavits which have been submitted – whether notice of the action
> should be given to potential class members.
>                                    * * *
> The second determination is typically precipitated by a motion for
> "decertification" by the defendant usually filed after discovery is largely complete
> and the matter is ready for trial.   At this stage, the court has much more
> information on which to base its decision, and makes a factual determination on
> the similarly situated question.  If the claimants are similarly situated, the district
> court allows the representative action to proceed to trial.  If the claimants are not
> similarly situated, the district court decertifies the class, and the opt-in plaintiffs
> are dismissed without prejudice.   The class representatives – i.e. the original
> plaintiffs – proceed to trial on their individual claims.

*Id*. at *2 (quoting *Mooney v. Aramco Servs. Co*., 54 F.3d, 1207, 1213-14 (5th Cir. 1995),

*overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)).

Because PAM stipulated to conditional certification and Phase I discovery is complete,

this case is now at the second stage.  *Harris* described the standard for evaluating a motion to

decertify at the second stage as follows:

> [At] the so-called "decertification" phase[,] [w]ithout making any decisions as to
> the merits of the case, the Court will be tasked with looking more critically at
> whether the collective-action mechanism is an effective way to resolve the claims.
> See *Smith v. Heartland Automotive Serv., Inc*., 404 F. Supp. 2d 1144, 1148 (D
> Minn. 2005).  In making this assessment, the Court must examine the purposes of
> §216(b) actions under the FLSA, which are:   "(1) reducing the burden on
> plaintiffs through the pooling of resources, and (2) efficiently resolving common
> issues of law and that that arise from the same illegal conduct."   *Morgan v.
> Family Dollar Stores, Inc*., 551 F.3d 1233, 1264 (11th Cir. 2008) (citing
> *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).  If the Court
> determines that the case is not suitable for collective-action disposition, the

collective action will be decertified, and the merits decision will proceed on an individual basis, rather than a classwide basis.

*Id*. at *3.

The court's "obligation at the second stage of the FLSA certification process is to determine whether the Plaintiffs and putative class members are factually similarly situated, based on the evidence gathered in discovery." *Id*. at *4. In short,

> To be similarly situated, Plaintiffs must adduce evidence to show that they were all victims of a company-wide decision, plan, or policy that violated the FLSA.

*Id. See also White v. 14051 Manchester Inc*., 301 R.F.D. 368, 376 (E.D. Mo. 2014) ("the Court decertifies this action because it would be untenable for this case to proceed on a collective basis when there is no uniform policy, nor shared experience and, consequently, representative testimony could not be presented regarding any shared experience").

To determine whether plaintiffs "suffer from a single, FLSA-violating policy" and are therefore "similarly situated," a "court may consider '(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations'." *Bouaphakeo v. Tyson Foods, Inc*., 765 F.3d 791, 796 (8th Cir. 2014), *aff'd* 136 S. Ct. 1036 (2016).

This analysis requires comparing the differences and similarities between the Named Plaintiffs' circumstances, and those of the Opt-In Plaintiffs, that are relevant to the claims. *Douglas v. First Student, Inc*., 888 F. Supp. 2d 929, 933 (E.D. Ark. 2012). Plaintiffs must demonstrate by a preponderance of the evidence that there is an efficient and manageable method to try the case as a collective action.[6]

---

[6] *See Lochridge v. Lindsey Mgmt. Co., Inc*., 2013 WL 12069066, at *2 (W.D. Ark. Dec. 10, 2013) (citing *Zavala v. Wal-Mart Stores, Inc*., 691 F.3d 527, 536 (3d Cir. 2012), for proposition that plaintiffs' burden of proof at second stage of FLSA inquiry and concluding preponderance of evidence is correct burden of proof.)

Plaintiffs are obligated to do more than identify common evidentiary themes or policies. They must explain how they will introduce evidence to establish the claims of *each* of the 3,000 Opt-In Plaintiffs.  Like a class action, a collective action under 216(b) is simply a form of joinder that "enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits."  *Shady Grove Orthopedic Assoc., P.A. v. Allstate Insur. Co*., 559 U.S. 393, 408 (2010); *cf. Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989) ("[s]ection 216(b)'s affirmative permission for employees to proceed on behalf of those similarly situated" provides courts with "procedural authority to manage the process of joining multiple parties in a manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure").  *See also Saleen v. Waste Mgmt., Inc*., 2009 WL 1664451, at *8 (D. Minn. June 15, 2009) ("a collective action is simply a procedural device aimed at facilitating, in an efficient and cost effective way, the adjudication of numerous claims in one action").

*Harris* explained that "[t]o be similarly situated, Plaintiffs must adduce evidence to show that they were all victims of a company-wide decision, plan, or policy that violated the FLSA," and if "there are too many differences among class members, particularly with respect to how they were treated and paid . . ., then . . . it will be inefficient, if not impossible, to attempt to try all the class members' claims at once in a collective action."  2017 WL 5606751 at *4-5.

In granting the defendants' motion to decertify, *Harris* held that "the liability issues cannot be resolved on a classwide basis without significant individual inquiry." The "Plaintiffs [did] not present the Court with a feasible method for establishing which, if any, class member was paid below the minimum wage . . . in violation of the FLSA," and "[i]nstead multiple individual inquiries would be needed in order to determine how many hours each [plaintiff]

worked when driving for [defendant], and how much each [plaintiff] was paid for that work." *Id.* at *6. Moreover, calculating the number of hours the [plaintiffs] worked per week would necessitate individual inquiries," and "[t]rying to reconstruct mileage logs and convert the work-only mileage into an hourly rate of pay . . . would require individual proof and would likely be a highly speculative endeavor." *Id.*

In the same way, the present case requires individual inquiry to determine how many hours per week Opt-In Plaintiffs spent performing compensable work, an individual inquiry whose difficulty is compounded by the fact that many Opt-In Plaintiffs openly admitted that they falsely reported their duty status. Indeed, as set out *infra*, some Opt-In Plaintiffs conceded it would be impossible to recreate whether they were performing compensable work when they falsely recorded time as "off-duty" or in "sleeper berth."

### B.   The Collective Action Should Be Decertified Because the Named and Opt-In Plaintiffs Are Not Similarly Situated

Plaintiffs' Complaint sets out the specific claims that they assert can be properly litigated as a collective action. (R. 7, Complaint, ¶21).[7] The factual disparities between the Named and the Opt-In Plaintiffs regarding each claim are dealt with as follows:

### 1.   Plaintiffs' Initial Orientation Claim

Plaintiffs allege in their "Initial Orientation" claim that PAM violated the FLSA by failing "to compensate its newly hired drivers at least the federal minimum wage for all compensable time worked during its initial orientation program." (R. 7, Complaint, ¶21). Only Named Plaintiff Caldwell purports to represent those Opt-In Plaintiffs. (R. 7, Complaint, ¶22(a)). The Complaint purports to allege a company-wide practice in that Caldwell "was

---

[7] The same specific claims were also set in the Notice attached to the May 8, 2017 Order Conditionally Certifying Collective Action and Approving Notice. (R. 19, 05/08/17 Order, Page ID # 155).

required to attend a multi-day orientation program in Arkansas" where he "attended orientation classes which lasted approximately 10 hours per day." (*Id.*, ¶51).   The Complaint alleges that under PAM's practice or policy, he was "required to engage in other compensable work during this period, including completing homework outside of class," and that he "was not paid at least minimum wage for all of the hours he worked during the initial orientation program." (*Id.*).

Discovery has dis-proven the allegation of a company-wide requirement that new drivers must perform work outside of class.   Plaintiffs' Initial Orientation claim is not based on any "company-wide decision, plan or policy that violated the FLSA," *Harris*, *supra*, at *4.   It instead depends on the particular facts of each Opt-In Plaintiff about whether, and for how long, they worked beyond the 8-hour workday at orientation.

PAM's Associate Vice President of Safety, Andrew Christensen, was a Rule 30(b)(6) witness who testified that for new drivers (*i.e.*, those with no prior driving experience) the orientation "program lasted Monday through Friday," for which drivers were paid "$300 a week, and then they also received $25 each evening, and then on Friday they would receive another [$]200."   Christensen Dep. at 14 (Exhibit 6).   Orientation was eight working hours per day, and included a 1 hour lunch break.   Mr. Christensen testified:

| | |
|---|---|
| Q. | How many hours per day is orientation? |
| A. | It typically runs eight [am] to five [pm]. |
| Q. | That would be nine hours per day? |
| A. | There would be a one hour lunch break in that time period. |
| Q. | . . . [W]hat occurs during the lunch break? |
| A. | Drivers are free to . . . roam about.   We also provide them lunch while they're here . . . . |

Christensen Dep. at 21 (Exhibit 6).

Orientation for new drivers thus involved 5 8-hour workdays for which PAM paid a total of $625, which is an hourly rate of $15.63.   Even assuming the $300 payment alone, drivers were paid an hourly rate of $7.50, which is *over* the applicable FLSA minimum wage of $7.25.

Caldwell came to PAM as an experienced driver and testified that his orientation was only 3 days, and each day "was at least eight hours" with a lunch break and morning and afternoon breaks.  Caldwell Dep. at 70-72 (Exhibit 7).  Caldwell also testified that he "would put an hour or two hours . . . each of those two days, three days" after orientation "studying outside of class." (*Id.* at 102-103). But contrary to the Complaint's allegation, Caldwell *conceded that PAM did not require him to study or put those hours in*.  Caldwell Dep. at 103 ("Q.  Did anybody require you to do that?  A.  No.") (Exhibit 7).

As Caldwell conceded, and contrary to the Complaint, PAM did not have a company-wide policy or requirement for orientation attendees to perform homework, or any other work, after the regular 8-hour day at orientation.

Any Opt-In Plaintiff's ability to demonstrate an FLSA minimum wage violation for the initial orientation thus requires an individual analysis of each Opt-In Plaintiff's situation, facts and circumstances, and those situations, facts and circumstances varied widely among the Opt-In Plaintiffs.

First, several Opt-In Plaintiffs who worked for PAM as drivers during the Collective Action Period nonetheless first became employed, and therefore attended orientation, ***before*** May 5, 2014.  *See, e.g.,* Miller Dep. at 113 ("Q. . . . When did you do orientation at P.A.M.?  A. I'm thinking 2011.") (Exhibit 8); Magallon Dep. at 8-9 (Exhibit 9); Mackey Dep. at 32 (Exhibit 10); Freeman Dep. at 15-16 (Exhibit 11); Ogle Dep. at 19 (Exhibit 12); Trame Dep. at 6 (Exhibit 13).  For them, and others that may be like them, PAM has the defense that any alleged FLSA minimum wage Initial Orientation claim is time-barred because the alleged failure to pay minimum wage occurred before May 5, 2014.  Thus, even though Opt-In Plaintiffs may have worked for PAM during the Collective Action Period, whether or not each Opt-In Plaintiff has a

viable Initial Orientation claim depends on when they attended orientation, and therefore requires individual consideration of their factual circumstances.

Second, Plaintiffs' Initial Orientation claim depends on whether, and for how long, attendees allegedly worked beyond the regular 8-hour workday and, if they did, whether they informed PAM of such work.[8]  Although the Complaint alleges Caldwell "attended orientation classes which lasted approximately 10 hours per day" (R. 7, Complaint ¶51, Page ID #13), he testified (consistently with Mr. Christensen) that orientation classes were in fact only 8 hours per day (Caldwell Dep. at 70-72 (Exhibit 7)), but that he did homework for 1-2 hours per day afterward.  (*Id.* at 102-103).  But he is not similarly situated to other Opt-In Plaintiffs who testified they did no homework.

Of the deposed Opt-In Plaintiffs who attended orientation during the Collective Action Period, several testified that they, *unlike Caldwell*, **did no homework after the 8-hour workday**.  *See* Acreman Dep. at 24 ("Q.  So while you were at orientation did you do any homework at night?  A.  No.") (Exhibit 14); Gonzales Dep. at 16 ("Q. . . . [D]uring orientation, did you do any homework at night?  A.  I don't think so.") (Exhibit 15); Lark Dep. at 16 ("No, they did not have homework assignments.") (Exhibit 16); Hamdan Dep. at 31 ("Q.  Did you have any homework?  In other words, did you study after [orientation]?  A. No.")  (Exhibit 3).

---

[8] PAM did not require orientation attendees to work after the 8-hour workday, and there is no evidence from any Named or Opt-In Plaintiff that they ever informed PAM they were doing so. PAM therefore did not "suffer or permit" any Named or Opt-In Plaintiff to work beyond the 8-hour workday at orientation. 29 U.S.C.§203(g) ("'[e]mploy' includes suffer or permit to work"). The "words 'suffer' and 'permit' as used in the statute mean 'with the knowledge of the employer.'" *Fox v. Summit Kings Mine*, 143 F.2d 926 (9th Cir. 1944).  PAM cannot be liable for time Plaintiffs allegedly worked, but did not report to PAM.  The "FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about." *Kellar v. Summit Seating, Inc*., 664 F.3d 169, 177 (7th Cir. 2011).

Other Opt-In Plaintiffs testified they **could not recall doing homework after the 8-hour workday**, which would preclude them from proving that they worked additional time beyond the 8-hour workday without compensation. *See* Chapman Dep. at 81 ("Q. . . . [D]uring orientation, did you do homework at night?  Did you look at some of the paperwork at night?  A.  I don't recall.")  (Exhibit 17); DeWitt Dep. at 20 ("Q. . . . [Y]ou don't recall doing any work outside of the class.  You just remember being in class and the driving instruction you received while you were in orientation.  A. Yes.") (Exhibit 18)).  *See also* Ricotta Dep. at 17 (Exhibit 1); S. Jones Dep. at 30 (Exhibit 19); Foster Dep. at 20-21 (Exhibit 20).

Still others testified that even if they did homework after the 8-hour workday, it was **only 1/2 to 1 hour**, and PAM did not require it.  *See* Bochart Dep. at 16-17 ("Q. . . . [D]uring orientation, did you have any homework to do?  Did you read anything at night? . . . A.  There wasn't required homework, but I took it seriously so I did study.") (Exhibit 21); Freeman Dep. at 17-18 (after class she spent "[p]robably maybe an hour reading through [orientation material]") (Exhibit 11); Campbell Dep. at 14-15 ("Q. . . . How much time would you estimate you spent actually doing work, homework and that sort of thing, outside the classroom during orientation? . . . A. Maybe an hour, half an hour a day.") (Exhibit 22); Hampton Dep. at 30-31 ("maybe a half hour to an hour at night I would be going over something" after orientation) (Exhibit 23).

PAM thus has defenses to the Initial Orientation claim that are individual to the circumstances of each Opt-In Plaintiff, based on whether each Opt-In Plaintiff did, or did not, or does not recall, performing homework after the 8-hour workday during orientation.  Those individual defenses preclude collective treatment.  *Douglas*, 888 F. Supp 2d at 936 (granting motion to decertify "due to the disparate facts of each plaintiff and [defendant's] individualized

defenses, it would be very difficult to appropriately adjudicate the claims of the named plaintiffs and the approximately 256 opt-in plaintiffs collectively" because "[e]ach plaintiff['s] case requires consideration of different background facts and different testimony based each driver's activities").

Lastly, Named Plaintiff Caldwell, the only representative for the Initial Orientation claim, is not similarly situated to the Opt-In Plaintiffs he purports to represent because PAM has defenses to Caldwell different from many other Opt-In Plaintiffs.  As set out in PAM's Motion to Dismiss Named Plaintiff Caldwell (R. 56, 05/25/18, Page ID #3398-3420), Caldwell's failure to timely disclose the claims in this action in his pre-existing bankruptcy action estops him from maintaining those claims here.[9]

Because Plaintiffs' Initial Orientation claim requires an examination of each Opt-In Plaintiff's individual circumstances at initial orientation, it cannot be maintained as a collective action, and should be decertified.

### 2.    Plaintiffs' Minimum Wage Claims for Solo and Team Drivers

The Named and Opt-In Plaintiffs are not similarly situated with respect to Plaintiffs' Team and Solo Driver Claims (Causes of Action 2 and 3), or Travel Time Claim (Cause of Action 4).

The Named Plaintiffs claim they were performing compensable work activities around the clock, "for days and weeks on end" while they were on the road away from home, even while in the sleeper berth or logged "off-duty," because they had to drive the truck, ride in the truck

---

[9] The Court's October 19, 2018 Memorandum Opinion and Order denied without prejudice PAM's Motion to Dismiss Named Plaintiff Caldwell, holding that such motion is more properly considered based on matters outside the pleadings.  For purposes of the present Motion to Decertify, the availability of that unique defense renders Caldwell not similarly situated to other Opt-In Plaintiffs.

while it moved, wait for cargo to be loaded or unloaded, fuel the truck, or remain with or near the truck to "help protect" the truck and cargo.  Plaintiffs claim they even performed compensable work while logged off-duty or in sleeper berth.  (R. 7, Complaint, ¶¶59 and 85).

### a.    Facts regarding Named Plaintiffs

Named Plaintiffs Hall and Browne purport to represent Team Driver claimants.  (R. 7, Complaint, ¶53).

With respect to logging duty status, Named Plaintiff Hall testified that pre-trip inspections took 30 minutes or longer, but that she always logged only 15 minutes as "on-duty" regardless of the actual time it took (Hall Dep. at 33 (Exhibit 24)), contrary to PAM's policy. While fueling, she logged 15 minutes "on-duty" regardless of how long it actually took (*id*. at 36-37), again contrary to PAM's policy.  She logged breaks less than 20 minutes as "off-duty," and conceded that PAM's policy was to log such breaks "on-duty." (*Id.* at 37-39.)

With respect to the adequacy of a truck's sleeper berth, Hall testified that "for what they were," they "were adequate" (Hall Dep. at 40 (Exhibit 24)), that she did nothing "in the sleeper berth besides sleeping," that she "tried to get every minute of sleep [she] could get," and that in the berth she was free to use her time for her own purposes and was "free to do anything" within it.  (*Id.* at 40-41, 79 and 97).

Hall testified that no one from PAM told her that she "had to stay with your truck 24/7." Hall Dep. at 78 (Exhibit 24).

Named Plaintiff Browne, who was Hall's father and team driving partner, testified that he also logged only 15 minutes "on-duty" for pre-trip inspections, even if it in fact took 30 or 40 minutes.  Browne Dep. at 113 (Exhibit 25).  He knew it was PAM's policy (and DOT regulation) to log the actual time as "on-duty."  (*Id*. at 120-121).  He also logged waiting to load or unload as "off-duty" (*id*. at 76), and short breaks as "off-duty" (*id*. at 75), contrary to PAM's policy.

19

Browne testified that in the sleeper berth he slept, played games, read or watched movies. (*Id*. at 80). No one from PAM told him he must be with the truck 24/7, nor was there ever any written instruction to do so. (*Id*. at 106-107).

Named Plaintiff Caldwell testified that he logged only 15 minutes "on-duty" for pre-trip inspections, regardless of the actual time it took, which he said was always over one hour. Caldwell Dep. at 34-35 (Exhibit 7). He logged only 15 minutes for fueling as "on-duty," and the rest of the time it took to fuel as "off-duty," to "try to save some time on my driving" limit of 11 hours. (*Id*. at 43). He said fueling could take up to one hour. (*Id*. at 41).

Caldwell testified that the sleeper berth was not an adequate sleeping facility, that he only got 5 hours of rest per night, that he did nothing in the berth but sleep, and that he was free to use time in the berth for his own purposes, at least within the confines of the sleeper berth. Caldwell Dep. at 52, 64, 100 and 146 (Exhibit 7).

> **b.    Individual    facts    regarding    Opt-In Plaintiffs**

How Opt-In Plaintiffs logged and reported their duty status to PAM, and how long it took them to perform various work activities, varied wildly, both as compared to the Named Plaintiffs, and as compared with each other.

> **(1)    Variation   Among   Plaintiffs   In Falsifying Duty Status Logs**

Many Opt-In Plaintiffs testified they **never falsified their duty status logs to PAM**. Acreman Dep. at 72 ("Q. While you were at PAM did you ever intentionally falsify your logs? A. No.") (Exhibit 14). *See also* Ricotta Dep. at 24 (Exhibit 1); Sutton Dep. at 53-55 (Exhibit 27); Chapman Dep. at 52-53 (Exhibit 17); Freeman Dep. at 43 (Exhibit 11); Mackey Dep. at 56 (Exhibit 10).

However, many other Opt-In Plaintiffs admitted that they **routinely falsified their duty status logs to PAM**, falsely reporting when they were, or were not, working.  Opt-In Plaintiff Escobedo testified:

> Q.      You didn't falsify your logs at P.A.M., I assume?
>                                      * * *
> THE WITNESS:  Yes, I did.
>                                      * * *
> Q.      . . . You understand it was against company policy to falsify your driver
>         logs?
>                                      * * *
> THE WITNESS:  Yes.
> Q.      (BY MR. KLETT):  So I take it from your testimony, even though you
>         knew it was against the company's policy to falsify your driver logs, you
>         did it anyway?
> A.      Correct.
> Q.      And in what ways did you falsify your driver logs?
> A.      Logging different statuses while doing other things.
> Q.      Such as what?
> A.      Being in the sleeper and doing my pre-trip.  . . .Being in sleeper and
>         checking the truck.  Checking the seal, the trailer.  . . . Not changing my
>         status while I was out of the truck while my teammate was fueling.

Escobedo Dep. at 25-27 (Exhibit 28).  Many other Opt-In Plaintiffs also admitted they falsified their logs.  *See* Pleasant Dep. at 19 ("Q. Did you ever falsify your log entries? A. The answer to that is yes.") (Exhibit 29); Beck Dep. at 31 ("Q. Did you log your activities and times truthfully and accurately at  . . . P.A.M.? . . . THE WITNESS: No, I didn't.") (Exhibit 30); Foster Dep. at 29-32 (Exhibit 20).  *See also* Miller Dep. at 57-62 (Exhibit 8); Eischens Dep. at 17-20 (Exhibit 2); McCrea Dep. at 38 (Exhibit 31).

Other Opt-In Plaintiffs pleaded their Fifth Amendment right against self-incrimination when asked if they falsified their duty status logs.[10]  *See* Galvan Dep. at 64 (Exhibit 32) ("Q. Did

---

[10] The Court's September 18, 2018 Order expressly stated "that although the Court will not compel any plaintiff to provide self-incriminating testimony if he has invoked his or her Fifth Amendment right not to do so, the Court will consider and may grant any request from PAM that an adverse inference be drawn from any such invocation."  (R. 79, Sept. 18, 2018 Order at 1-2,

Footnote continued on next page …

you ever falsify your driver log?. . . THE WITNESS:  I plead the Fifth.").  Galvan pleaded the

Fifth to the following questions:  "Can you identify all occasions when you falsified a record of

your duty status?," "Were there particular activities that would cause you to falsify your driver

records at P.A.M.?," "Did you ever advise anyone at P.A.M. that you had falsified your driver

records?," and many other questions about how and when he falsified his logs to PAM.  Galvan

Dep. at 74-75, 80-83, 88-90, 92-93, and 97-98 (Exhibit 32).  Other Opt-In Plaintiffs pleaded the

Fifth when asked if they falsified their log records to PAM.  *See* Foster Dep. at 32-35 (Exhibit

20).

PAM's policy was that drivers comply with DOT logging requirements, and PAM never

instructed them to falsify their logs, or violate DOT regulations or PAM policies.  *See* B. Jones

Dep. at 120 ("Q. . . . [D]id anybody in management at PAM encourage you to falsify your logs

so you could drive longer and get more miles?  A. No, sir.") (Exhibit 33); Magallon Dep. at 26

("Q. . . . [D]id anyone at P.A.M. ever suggest to you that you falsify your logs?  A. No.")

(Exhibit 9); Pleasant Dep. at 19 ("Q. Did anybody from P.A.M. . . . ever tell you to falsify your

log entries?  A. Nobody ever told me that.") (Exhibit 29); Galvan Dep. at 80 (Exhibit 32);

Freeman Dep. at 65 (Exhibit 11); Beck Dep. at 36 (Exhibit 30); Chapman Dep. at 97-98 (Exhibit

17); Garcia Dep. at 36 (Exhibit 4); Hamdan Dep. at 58-59 (Exhibit 3); Hampton Dep. at 44-45

(Exhibit 23); Sutton Dep. at 52-53 (Exhibit 27).

Opt-In Plaintiff Hamdan estimated he falsely mischaracterized 15-20 hours per week of

"off duty" time.  Hamdan Dep. at 68 (Exhibit 3).  Others testified it would be impossible to tell

---

Footnote continued from previous page …

Page ID #4016-17).  The Court should draw such an adverse inference in this civil matter.  *See*
*Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976); *SEC v. Brown*, 658 F.3d 863 (8th Cir. 2011)
("[t]he Fifth Amendment permits an adverse inference when the privilege against self-
incrimination is claimed by a party in a civil case").

how often they falsified their duty status.  *See* DeWitt Dep. at 96-99 (Exhibit 18).  Opt-In

Plaintiff Miller testified:

> Q.      . . . [Y]ou could not tell me any particular log entry that was falsified, as
>         opposed to the ones that you did correctly?
>
>                                        * * *
>
> A.      Correct.
>
>                                        * * *
>
> Q.      . . . [T]here would be no way for us to go and quantify any of that [i.e., amount of
>         falsely-logged time]?
>
> A.      Correct.

Miller Dep. at 83-84 (Exhibit 8).  (*Id.* at 57-62, 82-85).

From the sample of only 30 Opt-In Plaintiffs, many candidly admitted that they falsely

reported their duty status in violation of PAM's policy.  Determining which of the *3000* Opt-In

Plaintiffs similarly falsified their duty status, and determining how much compensable time they

in fact work (assuming it could even be determined), requires individual scrutiny and

consideration of each Opt-In Plaintiff.

Pursuant to the Court's September 18, 2018 Order (R. 79, Page ID #4016-4028),

Defendant served interrogatories on 30 Opt-In Plaintiffs, of which only 14 served answers on

October 12, 2018 as required.  (Exhibit 37).  Interrogatory No. 9 asked "Did you ever

intentionally falsify your log book entries and/or duty status mis-reporting your Qualcomm duty

status during your tenure of employment at P.A.M. beginning May 7, 2014 through the present?"

All responding Opt-Ins uniformly parroted the same non-responsive answer that "Plaintiff used

his best efforts to comply with the instructions provided by PAM and his trainer as to logging

time." (Exhibit 37, No. 9).  That stock, standardized answer starkly contrasts with the cross-

examined testimony of deposed Opt-In Plaintiffs who admitted that they falsified their logs, and

further illustrates the factual difference among the Opt-In Plaintiffs.

23

### (2)    Variation    Among    Plaintiffs
### Regarding Pre-Trip Inspections

Facts regarding pre-trip inspections varied wildly.  Opt-In Plaintiffs differed in how long it took them to perform pre-trip inspections, how they logged their duty status for pre-trip inspections, and other facts individual to each.

Contrary to Named Plaintiff Caldwell's testimony that pre-trip inspections always took over one hour (Caldwell Dep. at 34-35 (Exhibit 7)) some Opt-In Plaintiffs testified it took *15 minutes* to do their pre-trip inspection (McCrea Dep. at 40 (Exhibit 31); Freeman Dep. at 44-45) (Exhibit 11); Lark Dep. at 58-59 (Exhibit 16); Galvan Dep. at 41 (Exhibit 32); B. Jones Dep. at 90 (Exhibit 33)); some took *15-30 minutes* (Hamdan Dep. at 15 (Exhibit 3); Ogle Dep. at 46-47); (Exhibit 12); Mackey Dep. at 79 (Exhibit 10)); some took *20-30 minutes* (Valentine Dep. at 91 (Exhibit 34)); and some took *40-45 minutes* (Foster Dep. at 52-53 (Exhibit 20); Sutton Dep. at 61 (Exhibit 27); Miller Dep. at 26-27 (Exhibit 8)).

Opt-In Plaintiffs also varied widely in how they logged and reported to PAM the time for pre-trip inspections.  Many correctly logged it entirely as "on-duty," and not "off-duty" "or sleeper berth."   Sutton Dep. at 63 ("Q. Did you ever conduct a pre-trip inspection or part of a pre-trip inspection in off-duty status?  A. No.") (Exhibit 27); Ogle Dep. at 48 ("Q. . . . [H]ow would you log [pre-trip inspection] time?  A. On duty/not driving.") (Exhibit 12); Mackey Dep. at 81-82 ("Q. . . . [W]hat status did you record while you conducted pre-trip inspections?  A. On-duty.  Q. Did you record your status as anything but on-duty, when you were conducting pre-trip inspections? A. No.") (Exhibit 10).  *See also* B. Jones Dep. at 90 (Exhibit 33); Hamdan Dep. at 15 (Exhibit3); Gonzales Dep. at 42 (Exhibit 15); Garcia Dep. at 38, 51 (Exhibit 4); Campbell Dep. at 46-47 (Exhibit 22).

24

Conversely, other Opt-In Plaintiffs testified they violated PAM policy and improperly logged pre-trip inspections as "off-duty" (Foster Dep. at 42 ("Q. Did you ever log your time off duty when you were in fact doing a pre-trip inspection? A. Yes.") (Exhibit 20)), or as "sleeper berth."  (Hampton Dep. at 51 (Exhibit 23)).  Others logged 15 minutes "on-duty" and the rest of the time as "sleeper berth." Escobedo Dep. at 92 (Exhibit 28).  One logged pre-trip inspections "on-duty" for only 10 minutes, and the rest "off-duty," knowing it was contrary to PAM's stated policy.  S. Jones Dep. at 109-110 (Exhibit 19).

Some Opt-In Plaintiffs properly recorded as "on-duty" the actual time it took to do the pre-trip inspection.  Trame Dep. at 81 ("Q. Did you ever log your pre-trip or your fueling less than the actual time it took . . .?  A. No.") (Exhibit 13); McCrea Dep. at 49 ("[i]f I did [a pre-trip inspection for 30 or 45 minutes, I would report it for 30 or 45 minutes . . . as on duty not driving") (Exhibit 31); Foster Dep. at 60-61 (Exhibit 20); Lark Dep. at 61 (Exhibit 16); Campbell Dep. at 80, 107 (Exhibit 22).  Others violated PAM's policy and did not log the actual time.  *See, e.g.*, Miller Dep. at 49-50 ("Q. If [a pre-trip inspection] took you 30 minutes, 45 minutes, that's what you would put down?  A. Fifteen.") (Exhibit 8).  One said "there were times at P.A.M. when [he] would log [the] actual trip inspection item," and other times he would log "15 minutes even though it took longer." DeWitt Dep. at 90 (Exhibit 18).

### (3)   Variation   Among   Plaintiffs Regarding Fueling

The time it takes drivers to fuel (both waiting in line in traffic to get to the pump, and pumping fuel once at the pump) varied widely,[11] as did the way Opt-In Plaintiffs reported their

---

[11]  Some Opt-In Plaintiffs testified they "nearly always" had to wait in line to fuel.  *See* Interrogatory Answer No. 1 of Porinchak, Brown, and Butler.  (Exhibit 37).  Some waited "half the time" or "more than half the time."  *See* Interrogatory Answer No. 1 of Griffieth, Simper, Miller, Root, Tansey, and Oxley.  (Exhibit 37).  Others waited in line only "less than half of the
Footnote continued on next page …

duty status to PAM.  Some logged waiting in line as "driving" or "on-duty."  McCrea Dep. at 59-60 (Exhibit 31); Ricotta Dep. at 33-35 ("Q. . . . [I]f you were waiting in the truck with the truck presumably running with a line of trucks at the pump and you're waiting in line, how would you report your duty status at that point? . . . A. It should be driving or on duty.") (Exhibit 1); Foster Dep. at 48 (Exhibit 20); Campbell Dep. at 35-36 (Exhibit 22); Chapman Dep. at 56-57 (Exhibit 17); Garcia Dep. at 38 (Exhibit 4).

Others logged waiting in line as "off-duty," even though they were operating the vehicle. Hamdan Dep. at 20 (Exhibit 3); B. Jones Dep. at 77-78 (Exhibit 33); S. Jones Dep. at 47 (Exhibit 19); Sutton Dep. at 96-97 (Exhibit 27); Trame Dep. at 38 (Exhibit 13).  PAM did not tell drivers to log "off-duty" when waiting in a fuel line.  Sutton Dep. at 96-98 ("Q. Did anyone at P.A.M. instruct you to go into off-duty status when you had pulled up behind a truck waiting to fuel? A. No.  So that's a decision you made . . . so that you could preserve your on-duty time and driving time? A. Yes.") (Exhibit 27).  See also Interrogatory Answer No. 2 of Simper, Miller, Porinchak, Root, Brown, Carlton, Butler, Tansey, and Reeves.  (Exhibit 37).

Other Opt-Ins logged some combination of "off-duty" and "on-duty, not driving."  See Interrogatory Answer No. 2 of Griffieth, Dieter, and Oxley.  (Exhibit 37).  One logged waiting in the fuel line as "sleeper berth."   Lippner Interrogatory Answer No. 2.  (Exhibit 37).  Another was "not certain how his time was logged as the qualcomm [sic] did so automatically." Pszenitzki Interrogatory Answer No. 2.  (Exhibit 37).

With respect to logging the time while pumping fuel, which PAM policy requires to be "on-duty," Opt-In Plaintiffs' testimony varied tremendously in how they logged or reported that time to PAM.  Opt-In Plaintiff DeWitt testified he logged "[o]ff-duty, as I actually fueled."

Footnote continued from previous page …

time."  *See*  Interrogatory Answer No. 1 of Dieter, Carlton, Lippner, Pszenitzki, and Reeves. (Exhibit 37).

DeWitt Dep. at 63 (Exhibit 18).  One Opt-In Plaintiff logged 2 minutes "on-duty," and the rest of the time it took to fuel as "off-duty."  Bochart Dep. at 29 (Exhibit 21).  Some logged part of the time "on-duty," and the rest of the time "off-duty."   Hamdan Dep. at 13-14 (Exhibit 3); Escobedo Dep. at 97 (Exhibit 28).  One logged 5 minutes "on-duty," regardless of the actual time fueling took (S. Jones Dep. at 50-51 (Exhibit 19)), while others followed PAM policy and logged "on-duty" the actual time it took to fuel.  Trame Dep. at 81 (Exhibit 13); Campbell Dep. at 80 (Exhibit 22).

Opt-In Plaintiff Escobeda explained why drivers would violate PAM policy and mislog their fueling status:

> Q.  The next numbered paragraph . . . is Fuel Stops, "Fuel stops shall be logged for as long as it takes, line 4 on duty not driving."  . . . . [D]id you always comply with that requirement . . .?
> A.  Sometimes we would cut it short to save time as well.  . . . We'd start fueling up in off duty, and then once we were getting down to finishing, we'd log it as on duty fuel.
>
> * * *
>
> Q.  . . . [S]o it was a way of manipulating the system to not show as many hours on duty, correct?
> A.  Correct.
> Q.  And so when the log was sent in to the company, the company would understand that it took you less time to fuel your vehicle than it actually did, correct?
>
> * * *
>
> A.  Correct.
> Q.  All right. And that clearly was in violation of what you were learning during the orientation program, and what's written in this document, correct?
> A.  Correct.

Escobedo Dep. at 96-98 (Exhibit 28).

Opt-In Plaintiff DeWitt said whether he logged fueling properly as "on-duty," or falsely as "off-duty," depended on the circumstances and how much available driving time he had left. DeWitt Dep. at 41-43, 47, 57-58 (Exhibit 18).  He of course did not tell PAM that he falsely

logged that time.   (*Id*. at 50).   Opt-In Plaintiff Lippner logged fueling either "on-duty, not

driving" or "sleeper berth."  Lippner Interrogatory Answer No. 3.  (Exhibit 37).

**(4)     Variation     Among     Plaintiffs
Regarding Processing Paperwork**

PAM policy requires drivers to log submitting post-delivery paperwork as "on-duty."

PAM Driver's Manual at 84 (Exhibit 5); Eischens Dep. at 30 ("Q. . . . [PAM] told you that when

you're doing your paperwork, you should be logged in as on duty not driving? A. Correct.")

(Exhibit 2).   Some Opt-In Plaintiffs followed PAM policy and did so.  Ricotta Dep. at 24-28

(Exhibit 1); Lark Dep. at 40 (Exhibit 16); Campbell Dep. at 40 (Exhibit 22). Others violated

PAM's policy by logging it as "off-duty."  Freeman Dep. at 30 (Exhibit 11); DeWitt Dep. at 136

(Exhibit 18); S. Jones Dep. at 57-58 (Exhibit 19).  One Opt-In variously logged it as "on-duty,"

"off-duty," and "sleeper berth."  McCrea Dep. at 55-56 (Exhibit 31).  Another could not recall

how he logged paperwork.  Chapman Dep. at 45 (Exhibit 17).

Some Opt-In Plaintiffs testified they *never* logged doing paperwork as "sleeper berth."

Foster Dep. at 42 ("Q. . . . Did you ever log your time and duty status as sleeper berth when you

were in fact processing paperwork? A. No.") (Exhibit 20).  Others said they violated PAM policy

by doing paperwork while in sleeper berth status without telling PAM (Eischens Dep. at 90

(Exhibit 2)), and some spent an hour per night doing so.  Acreman Dep. at 89 ("Q. About how

much time in paperwork would you say you spent in the sleeper berth per day? A. About an hour

every day or two . . ..  Q. . . . How did you log that? A. Sleeper berth.  Q. Even though you were

doing paperwork? A. Yes."); *Id*. at 95 (Exhibit 14); Chapman Dep. at 98-99 ("Q. And about how

much time would you estimate you spent in the sleeper berth doing paperwork each day? A.

Probably an hour a night") (Exhibit 17).

28

### (5) Variation Among Plaintiffs Regarding Providing "Security" While Off Duty or in Sleeper Berth

Named Plaintiffs allege they were in fact "working," and therefore entitled to be compensated for, time logged "off-duty" and "sleeper berth" because they constantly and continuously were responsible for the truck, trailer and cargo and had to provide around-the-clock security. But their testimony differed tremendously regarding the "security" they had to provide.

Some testified that while logged in "sleeper berth," they frequently were awakened by noises at rest and truck stops, which required them to leave the berth and walk around the truck to assure its security. For example, Opt-In Plaintiff Stanford Jones testified he was awakened *3-4 times per night*, and had to get out of his berth at least once *every* night because of security concerns:

> Q. . . . How many times in the middle of the night are you awakened?
> A. I would say three to four, but it depends on exactly what part of the state you're in, what city you're in.
>                                             * * *
> Q. Do you physically get up and get out of the sleeper berth and walk around the truck during your sleeper berth time?
> A. Oh, yes.
> Q. How many times, on average, would you say you do that?
> A. I can't put an average number on it. Like I said, [it] varies between place that I'm at, time of the day. It all varies. I really can't put an average on it.
> Q. . . . Are there some nights where you don't get up at all?
> A. Oh, no, you get up. It's never no nights you don't get up.
> Q. Every time you log a stint in the sleeper berth, it includes times that you're up and walking around securing the area, securing the truck?
> A. Yes. . . .
> Q. Do you ever just check the mirrors or do you physically get out of the berth . . . and walk around?
> A. Oh, I get out.

S. Jones Dep. at 68-69 (Exhibit 19). *See also* Magallon Dep. at 61-62 ("A. . . . [I]f I was in the sleeper berth . . . every sound that I hear, I would wake up to see what's going on around my

trailer. . . . Q. . . . How many times do you recall actually getting out of the truck at night?   A.

Getting Out? At least one.  At least one.") (Exhibit 9).

In stark contrast, other Opt-In Plaintiffs testified that they *never*, *or rarely*, had to get out

of their sleeper berth because of security concerns.   Opt-In Plaintiff Mackey testified he never

got out of his berth to check the truck's security:

> Q.   . . . [W]hen you heard a noise, did you actually get out of the sleeper berth
> to go outside and check it out?
> A.   No.  I just check with my windows, check through the mirrors to see if
> you see anything coming down the side.  Because you can pretty much tell
> if the door or something is open.
> Q.   So on these times that you heard a noise, you would come out of your
> sleeper berth?
> A.   No.  You don't have to come out of your sleeper berth.  You know, from
> the sleeper berth from your bed, you can see through the mirrors and look.
> Q.   . . . [T]hese times that you heard a noise, you open up the curtain, you can
> look in the rearview mirrors and you never got out of the truck?
> * * *
> A.   No.  Because then if I get out of the truck, I got to come off of sleeper
> berth and start my break all over again.

Mackey Dep. at 113-114 (Exhibit 10).  The longest it took him to check his mirrors was "[f]our

or five minutes," and often it was just "a matter of seconds."  Mackey Dep. at 115 (Exhibit 10).

Opt-In Plaintiff Hampton testified:

> Q.   . . . Do you remember ever getting out of your sleeper berth after you got
> in it while you worked at P.A.M.?
> A.   No, I don't remember that.
> * * *
> Q.   You don't recall ever getting out while you were in your sleeper berth
> mode until your sleeper berth time was up; is that correct?
> A.   I don't think I did, no.
> Q.   So whatever responsibility you had for the load or whatever else . . ., it
> was never a situation sufficient that you had to get out of the sleeper
> berth?
> A.   No, as far as something happening to the truck no.

Hampton Dep. at 89 (Exhibit 23).

Other Opt-In Plaintiffs testified that it was "rare" to get out of the sleeper berth because of security concerns.  *See* Ricotta Dep. at 72-73 ("Q. . . . [W]hile you were in the sleeper berth in a truck stop or rest area . . . did you ever hear any noises that caused you to get up and look around?  A.  Yeah. . . . It might happen once or twice a week. . . . Usually . . . you're literally just popping your head out and just looking at the mirrors and then . . . if you don't see anything, you just pop your head back into the sleeper berth.") (Exhibit 1); Galvan Dep. at 105 ("Q. . . . You said you'd be woken by noises.  Was there an occasion when you would exit the vehicle and go check it out or anything like that?  A. Definitely.  Q. . . . How often would that happen?  A.  A few times a month, maybe.") (Exhibit 32); Beck Dep. at 80 (it "was fairly rare" to be awakened by noise that required him to get out of berth) (Exhibit 30).

Even those Opt-In Plaintiffs who said they had to perform "security" work during sleeper berth time testified they could not quantify how much time they spent performing that activity.  *See* S. Jones Dep. at 80 ("Q. . . . Do you know of any way that we could determine how many minutes or hours in any given sleeper berth increment you were outside the sleeper berth [because of security concerns]?   A.  No.") and 77-79 (Exhibit 19); Eischens Dep. at 139 ("Q. . . . If you go back and try to figure out how many minutes on a particular night you were providing that [security] service, you wouldn't be able to do that, correct? . . . THE WITNESS: Correct.") (Exhibit 2).

While some Opt-In Plaintiffs claimed that truck stops were "dangerous" and required constant vigilance, others said *exactly the opposite*.  For example, Opt-In Plaintiff Beck testified that truck stops were safe, and that drivers need not worry about security.  Opt-In Plaintiff Beck testified:

> Q.    Do you agree with [the] statement [that truck stops are not necessarily the best place to stop to rest]?

> A.   No. I don't agree with that statement at all.
> Q.   Do you think that rest stops are a good place to rest?
>                                  * * *
> A.   Truck stops are, yes. . . . It's a safe place. You don't have to worry about your cargo . . . Your don't have to worry about anything because you've got someone butted up next to the back of your trailer.

Beck Dep. at 103 (Exhibit 30). *See also* Ricotta Dep. at 55 ("Q. . . . Did you spend time losing sleep at night worrying about whether someone was going to break into your truck or break into your load . . .? A. Did I lose sleep over it? No.") (Exhibit 1).

In addition to individual differences about needing to provide "security" while in the sleeper berth, PAM did not have a company-wide policy requiring drivers to provide round-the-clock security. *See, e.g.*, Acreman Dep. at 50 ("Q. Were you ever told during orientation or any other time by a driving manager or somebody in authority that you had to stay with the truck 24/7? A. I don't recall.") (Exhibit 14); Campbell Dep. at 72 ("Q. . . . No one from P.A.M. instructed you that you must stay with the truck 24 hours a day, 7 days a week while you're on the road; is that correct? A. I don't recall.") (Exhibit 22).

### (6)   Variation Among Plaintiffs Regarding Driving Time

Opt-In Plaintiffs differed in how they logged driving time. Some testified they followed PAM's policy of logging as "driving" all time spent stopped in traffic. *See* S. Jones Dep. at 45-46 (Exhibit 19); Gonzales Dep. at 25-26 (Exhibit 15); Chapman Dep. at 29 (Exhibit 17); B. Jones Dep. at 17 (Exhibit 33). However, some violated PAM policy and logged it "off-duty." *See* Bochart Dep. at 24 (" . . . [I]f I was in traffic, I would go off-duty and idle until it [Qualcomm] would trip me off just to protect my hours. Q. So if you got stuck in traffic . . . you would log that off-duty? A. Almost always.") (Exhibit 21). One sometimes logged being stuck in traffic as "sleeper berth." Trame Dep. at 34 ("If I was limited in time and I had to get that load there to

where I wouldn't lose the load to somebody else and then me sit, sometimes I would sit there when I'm not moving and I would go sleeper berth") (Exhibit 13).

Moreover, Opt-In Plaintiffs differed with respect to whether they used their trucks for personal reasons, which affects whether time logged as "Driving" is compensable or not. "Bobtailing" refers to driving the truck without a trailer attached.  Trame Dep. at 77 (Exhibit 13).

Some Opt-In Plaintiffs testified they frequently "bobtailed" for personal, non-work reasons, such as going to the grocery store.  *See* Magallon Dep. at 46 ("Q. . . . How many times would you bobtail to Wal-Mart, for example?   A. . . . Maybe once a week.") (Exhibit 9). Magallon recorded it as "driving."  Magallon Dep. at 46 ("Q. . . . [H]ow did you log those miles? A.  On driving.") (Exhibit 9); Pleasant Dep. at 49 ("Q. How often did you bobtail to a grocery store or Wal-Mart to get supplies? A. Every now and then.").  (Exhibit 29).  Pleasant recorded it as "off-duty" driving.  Pleasant Dep. at 50 (Exhibit 29); Beck Dep. at 66 ("Q. Did you ever bobtail anywhere . . .?  A. Yes, I did. . . . I'd go up to the Flying J to get something to eat.  Q. Did you ever go to Wal-Mart to get food?  A. Yes, I did.") (Exhibit 30).  Other Opt-Ins expressly did not bobtail for such personal reasons.  *See* Garcia Dep. at 58 ("Q. Did you ever bobtail somewhere to go pick up food, or to Wal-Mart or anything like that?  A. No, I didn't bobtail to Wal-Mart.").  (Exhibit 4).

Determining whether, and how long, Opt-In Plaintiffs bobtailed for personal, non-compensable reasons requires examining each one's experience, as well as the varying ways they reported that time.

### (7)  Variation Among Plaintiffs Regarding Time in Sleeper Berth

Plaintiffs' testimony about time spent in the sleeper berth varied widely.  Unlike the Named Plaintiffs, many Opt-In Plaintiffs testified that the sleeper berth was an adequate facility

in which to sleep.[12]  *See* Acreman Dep. at 14 ("Q. Did you find the sleeping facilities at PAM adequate? A. I suppose.   Q. . . . [C]ould you normally get at least five or six hours of uninterrupted sleep?   A. I would say four to five.") (Exhibit 14); B. Jones Dep. at 73 ("Q. . . . [W]hen you spent the night in the sleeper berth, did you find the sleeping facilities adequate? . .  THE WITNESS: I mean, I guess they're the best adequate they could be for sleeping in a vehicle.") (Exhibit 33); Hamdan Dep. at 26-27 ("Q. . . . . Did you find he sleeping facilities adequate? . . . A. It was okay. It's not comfy like a hotel, but it was okay.") (Exhibit 3); Ricotta Dep. at 57 ("Q. Would it be fair to say that in general and in the main you were able to get an adequate rest in the sleeper berth the time you were in it? A. Yes.") (Exhibit 1).

Opt-In Plaintiffs variously testified that they generally got 4-5 hours of sleep (Hampton Dep. at 65 (Exhibit 23)), some 5-6 hours (Garcia Dep. at 63-64 (Exhibit 4); Chapman Dep. at 36 (Exhibit 17)), some 4-9 hours (B. Jones Dep. at 25 (Exhibit 33)); others 6 1/2 -7 hours (DeWitt Dep. at 109 (Exhibit 18)); and 7-8 hours (Beck Dep. at 70 (Exhibit 30)).  One said she was only "occasionally" unable to get at least five uninterrupted hours of sleep.  Freeman Dep. at 99 ("Q. Were there ever situations where you were unable to get five hours of continuous sleep while in the sleeper berth?  A. Occasionally, but not often. . . . Maybe two or three times a month . . ."). (Exhibit 11).

One testified he got, on "average, eight hours" of sleep "when [he] got in the sleeper berth." Hamdan Dep. at 27 (Exhibit 3).  Opt-In Plaintiff Hampton said as a solo driver he "had no trouble sleeping and getting rest in" the sleeper berth (Hampton Dep. at 69 (Exhibit 23)), and Opt-In Ricotta testified "it was rare the [he] had sleep disruption when [he was] in the sleeper berth." Ricotta Dep. at 80-81 (Exhibit 1).

---

[12] Whether a truck's sleeper berth is "adequate" is a question of law.  The DOL has determined that it is.  *See* n. 2, *supra*.

With respect to team drivers, the ability to sleep depended on a variety of different factors unique to each individual.  Opt-In Plaintiff Eischens explained:

> Q.    . . . One of the things that would affect how well you'd sleep as a team driver would be the way that your codriver would operate the vehicle?
> A.    Yes.
> Q.    If you had a better driver, you might sleep better, right?
> A.    A lot better.
> Q.    So there's going to be a lot of variation in how well the drivers sleep, based upon the habits of the other drivers, correct?
>                                                 * * *
> THE WITNESS:  Yeah.

Eischens Dep. at 100-101 (Exhibit 2).  Moreover, with respect to the ability to sleep at truck stops, Opt-In Plaintiff Eischens testified "variations happen all across the country" because "some stops . . . are loud," some "not so loud," "every day is different," and "every driver is different."  (*Id*. at 135-136).

Testimony varied widely about whether, and how often, drivers' sleep was disrupted by Qualcomm messages and telephone calls from PAM.  Some said the Qualcomm went off frequently and disturbed sleep.  *See* Gonzales Dep. at 47 (sleep interrupted "by a Qualcomm message" about "every day, every other day") (Exhibit 15); Eischens Dep. at 126 (Qualcomm went off when "[l]ogged in the sleeper berth . . . "[a]ll the time," every night at least "[t]wo or three times") (Exhibit 2).

Others testified their sleep was seldom or infrequently disrupted by Qualcomm messages.  *See* Freeman Dep. at 38 (Qualcomm messages while in sleeper berth come only "two or three times a week") (Exhibit 11); Hampton Dep. at 71 ("Q. You don't remember being woken up because you got too many Qualcomm messages? A. No.") (Exhibit 23); S. Jones at 86-87 (Qualcomm interruptions of sleep "wasn't that frequent") (Exhibit 19); Ricotta Dep. at 45 ("Q. . . . [M]ost if not all the time you were in the sleeper berth you weren't disrupted by Qualcomm messages coming in?  A. Usually not, no.") (Exhibit 1).

Qualcomm messages interrupted sleep less for drivers on dedicated routes than those with irregular routes.  Ricotta Dep. at 44 (Qualcomm interruptions were "kind of rare" "because I was on a dedicated route" and it "was always the same stuff") (Exhibit 1).

PAM did not require drivers to monitor the Qualcomm while in the sleeper berth.  DeWitt Dep. at 112 ("Q. . . . So there was no rule at P.A.M. that you're supposed to check your Qualcomm messages while you're in the sleeper berth, was there? . . . A. No, of course not.") (Exhibit 18).  However, some drivers chose to do so to avoid missing out on potential loads.  Opt-In Plaintiff Beck testified:

> Q.      . . . [I]f you got a load and you elected to keep your Qualcomm unit turned on and you interrupted you[r] sleeper berth time to go get that load, and then you finished and delivered that load, you might get another load quicker; is that right?
> A.      Right. . . .

Beck Dep. at 79 (Exhibit 30).

Moreover, some Opt-In Plaintiffs said the Qualcomm can be turned down or set to "mute."  Garcia Dep. at 72 (Exhibit 4); Beck Dep. at 78-79 (Exhibit 30); Hampton Dep. at 70 (Exhibit 23); B. Jones Dep. at 26 (Exhibit 33); DeWitt Dep. at 110 (Exhibit 18).  When lowered, it would not disrupt sleep.  Escobedo Dep. at 31 ("Q. . . . Did [your previous trucking employer] send messages over the Qualcomm while you were trying to sleep? A. Yes, they would.  Would that wake you up? A. No. Q. Why not? A. Because the buzzer on it was real low.") (Exhibit 28).

Similarly, drivers had different experiences being disrupted from sleep by telephone calls. Some said they were frequent.  Trame Dep. at 15-16 (phone calls occurred "[q]uite often," generally "[o]nce a day") (Exhibit 13); Sutton Dep. at 13-15 (while in sleeper berth, PAM

36

"called me all the time," "[i]t happened quite often," and "[t]hey would all constantly")[13] (Exhibit 27); Magallon Dep. at 53-54 (3-4 telephone calls per day) (Exhibit 9).   Other Opt-In Plaintiffs rarely were interrupted by phone calls.  *See* Freeman Dep. at 36-37 (received phone calls "[m]aybe two or three times a month but not often") (Exhibit 11); Beck Dep at 73-74 (calls were "very rare," "maybe twice" his entire time at PAM) (Exhibit 30); Hampton Dep. at 74 (does not recall ever getting phone calls) (Exhibit 23); B. Jones at 27 (phone calls no more than twice per week) (Exhibit 33); Campbell Dep. at 67-68 (received only one call her time at PAM) (Exhibit 22); DeWitt Dep. at 116 (does not recall ever getting phone calls) (Exhibit 18).

The Opt-In Plaintiffs' Answers to Interrogatory No. 7 were that they were called only 1 or 2 times per week at most, and some less than that.  (Exhibit 37).

**(8)**   **Variation   Among   Plaintiffs Regarding   Loading,   Unloading and Waiting for Loads**

PAM policy is that loading, unloading and waiting for loads is "on-duty" time.  (PAM Driver's Manual at 84; Upholster Dep. at 16 ("Q. . . . [Y]ou knew that it was PAM's policy that the entire time of loading and unloading would be recorded as on duty, not driving?  A. Yes, correct.") (Exhibit 35); S. Jones at 94 ("Q. . . . [Y]our understanding is that PAM's driver manual and policy is that [loading and unloading] should be recorded as on duty not driving?  A. That's correct.") (Exhibit 19).

Some Opt-In Plaintiffs followed PAM's stated policy and logged loading "on-duty."  *See*, *e.g*., Sutton Dep. at 68-69 ("Q. . . . [W]hen you would go drop off a load, what would your status be?  A. On-duty.  Q. And did you remain on-duty until the load was completely dropped and you were allowed to leave?  A. Yes.").  Sutton stayed "on-duty" even if he had to wait for the load to

---

[13] Sutton conceded PAM only called when his sleeper berth hours were up.  Sutton Dep. at 18-19 (Exhibit 27).

be readied for pick up. *Id*. at 69 (Exhibit 27). *See also* Ricotta Dep. at 65 ("Q. . . . "[W]hile you are doing those live loads, how would you generally log your time?  A. On duty.  Q. . . . So there will be instances where you have six on-duty hours just waiting?  A.  Yeah.") (Exhibit 1).

Other Opt-In Plaintiffs violated PAM policy and logged unloading "off-duty."  *See* Upholster Dep. at 116-117 (Exhibit 35); S. Jones Dep. at 89 (recorded "off-duty" until "they finish unloading my truck," despite knowing it was contrary to PAM's policy requiring it to be logged "on-duty"). *Id*. at 101-104. (Exhibit 19).

With respect to waiting for loads, some Opt-In Plaintiffs understood PAM's policy to log "on-duty."  Eischens Dep. at 27 (Exhibit 2); Campbell Dep. at 68 (Exhibit 22).  Opt-In Plaintiff DeWitt testified one can never log waiting time "off-duty":

> Q. Is there a point in time when you're waiting on a load that it's appropriate to go off-duty?
> A. No.
> Q. Never.
> A. Never.
> Q. If you're three hours sitting there waiting on a [load] and you're in your sleeper berth reading, that's on-duty?
> A. It's never acceptable to go off-duty when you're waiting on a load.

DeWitt Dep. at 32 (Exhibit 18).

Some Opt-In Plaintiffs logged wait time "off-duty" or "sleeper berth."  *See, e.g.*, Campbell Dep. at 29-31 (Exhibit 22).  One logged "on-duty" for 7-10 minutes, and the rest off duty.  B. Jones Dep. at 108 (Exhibit 33).

Opt-In Plaintiff Lark explained that wait time differed greatly between dedicated routes and irregular routes:

> Q. Are there situations where you had to wait for a dock to become available?
> A. Yes.
> Q. Was that more often than not?
> A. Dedicated route, no. . . . We had our assigned time.
> * * *
> Q. . . . . On a dedicated route on average, how long would you have to wait?

           &ast; &ast; &ast;

A.  Fifteen minutes to an hour.

           &ast; &ast; &ast;

Q.  What kind of average waiting time would you experience on irregular routes?

A.  I've waited up to, almost my ten hour break waiting at times.

Lark Dep. at 65-66 (Exhibit 16).

### (9) Variation Among Plaintiffs Regarding Short Breaks

PAM's policy for reporting breaks less than 20 minutes is to log it "on-duty."  Numerous Opt-In Plaintiffs logged such breaks "off-duty."  *See* Gonzales Dep. at 25 (Exhibit 15); Acreman Dep. at 42 (Exhibit 14); Bochart Dep. at 24 (Exhibit 21); Chapman Dep. at 23-24 (Exhibit 17); DeWitt Dep. at 61-64 (Exhibit 18); Escobedo Dep. at 109-112 (Exhibit 28).

### c. These Claims Cannot Be Resolved Collectively

These variations among Plaintiffs require decertification.

*Douglas v. First Student, Inc.*, 888 F. Supp. 2d 929 (E.D. Ark. 2012), decertified a collective FLSA action where, as in the present case, there were disparate facts among the plaintiffs regarding how they accounted for their time, and whether they accurately recorded such time, which precluded collective treatment.  Some plaintiffs "contend[ed] that accurate records of the length" of driving "routes do not exist," and that "[a]lthough the drivers were required to record their time," the "records they made do not accurately include all the time they spent performing their other driver duties."  *Id*. at 934.  Similar to the present case, in *Douglas*:

> Plaintiffs . . . contend that they performed additional, non-driving duties, such as being trainers, helping with dispatch, helping with clinical work, and recruiting. Although they were required to record their work time for those tasks, plaintiffs contend that the records are not always accurate, because they were told by various persons to record only three hours per day for those duties, regardless of how long they actually performed those duties.

*Id*. at 934-35.

*Douglas* concluded that the "plaintiffs cannot demonstrate that [the defendant] is liable under the FLSA to the members of the class" because of the disparate facts regarding how time was recorded, and whether it was accurate, requiring individual consideration of each plaintiff's circumstances.  *Id*. at 935.

In *Ezell v. Acosta, Inc*., 2018 WL 3763834 (E.D. Mo., Aug. 8, 2018), the employer had "written policies provid[ing] that employees must record and report all working time."  *Id*. at *4. Discovery established that "each Plaintiff had a different experience with respect to reporting time," *id*., and the FLSA claim was "based on their own choices and beliefs, as well as instructions from different supervisors," rather than a company-wide policy or decision.  *Ezell* denied certifying the FLSA "off-the-clock" claim because the variation among opt-in plaintiffs:

> . . . [T]he  testimony . . . shows  that  the  claims  stem  from  a  variety  of circumstances based on employees' own choices and beliefs about time recording, work completion, and instructions from supervisors, thus showing a lack of common policy or practice at Acosta.  Defendant argues that working "off-the-clock" resulted from personal decisions requiring an individualized analysis.

*Id*. at *2.  The court agreed and refused to certify a collective action.

Similarly, in *Porteous v. Capital One Serv. II, LLC*, 2018 WL 3469016 (D. Nev., July 17, 2018), the defendant's "company handbook [gave] employees examples of how to accurately record their time into defendant's timekeeping system," and the plaintiff's claim that managers told employees to work off-the-clock directly contradicts all of the defendant's policies, procedures and training."  *Id*. at *6-7.  Although *Porteous* did not rule on certification because it found no FLSA violation, it illustrates that each Opt-In Plaintiff's circumstance would have to be examined in the present action to determine whether they working when they logged time as "off-duty" or "sleeper berth."

*Watson v. Surf-Frac Wellhead Equip. Co., Inc*., 2013 WL 5524122 (E.D. Ark., Oct. 3, 2013), decertified a collective action where, as in the present case, the plaintiffs' claim that "on-call" time was compensable was too individualized for collective treatment:

> In order to prove conduct that violated the FLSA, plaintiff will have to prove that the application of the policies to individual plaintiffs, not the policies themselves, were unlawful.   With regard to the claim that plaintiffs' on-call time was compensable, the Court notes the fact-intensive inquiry required, including the amount of time each plaintiff was on call/employed by Surf-Frac and how often each plaintiff was called in to work while on call. The Court finds no benefit to representative testimony in this regard.
>
> With regard to the claims that Surf-Frac automatically deducted lunch breaks, failed to pay plaintiffs for hours worked off the clock, and took unauthorized deductions, in order to prove FLSA violations, each individual plaintiff will have to prove, among other things, that he worked more hours than he was paid and the number of hours per week he worked over 40 hours a week.  None of these claims are properly decided through collective action.

*Id*. at *6.

In exactly the same way, each Opt-In Plaintiff in the present case would have to show that the number of hours spent driving or performing other "on-duty, not driving" activity, when divided by their per-mile compensation rate, was less than minimum wage.  That is a fact-intensive analysis, especially given the wide variation in how long it took Opt-Ins to perform work, how they logged and reported it, and what duties they were required to perform.

### 3.    Plaintiffs' Claim Regarding Use of Comdata Pay System

With respect to Plaintiffs' "Comdata Card Fees" claim, Plaintiffs allege in Cause of Action Number Five that "*PAM required its drivers* to receive the wages Defendant PAM determined were due to them via a Comdata Card that Defendant PAM provided to each driver." (R. 7, Complaint, ¶103) (emphasis added).  Plaintiffs claim that because of fees associated with the Comdata Card, PAM "failed to pay all wages earned to Named Plaintiffs and Comdata Plaintiffs and failed to pay minimum wage for all hours worked."  (R. 7, Complaint, ¶107).

41

Plaintiffs allege that Opt-In Plaintiffs are "similarly situated because all Comdata Plaintiffs were subject to the violations detailed under Cause of Action 5 . . . ."  (R. 7, Complaint, ¶22(e)).  All three Named Plaintiffs "are the representative plaintiffs for this subclass."  (*Id.*).

Contrary to Plaintiffs' Complaint's allegation, discovery shows there was no company-wide policy or requirement under which PAM "required its drivers to receive [their] wages . . . via a Comdata Card . . ."  (R. 7, Complaint, ¶103).  The Named Plaintiffs were in fact paid wages via the Comdata Card (Browne Dep. at 52-53 (Exhibit 25); Caldwell Dep. at 115-116 (Exhibit 7); Hall Dep. at 57 ("Q. . . . [W]as your pay direct deposited to a bank, or did it go to a Comdata Card?  A.  It went to a Comdata Card."). (Exhibit 24)).

However, unlike the Named Plaintiffs, numerous Opt-In Plaintiffs testified they elected to be paid by direct bank deposit and *not* through the Comdata Card.  They are thus not similarly situated to the Named Plaintiffs.  Opt-In Plaintiff Hamdan testified:

> Q.      . . . [Y]ou're paid - - you have a choice of either receiving a check or receiving a direct deposit to a bank or having it put on a Comdata card.  Do you recall what you elected to do?
> A.      Bank deposit.
> Q.      Direct deposit?
> A.      Yes.
> Q.      . . . [W]as it always direct deposit?
> A.      Yes.
> Q.      You never ever had any money - - or your personal money put on a Comdata card?
> A.      No.

Hamdan Dep. at 38 (Exhibit 3).

Many other Opt-In Plaintiffs did the same.  *See* Campbell Dep. at 66 ("Q. . . [D]id you receive your [payroll payments] through direct deposit or did you use the Comdata?  A. Direct Deposit.") (Exhibit 22); Gonzales Dep. at 48-49 (Q. . . . [D]id you get a check, did you get a direct deposit, or did [PAM] put [your pay] on your Comdata Card?  A.  I think it was direct deposit.") (Exhibit 15); McCrea Dep. at 93 ("Q. . . . You had direct deposit, you didn't [get] paid

through Comdata?  A. Right.") (Exhibit 31); Freeman Dep. at 53 ("Q. When you were at P.A.M. did you have direct deposit or did you use the Comdata system they have in place? A. Direct deposit.") (Exhibit 11); Lark Dep. at 85-86 ("Q. . . . [H]ow were you paid?  By that I mean did you have direct deposit?  A. Direct deposit.") (Exhibit 16); Valentine Dep. at 78 ("Q. . . . [H]ow did you receive your pay?  Was that direct deposit, comdata or - - A. Yes.  Direct deposit.") Exhibit 34); Chapman Dep. at 67 ("Q. . . . You didn't use a Comdata [Card] for payroll because we've already seen that checking account where your money was sent direct to the checking account; is that correct?  A.  Yes, sir.") (Exhibit 17); and Acreman Dep. at 57 ("Q. Do you recall what election you made [between being paid through Comdata Card or direct deposit]? A. Checking.  Direct Deposit.") (Exhibit 14)).  *See also* Trame Dep. at 73 (Exhibit 13); Garcia Dep. at 75 (Exhibit 4); Magallon Dep. at 78 (Exhibit 9); Ricotta Dep. at 46-47 (Exhibit 1); and Bochart Dep. at 30 (Exhibit 21).

In contrast, other Opt-In Plaintiffs chose to be paid wages through the Comdata system. *See* Beck Dep. at 93 ("Q. . . . Did you elect to have your pay loaded on to a Comdata card?  A. Yes, I did.") (Exhibit 30); Foster Dep. at 74 ("Q. . . . [W]ere you paid your payroll compensation on the Comdata card or did you have direct deposit?  A. I think it was on the Comdata card.") (Exhibit 20); Keller Dep. at 18-19 ("Q….Okay. So during 2013, '14, and '15 do you remember how you were paid? And by that, I mean did you get a check or was it direct deposit or was it put on your…a Comdata card?  A. It was put on Comdata.) (Exhibit 36).  Thus, determining whether any Opt-In Plaintiff has a viable Comdata Card Fees Claim requires determining individually how each Opt-In Plaintiff elected to be paid their wages.

Some Opt-In Plaintiffs answering Interrogatory No. 12 testified they used *only direct deposit* (Simper, Root, Pszenitzki, and Reeves), some used *only Comdata* (Butler, Dieter, and

Parinchak), and others used a *combination of direct deposit and Comdata* (Griffeith, Brown, Carlton, Lippner, Tansey, and Oxley).   Another was paid through direct deposit and check. (Miller) (Exhibit 37).

Moreover, even for those Opt-In Plaintiffs who elected to be paid through a Comdata Card, Named Plaintiff Browne testified he was not "charged anything the first time - - . . . for the first withdrawal," but for "[s]ubsequent withdrawals . . . they do charge" a fee.  Browne Dep. at 52-53 (Exhibit 25).   Named Plaintiff Browne testified he was never charged any fee for accessing his money at PAM:

> Q.     . . . [D]uring the period of time you were employed by [PAM] and you
>          used the Comdata Card for pay, . . . neither Comdata nor [PAM] charged
>          you for accessing that money; is that correct?
> A.     Not that I'm aware of, no.
> Q.     So my statement's correct?
> A.     That's correct.

*Id*. at 53.

And although Comdata Card fees were assessed when employees took out cash advances, some Opt-In Plaintiffs testified they *never* took such advances, (Bochart Dep. at 30 ("Q.  Did you use the Comdata Card ever for advances?  A. Never.") (Exhibit 21)), some only *once*, (Gonzales Dep. at 49 ("maybe I did one time or something like that") (Exhibit 15)), while others took advances *regularly*.  Ogle Dep. at 15 (took "advances off [Comdata Card] [o]n a regular basis") (Exhibit 12); Beck Dep. at 96 (Exhibit 30).   Others testified they never incurred any Comdata card fees.  *See* Lark Dep. at 86 ("Q. . . . Did you ever . . . incur any fees that you were personally responsible for through use of the Comdata card?  A. No.") (Exhibit 16).

Whether or not each Opt-In Plaintiff can show he or she was not paid minimum wage for any pay period because of Comdata fees depends on the individual circumstances of the Opt-In - - *i.e.*, whether they were paid using the Comdata Card, whether they took pay advances for

44

which they were charged fees, whether they made multiple withdrawals if they were paid through a Comdata Card, the amount of such fees, and how much each Opt-In Plaintiff was paid for each pay period in which any Comdata Card fees were assessed.

Because of the need for individual analysis relative to each Opt-In Plaintiff, Plaintiff's Comdata Card Fee claim cannot be tried on a collective basis.

### 4.    Plaintiffs' Claim Regarding Deductions

All PAM employees, as a condition of employment, signed a Deposit Authorization under which they "authorize[d] a $25.00 deduction from each of [their] weekly payroll checks until a maximum deposit amount of $500.00 is reached," against which PAM could deduct at the time of an employee's separation various expenses the employee owes (*e.g.*, fines, towing expenses, damage to vehicles, etc.) *See* Deposit Authorization Form (Exhibit 26).   Named Plaintiff Caldwell purports to represent Opt-In Plaintiffs on the "Unlawful Deductions" claim, alleging the escrow deductions, as well as $45 per week deduction taken against Caldwell "ostensibly to pay for" the Commercial Drivers License school he attended, caused his weekly pay to go below less than minimum wage.  (R. 7, Complaint, ¶¶109-111).

Resolving the Unlawful Deductions claim cannot be done collectively because it requires individual examination of each Opt-In Plaintiff to determine, in any pay period, (1) whether such deductions were taken; (2) whether the Opt-In Plaintiff's wages fell below minimum wage because of such deductions; (3) whether they received their escrowed funds upon separation; (4) if not, whether PAM properly deducted from their escrow for reasons such as unpaid fines, property damage and similar deductions to which employees agreed.

With respect to Named Plaintiff Caldwell's claim that PAM deducted $45 per week to pay for CDL school, many Opt-In Plaintiffs began work at PAM with a CDL, and therefore no similar deductions would have been taken from them.  *See, e.g.*, Chapman Dep. at 17 ("Q. You

already had your CDL when you went through orientation; is that correct? A. It is.") (Exhibit 17); Foster Dep. at 18 ("Q. When you filled out your application, applied for truck driving position with P.A.M., you had already had your CDL license, right? A. Yes.") (Exhibit 20); Freeman Dep at 15 (Exhibit 11).  Resolving the Deductions claim requires determining whether each Opt-In Plaintiff did, or did not, have a CDL before working at PAM, or whether they came to PAM out of CDL school so PAM would pay for it (assuming they stayed employed at PAM for one year).

With respect to the escrow, the Opt-In Plaintiffs varied significantly.  Some Opt-In Plaintiffs said they never received their $500 escrow back after termination.  Acreman Dep. at 56 (Exhibit 14); Campbell Dep. at 63, 65 (Exhibit 22); Chapman Dep. at 49 (Exhibit 17); Lark Dep. at 98 (Exhibit 16); Ricotta Dep. at 49-50 (Exhibit 1); Beck Dep. at 95 (Exhibit 30); S. Jones Dep. at 106 (Exhibit 19).

Other Opt-In Plaintiffs got the full escrow amount back without any deductions. Freeman Dep. at 56 (Exhibit 11); Ogle Dep. at 13-14, 32 (Exhibit 12).  Some believed they received the full escrow back.  Magallon Dep. at 79-80 (Exhibit 9); Trame Dep. at 61 (Exhibit 13).  Some admitted it was either not returned because of a fine (Bochart Dep. at 59 (Exhibit 21)), or other debt.  Acreman Dep. at 57 (Exhibit 14).  Others were unaware of any deductions. Hamdan Dep. at 96 (Exhibit 3); Garcia Dep. at 76-77 (Exhibit 4); Trame Dep. at 67 (Exhibit 13).

Named Plaintiff Caldwell's Deductions claim cannot be resolved collectively because each Opt-In Plaintiff would have to be individually considered to determine whether they incurred such loss.  It should therefore be decertified.

**5.      Even Under Plaintiff's View of Proper Compensation, Many Opt-In Plaintiffs Never Incurred An FLSA Minimum Wage Violation**

Lastly, independently of the above factual variations that require individual scrutiny of each Opt-In Plaintiff's circumstances, even if all of Plaintiffs' assumptions about how Plaintiffs should be paid are taken into account, many Opt-In Plaintiffs would still not incur an FLSA minimum wage violation in any pay period, thus requiring individual consideration to determine if there was any FLSA violation.  Stated alternatively, even if Named Plaintiffs could establish an FLSA violation because they were not paid minimum wage for 16 hours per day, that would not establish an FLSA violation for all Opt-Ins.

Dr. Clayton Reck, Ph.D., an expert economist, reviewed the facts of dozens of Opt-In Plaintiffs' work and payroll records.  Assuming, as Named Plaintiffs contend, that they must receive federal minimum wage for 16 hours every day, and also taking into account all pay deductions, Dr. Reck has identified examples of Opt-In Plaintiffs who received at least minimum wage in every pay period while working at PAM.  Dr. Reck Decl. Exhibit 38, ¶3.

Thus, there are demonstrably many, many Opt-In Plaintiffs who did not incur any FLSA violation, *even using Plaintiff's assumptions about how they should be compensated*.  Identifying those Opt-In Plaintiffs requires an individual and scrutinizing examination of each Plaintiff's payment history and log reports.  *See* Dr. Reck Decl., Exhibit 38, ¶4  In short, to determine in any given case whether an Opt-In Plaintiff can even show an FLSA violation, one must look individually at each Opt-In Plaintiff's situation.  As these examples show, the need for such individualized scrutiny to determine whether there has been an FLSA violation defies being able to resolve the Opt-In Plaintiffs' claims on a collective basis.

### III.    CONCLUSION

The Named Plaintiffs are not similarly situated with the Opt-In Plaintiffs, and the facts essential for resolving the claims differ dramatically not only between the Named and Opt-In Plaintiffs, but among the Opt-In Plaintiffs themselves.  The Court should therefore decertify the collective FLSA action.

Respectfully Submitted,

CONNER & WINTERS, LLP

s/Robert L. Jones, III
Robert L. Jones, III, AR #69041
Kerri E. Kobbeman, AR #2008149
Amber J. Prince, AR #2007247
4375 N. Vantage Drive, Suite 405
Fayetteville, AR  72703
(479) 582-5711
(479) 587-1426 (fax)
bjones@cwlaw.com
mburney@cwlaw.com
kkobbeman@cwlaw.com
aprince@cwlaw.com

DICKINSON WRIGHT PLLC

/s/ Martin D. Holmes
M. Reid Estes, Jr., BPR #9043
Peter F. Klett, BPR #12688
Martin D. Holmes, BPR #12122
424 Church Street, Suite 800
Nashville, TN  37219
(615) 620-1737
(844) 670-6009 (fax)
restes@dickinsonwright.com
pklett@dickinsonwright.com
mdholmes@dickinsonwright.com

/s/ K. Scott Hamilton
500 Woodward Avenue
Suite 4000
Detroit, MI  48226-3425
(313)-223-3500
khamilton@dickinsonwright.com

*Attorneys for the Defendant P.A.M. Transport, Inc.*


Dated:  November 2, 2018

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing pleading was electronically filed with the Clerk of the Court using the CM/ECF System on November 2, 2018, which will serve notice of same on the following:

Justin L. Swidler, Esq.
Richard S. Swartz, Esq.
Joshua S. Boyette, Esq.
Travis Martindale_Jarvis, Esq.
Swartz Swidler, LLC
1101 Kings Hwy. N., Suite 402
Cherry Hill, NJ 08034

/s/ Martin D. Holmes
Martin D. Holmes

DETROIT 27403-20 1472290v1