**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS**

| | |
|---|---|
| **DAVID BROWNE, et al.,** | |
| **Plaintiffs,** | |
| **vs.** | |
| **P.A.M. TRANSPORT, INC, et al.** | **Case No. 5:16-cv-05366-TLB** |
| **Defendants.** | |

**PLAINTIFFS' BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ............................................................................................................ 1

II.  LEGAL ARGUMENT .................................................................................................... 2

  A.  Standard of Review ................................................................................................... 2

  B.  The FLSA and the AMWA Require Employers to Pay Employees Minimum Wage for all Compensable Work Time ............................................................................................ 3

    1.  Plaintiffs and the Class are entitled to summary judgment on their claim seeking compensation for 16 hours per day for each day they were over-the-road with PAM. .......... 4

    2.  Drivers are continuously on duty when on a multi-day or multi-week shift ................. 12

    3.  Defendant failed to pay minimum wage for driving and on duty not driving time. ...... 18

    4.  Defendants failed to pay Plaintiffs the minimum wage for short rest breaks logged on line 1 (off-duty) and line 2 (sleeper berth). .................................................................. 19

    5.  Sleeper Berth Time in Excess of 8 Hours per Day. ....................................................... 20

  C.  Defendants Minimum Wage Violations Must be Determined on each Pay Day. ............. 21

  D.  Defendant's Actions are Willful and not in good faith. .................................................... 22

  E.  Plaintiffs and the Class are entitled to judgment on their Wage Payment Claims. ............ 24

    1.  The Court should enter judgment against PAM for its unlawful charging of nearly 800% annualized interest for employee advances ........................................................................ 24

    2.  The Court should enter judgment against PAM for its failure to pay all wages at separation. ................................................................................................................... 25

III. CONCLUSION .............................................................................................................. 26

# TABLE OF AUTHORITIES

Page(s)

Cases

*Anderson v. Mount Clemens Pottery Co.*,
  328 U.S. 680 (1946) .................................................................................................. 12

*Armour & Co. v. Wantock*,
  323 U.S. 126 (1944) ........................................................................................ 4, 5, 11

Auer v. Robbins,
  519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) ............................................. 11

Barrentine v. Ark.-Best Freight Sys., Inc.,
  450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) ............................................ 11

*Bauer v. Singh*,
  2011 U.S. Dist. LEXIS 14193 (S.D. Ohio Feb. 14, 2011)*Bauer v. Singh*, 2011 U.S. Dist.
  LEXIS 14193 (S.D. Ohio Feb. 14, 2011).................................................................. 19

*Biggs v. Wilson*,
  1 F.3d 1537 (9th Cir. 1993) ...................................................................................... 21

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................ 2, 3

*Cope v. Let's Eat Out, Inc.*,
  354 F.Supp.3d 976 (W.D. Mo. 2019) ...................................................................... 10

*Douglas v. First Student, Inc.*,
  2011 Ark. 172 (Ark. 2011) ....................................................................................... 22

*Hensley v. MacMillan Bloedel Containers, Inc.*,
  786 F.2d 353 (8th Cir. 1986) ...................................................................................... 3

*Herman v. Fabri-Centers of Am., Inc.*,
  308 F.3d 580 (6th Cir. 2002) .................................................................................... 21

*Herman v. Palo Group Foster Home*,
  976 F. Supp. 696 (W.D. Mich. 1997) ...................................................................... 19

*Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers of Am.*,
  325 U.S. 161 (1945) .................................................................................................... 2

*Julian v. Swift Transportation Co. Inc.*,
  360 F. Supp. 3d 932 (D. Ariz. 2018) ..................................................................... 7, 8

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019) .......................................................................................... 9, 11

*Mathis v. About Your Smile, P.C.*,
  2002 U.S. Dist. LEXIS 15572, 4-5 (E.D. Pa. Aug. 14, 2002)*Mathis v. About Your Smile, P.C.*,
  2002 U.S. Dist. LEXIS 15572, 4-5 (E.D. Pa. Aug. 14, 2002) ............................... 22

*McDonald v. Jp Mktg. Assocs., LLC*,
  2007 U.S. Dist. LEXIS 27747 (D. Minn. Apr. 13, 2007)*McDonald v. Jp Mktg. Assocs., LLC*,
  2007 U.S. Dist. LEXIS 27747 (D. Minn. Apr. 13, 2007) ...................................... 22

*McLaughlin v. Richland Shoe Co.*,
  486 U.S. 128 (1988) .................................................................................................. 22

*Mitchell v. JCG Indus.*,
  745 F.3d 837 (7th Cir. Ill. 2014).............................................................................. 19

*Montoya v. CRST Expedited, Inc.*,
  2019 WL 4230892 (D. Mass. Sept. 6, 2019)..................................... 7, 8, 11
*Olson v. Superior Pontiac-GMC, Inc.*,
  765 F.2d 1570 (11th Cir. 1985) ................................................................ 21
Opinion Letter,
  2019 WL 3345452 ...................................................................................... 8
*Perez v. Contingent Care, LLC*,
  820 F.3d 288 (8th Cir. 2016) ............................................................... 12, 16
*Petrone v. Werner Enterprises, Inc.*,
  121 F. Supp. 3d 860 (D. Neb. 2015) ....................................................... 19
*Reich v. Cole Enters.*,
  901 F. Supp. 255 (S.D. Ohio 1993)........................................................... 19
*Ricci v. DeStefano*,
  557 U.S. 557 (2009) ..................................................................................... 3
*Rogers v. City of Troy*,
  148 F.3d 52 (2d Cir. 1998) ........................................................................ 21
*Rother v. Lupenko*,
  515 Fed. Appx. 672 (9th Cir. 2013) ................................................... 19, 22
*Scott v. Harris*,
  550 U.S. 372, (2007) .................................................................................... 3
*Skidmore v. Swift*,
  323 U.S. 134 (1944) ......................................................................... 5, 6, 10
*Tennessee Coal, Iron & Railroad Co. v. Muscoda Local No. 123*,
  321 U.S. 590 (1944) ..................................................................................... 4
*Torgerson v. City of Rochester*,
  643 F.3d 1031 (8th Cir. 2011) .................................................................... 3
*Trinity Regl. Hosp. v. Bowen*,
  1987 WL 108988 (N.D. Iowa Jan. 7, 1987) ............................................ 10
*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S.Ct. 1036.............................................................................................11
*U.S. Dept. of Lab. v. Am. Future Sys., Inc.*,
  873 F.3d 420 (3d Cir. 2017) ...................................................................... 19
*Walling v. Portland Terminal Co.*,
  330 U.S. 148, 67 S. Ct. 639, 91 L. Ed. 809 (1947) ................................... 2
*Woolridge v. Gateway Transportation of Georgia, Inc.*,
  2019 WL 2610904 (N.D. Ga. June 24, 2019) ............................................ 7

Statutes

29 U.S.C. §202............................................................................................... 1
29 U.S.C. § 202(a) ....................................................................................... 11
29 U.S.C. § 203(g) ......................................................................................... 4
29 U.S.C. § 206(a) ......................................................................................... 3
29 U.S.C § 211(c) ........................................................................................ 12
Ark. Code Ann. § 11-4-202............................................................................ 1
Ark. Code Ann. § 11-4-203.......................................................................... 25

Ark. Code. § 11-4-402(a) ................................................................................ 24, 25
Ark. Code § 11-4-402(c) ...................................................................................... 24
Ark. Code § 11-4-405(a) ...................................................................................... 25
Ark. Code § 11-4-405(b) ................................................................................ 25, 26

Rules

Fed. R. Civ. P. 56(c)(2) .......................................................................................... 2
Fed. R. Civ. P. 56(e)(2) .......................................................................................... 2

Regulations

29 C.F.R. §785.18 ................................................................................................ 19
29 C.F.R. §790.21 ................................................................................................ 21
29 C.F.R. § 785.22 ........................................................................................ Passim
29 C.F.R. § 785.22(a) ................................................................................... 6, 7, 9
29 C.F.R. § 785.41 ........................................................................................... 6, 7
29 C.F.R. §§ 785.12-785.45 ................................................................................. 5
Ark. Admin. Code 010.14.1-108(D)(3) ................................................................. 6

## I.    <u>INTRODUCTION</u>

Plaintiffs are over-the-road drivers who worked for PAM Transport, Inc. from December 9, 2013 through the present. Plaintiffs represent a collective seeking damages for violations of the Fair Labor Standards Act ("FLSA"), and represent a Rule 23(b)(3) class seeking damages for various violations of Arkansas Minimum Wage Act ("AMWA"), the Arkansas Wage Payment Collection Law.

PAM requires its drivers to work multi-day and often multi-week shifts, known as "tours of duty", wherein they are required to remain away from home hauling freight for the benefit of PAM.  During this time, it remains undisputed that drivers are responsible for the security of the truck, trailer, and cargo in their possession. The evidence further shows that drivers remain continuously on-call throughout the tour. The evidence shows that drivers are rarely, if ever relieved of duty during these tours.

Earlier in this litigation, Defendant sought judgment as a matter of law that the time drivers spend logged as "off-duty" or "sleeper berth" pursuant to the federal Department of Transportation's hours-of-service regulations for over-the-road truck drivers was non-compensable time under FLSA and the AMWA. This Court held that the wage and hour laws' tests for compensability were not governed by the Department of Transportation hours-of-service regulations, and under those tests, the maximum amount of time for eating and sleeping that could be excluded from each 24+ hour work shift was 8 hours. Plaintiffs now seek summary judgment of their claims confirming the compensability of this time.

The FLSA and the AMWA enshrine the public policy of the state and nation to ensure minimum wages for workers to safeguard their health, efficiency, and general well-being, and to protect them and their employers from the effects of serious and unfair competition resulting from substandard wages. Ark. Code Ann. § 11-4-202; 29 U.S.C. §202. But neither the AMWA or the

FLSA was intended to dictate **how** a company chooses to pay its workers—only to ensure that these workers receive a basic minimum wage. *See Walling v. Portland Terminal Co.,* 330 U.S. 148, 154, 67 S. Ct. 639, 642, 91 L. Ed. 809 (1947) (Jackson, J., concurring). But this imposition of a standard floor would be a hollow one if employers could arbitrarily **exclude** from the "compass of the workweek" "certain portions of [employees] work." *Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers of Am.,* 325 U.S. 161, 167 (1945). The FLSA was "not designed to codify or perpetuate those customs or contracts which allow an employer to claim all of an employee's time while compensating him for only part of it." *Id.* Here, PAM hires over-the-road drivers to spend their days and weeks away from their friends, families, and homes, working for PAM and PAM's customers, and knitting together our national economy. They are giving this time to PAM, and, under clear, strong, and fair precedent that has stood the test for time, they are entitled to be paid at least the minimum wage.

Thus, for the reasons briefed at length below, Plaintiffs respectfully request the Court enter judgment in their favor.

## II.    LEGAL ARGUMENT

### A.    Standard of Review

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial." *Id.* at 324, *quoting* Fed. R. Civ. P. 56(e)(2). "On a motion

for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557 (2009*), quoting Scott v. Harris*, 550 U.S. 372, 380, (2007) (internal quotations omitted). "The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-1043 (8th Cir. 2011). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci*, 129 S. Ct. at 2677 (internal quotations omitted).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." *Torerson,* 643 F.3d at 1043, *quoting Celotex Corp*, 477 U.S. at 327.

**B.      The FLSA and the AMWA Require Employers to Pay Employees Minimum Wage for all Compensable Work Time.**

"In general, to establish a violation of the minimum wage requirements of the FLSA, a plaintiff . . . must demonstrate that he was engaged in compensable activity within the meaning of the statute and that the wages received for *that* activity, if any, were below the statutory minimum wage." *Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353, 355 (8th Cir. 1986) (emphasis added), *citing* 29 U.S.C. § 206(a).

As discussed below, Defendant regularly failed to pay minimum wage for compensable activities under federal and state law. Hence, Plaintiffs request summary judgment in their favor.

Plaintiffs and class members are current and former over-the-road truck drivers who worked shifts that extended well beyond 24-hours. Plaintiffs seek summary judgment holding they are entitled to compensation at minimum wage levels for no less than 16 hours per day. In

the alternative, Plaintiffs seek summary judgment holding that: (1) all time logged as "driving" and "on duty not driving" constitutes compensable hours under the FSLA; (2) all short rest breaks of 20 minutes or less constitute compensable hours under the FLSA; and (3) all sleeper berth time beyond 8 hours per day constitutes compensable hours.

1.     **Plaintiffs and the Class are entitled to summary judgment on their claim seeking compensation for 16 hours per day for each day they were over-the-road with PAM.**

The FLSA contains no definition of "hours worked," but uses the term in its definition of "employ," which states that to employ means to "suffer or permit to work." 29 U.S.C. § 203(g) Shortly after FLSA was enacted, the Supreme Court defined the term "work" to mean "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tennessee Coal, Iron & Railroad Co. v. Muscoda Local No. 123,* 321 U.S. 590 (1944). In a subsequent case, the Court clarified that definition to include as work all time spent primarily for the benefit of the employer, even if the employee does nothing but wait. *Armour & Co. v. Wantock,* 323 U.S. 126, 133 (1944) (an employer "may hire a man to do nothing, or do nothing but wait for something to happen."). "Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. . . Whether time is spent primarily for the employer's benefit or for the employee's is a question dependent upon all circumstances of the case." *Id.*

In *Armour,* the Court held that firefighters required to stay on the employer's premises after their active-duty shifts in order to respond to alarms were working during the entire time, despite the fact that they spent their post-shift hours "sleeping, eating, playing cards, listening to the radio or otherwise amusing themselves." *Id.* at 128. That the "employer and employee cooperated to make the confinement and idleness incident to it more tolerable" did not diminish the fact that the

4

confinement primarily benefited the employer and was compensable. *Id.* at 134. In *Skidmore,* known typically as the leading case on regulatory deference prior to *Chevron,* the substantive issue was the same as *Armour* and the decision was released in tandem with that opinion. *Skidmore v. Swift,* 323 U.S. 134, 136 (1944). The Supreme Court held in *Skidmore* that nothing precludes waiting time from also being working time, and that for employees confined to the employer's premises for 24 hours, but off-duty for twelve, eating and sleeping time should be excluded from hours worked, but that the balance of the time was compensable because "**there is nothing in the record to suggest that, even though pleasurably spent, it was spent in the ways the men would have chosen had they been free to do so.**" 323 U.S. at 139.

The DOL has issued regulations codifying the holdings of *Skidmore* and *Armour* which govern the calculation of work time for employees whose workdays include sleeping or other periods of inactivity. 29 C.F.R. §§ 785.12-785.45[1]. Plaintiffs are entitled to compensation for sleeper berth periods in excess of 8 hours per day under 29 C.F.R. § 785.22, entitled "Duty of 24 hours or more." That regulation provides that when an employee is required to be on a tour of duty for 24 hours or more, the employer and employee may agree to exclude *bona fide* meal periods and a *bona fide* regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. *Id.* If the sleeping period is more than 8 hours, only 8 hours of the sleeping period will be credited as non-compensable. *Id.* Where no express or implied agreement to the contrary is present, the 8 hours of sleeping time and meal periods constitute hours worked. *Id.*

---

[1] "The pertinent provisions of the Arkansas minimum wage law here, both statutory and regulatory, are identical to federal minimum wage law." *See* Class Certification Order (ECF Doc. 102) at p. 7 n1.

This Court has already considered arguments regarding the amount of compensable time for which an employee truck driver is entitled to minimum wage compensation when the driver is on a continuous tour of duty.   In its October 2018 Opinion, the Court, in following 29 C.F.R. § 785.22(a), as well as *Skidmore v. Swift & Co.*, 323 U.S. 134, 136-137 (1944), held that "when an employee is required to be on duty for more than 24 hours, his employer must pay him for at least 16 of those hours, even if he has spent more than 8 hours sleeping and eating during that 24-hour period." ECF Doc. No. 82 at 5.   In so determining that drivers were on duty (as defined by FLSA precedent and DOL regulations) for more than 24 hours, the Court considered and ultimately rejected Defendant's arguments that a driver could not be "on duty" for more than 24 hours because of rules propagated by the Dept. of Transportation which, for safety reasons, limit the amount of time a commercial truck driver can driver each day. *Id.* at 7-8.

The Court further considered Defendant's argument that 29 C.F.R. § 785.41 changed the analysis and rendered all time in a truck's sleeper berth non-compensable.   The Court rejected Defendants' argument, finding that the regulatory scheme was unambiguous and that 29 C.F.R. § 785.22(a)[2] requires that employers pay for at least 16 hours of time each 24-hour shift provided that "the employee has been on duty for at least 24 hours,… the employee and employer have agreed to exclude it from hours worked, … and [the sleeping and eating time] exceeds 8 hours." *Id.* at 10.   The Court reiterated its holdings in the Class Certification decision it entered on January 25, 2019.   ECF Doc. No. 102 ("In a prior Order in this case, this Court interpreted the relevant laws to the effect that 'when an employee is required to be on duty for 24 hours, his employer must pay him for at least 16 of those hours, even if he has spent more than 8 hours sleeping and eating during that 24-hour period.").

---

[2] Arkansas adopted 29 C.F.R. § 785.22(a) at Ark. Admin. Code 010.14.1-108(D)(3).

Since this Court's holding a little more than a year ago, an emerging consensus in the federal courts agree that long-haul truck drivers on tours of duty extending 24 hours may not have more than 8 hours per day deducted for sleeping and eating time. First, in December of 2018, the United States District Court for the District of Arizona followed this Court's October 2018 decision in determining that regulations issued by the DOT have little to no bearing on the question of the amount of time for which a long-haul over-the-road driver is entitled to compensation. *Julian v. Swift Transportation Co. Inc.*, 360 F. Supp. 3d 932, 944 (D. Ariz. 2018). Like this Court, the *Swift* court determined that pursuant to 29 C.F.R. § 785.22(a), the maximum amount of time Swift could consider as non-compensable sleeping time for drivers on multi-day tours of duty was 8 hours per day. The *Swift* Court awarded summary judgment to the drivers. *Id.* at 951-952.

Next, in June of this year, the Northern District of Georgia was called to consider whether drivers are entitled to at least 16 hours of pay each day on a multi-day tour of duty. *Woolridge v. Gateway Transportation of Georgia, Inc.*, 2019 WL 2610904 (N.D. Ga. June 24, 2019). The Northern District of Georgia also determined that the DOT regulations are inapposite to the question of compensability and held that the "applicable DOL regulation is 29 C.F.R. §785.22 and not 29 C.F.R. §785.41." The court held that the driver's pleadings, which alleged that he was on duty for more than 24 hours because he was required to "remain with or near the truck to protect it and the contents of the shipping container or trailer he was towing" were sufficient to show the driver was "continuously on duty during these extended tours." *Id.* at *5.

Most recently, in September of this year, the District of Massachusetts considered the question as well, in *Montoya v. CRST Expedited, Inc.*, 2019 WL 4230892 (D. Mass. Sept. 6, 2019). That court also found that a trucking employer was required to consider as compensable hours all time a driver spent in a truck's sleeper berth beyond 8 hours per day when a driver is on a multi-

day work-shift.  *Id.* at *19-20.  In *Montoya*, the court rejected as arbitrary a July 2019 Dept. of

Labor Opinion Letter (the "Letter"), which is more fully addressed below.

In response to the growing consensus of the federal courts, the Department of Labor issued

the Letter stating that in the current administration's view, where a driver is "completely relieved"

from their duties, time a driver spends in a truck's sleeper berth would not constitute working time.

DOL Opinion Letter July 22, 2019, 2019 WL 3345452.  In the view expressed in the Letter, a

driver who is on a tour may be completely relieved from duty when in a truck's sleeper berth, and

if the driver is, such time would be non-work time and the 8-hour cap of 29 C.F.R. § 785.22 would

be inapplicable as the driver would not be "on duty."  The DOL recognized that the Letter issued

breaks nearly 70 years of DOL precedent on the issue, and announced in the Letter that it its

conclusions were at odds with four separate DOL opinion letters issued since 1964.  Rather than

attempt to harmonize such interpretations, the DOL stated it was abruptly withdrawing them. The

Letter claims that it was doing so, not in response to any new development of the FLSA, but instead

because the interpretation was "unnecessarily burdensome" on employers. The Letter states that

the administration "disagrees with recent judicial decisions that have regarded sleeper berth time

as on-duty sleeping time, rather than off-duty travel time," and cited to this case and *Julian v. Swift*

*Transp. Co., Inc.* 360 F. Supp. 3d 932 (D. Ariz. 2018).

Notably, the Letter did not withdraw the guidance provided in the DOL Field Operations

Handbook, which also provides that a trucking company and employee can agree to exclude no

more than 8 hours per day of sleeper berth time as non-compensable work.  The interpretation

found in Chapter 31 of the Field Operations Handbook, which has been consistent since at least

May of 1986 (revision history is unavailable before that date) remains in the most current

publication available on the DOL's website.[3] *See* DOL Field Operations Handbook, Ch. 31(b)(09) (limiting the amount of time an employer may dock a truck driver who is on a multi-day tour for sleeping to 8 hours per days). Similarly, the DOL's instruction found in Chapter 14 of the Field Operations Handbook was not withdrawn, and remains in the most recent publication. United States Dept. of Labor Field Operations Handbook, Chapter 14, 14g03(b) ("**Time during which an employee is considered on or off duty by the Department of Transportation is not governed by the same principles as apply under the FLSA**. The DOT's regulations are concerned primarily with the safe operation of the vehicle and not compensable hours worked. **Thus, the off-duty time required by DOT for safety purposes may exceed the amount of sleep time or other non-working time that may be deducted** pursuant to FOH 31b09 or 31b12.")

The Supreme Court recently revisited the amount of deference to provide an agency when it interprets its own regulations. *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). "First and foremost, a court should not afford *Auer* deference unless the regulation is genuinely ambiguous." *Id.* at 2415. Additionally, *Auer* deference is not warranted in all cases, even where an agency is interpreting a genuinely ambiguous regulation. *Id.* at 2414. For example, "a court may not defer to a new interpretation, whether or not introduced in litigation, that creates 'unfair surprise' to the regulated parties. That disruption of expectations may occur when an agency substitutes one view of a rule for another." *Id.* at 2417-2418. Thus, deference is generally unwarranted where the interpretation conflicts with a prior one. *Id.*

This Court has already determined that 29 C.F.R. § 785.22 is not ambiguous in its application to over-the-road truck drivers. Order Denying Judgment on the Pleadings at pp. 9-10 ("[A]ny ambiguity on the topic disappears once one looks to 29 C.F.R. § 785.22(a). As has been

---

[3] https://www.dol.gov/whd/FOH/FOH_Ch31.pdf

extensively discussed by now, *that* regulation tells us *exactly* how to determine whether sleeping time is compensable—and that analysis has nothing to do with whether the employee is driving or riding in a truck.").  As a consequence, the Court determined that it "need not give controlling deference to the DOL's interpretation of its own regulations on the matter" and determined, based on its own analysis, that the maximum amount of time a driver who is on a tour may have removed from his or her pay is 8 hours.   Though the DOL interpretation has apparently shifted, that the DOL is not entitled to controlling deference on the matter has not.

Because the new, contradictory agency interpretation that drivers may be forced to wait long periods in a truck's sleeper berth by their employer without pay is not entitled to *Auer* deference, it must only be afforded deference to the extent that the interpretation has the power to persuade.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 139-140 (1944).  But the abrupt issuance of the Letter purporting to change the DOL's interpretation after years of consistently construing 29 C.F.R. § 785.22 as applying to over-the-road truck drivers is not persuasive.  The DOL provides no basis for its sudden change of heart other than that such rule would be "unnecessarily burdensome for employers."  The Letter "does not offer reasoning or evidence of any thorough consideration for reversing course."  *See Cope v. Let's Eat Out, Inc.,* 354 F.Supp.3d 976 (W.D. Mo. 2019) (finding DOL opinion letter which abruptly changed the DOL's interpretation of a tip credit, issued after the litigation had commenced, was entitled to no weight); *Trinity Regl. Hosp. v. Bowen*, 2C 86-3001, 1987 WL 108988, at *5 (N.D. Iowa Jan. 7, 1987) (where agency provided no "reasoned analysis" for its sudden change in interpretation of a rule, the interpretation was "arbitrary" and entitled to no weight).

For example, the Letter fails to consider the burdens imposed on employee truck drivers who could be kept away from family and friends for weeks at a time while being paid *no* money

simply because the employer required the driver to stay in a truck's sleeper berth while awaiting

dispatch or customer demands or in providing security. Rather than considering the need to balance

between the two competing interests, the Letter only addresses the burden to the employer.   Such

consideration is especially unpersuasive as the FLSA is a remedial statute designed to protect

workers. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1047 ("The broad remedial goal

of the statute should be enforced to the full extent of its terms"). The DOL further fails to explain

how its new interpretation is consistent with firmly established precedent that the FLSA requires

employers to compensate employees for being engaged to wait.   *See Armour,* 323 U.S. at 133.

Accordingly, the DOL's interpretation conflicts with more than 60 years of precedent, is not well

reasoned, and is arbitrary.

It is thus of little surprise that the only Court to have addressed the Letter found it

unpersuasive and entitled to no deference.

> The WHD's opinion letter is unpersuasive because the agency was addressing a situation where the drivers were permitted to sleep, on average, seven hours during a twenty-four hour period. The WHD did not address the situation presented here where some student drivers spent time in the sleeper berth that is substantially more than a normal sleep period. Moreover, even if the opinion were to provide that drivers could be relegated to a sleeper berth for long periods of time without pay, the only reason the agency provides for its flip-flop is that its prior interpretation was "unnecessarily burdensome for employers." Id. Because the FLSA was designed to protect workers, see 29 U.S.C. § 202(a), such reasoning does not support deference to the opinion, see Barrentine v. Ark.-Best Freight Sys., Inc., 450 U.S. 728, 739, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981). Additionally, the opinion letter does not address whether this new interpretation is consistent with its regulations requiring that wait time is compensated. See generally Kisor v. Wilkie, —— U.S. ——, 139 S. Ct. 2400, 2416, 204 L.Ed.2d 841 (2019) ("We have recognized in applying Auer [v. Robbins, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) ] that a court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight.").

*Montoya v. CRST Expedited, Inc.*, CV 16-10095-PBS, 2019 WL 4230892, at *20 (D. Mass. Sept.

6, 2019).

Nevertheless, even if the Court were to consider the Letter as being entitled to some weight, the factual predicate of the Letter does not apply to the undisputed facts of this case. The Letter assumes that the driver is "completely relieved of duty" and is not "on call." As set forth below, drivers PAM are working continuously while on their tours of duty.

### 2. Drivers are continuously on duty when on a multi-day or multi-week shift.

PAM instructs its drivers to log "sleeper berth" whenever the driver is in the sleeper berth on a tour of duty. When a driver is on a tour of duty, he is generally never relieved of all responsibility.[4] Instead, the undisputed evidence shows that during the entire tour, the driver is responsible for PAM's truck, PAM's customer's cargo, and is responsible for responding to dispatch and load assignments when over-the-road. Consequently, time spent in the sleeper berth predominantly benefits PAM and constitutes "on duty" time for purposes of 29 C.F.R. §785.22.

Beginning in orientation, PAM instructs its drivers that they must be vigilant when over-the-road to prevent cargo theft and truck hijackings. PAM even explains that the truck itself could be used as a weapon if it were in the wrong hands. As part of the onboarding process, each driver working for PAM is required to sign a document agreeing that the driver may be financially responsible for discrepancies in cargo that is in the possession of the driver. Plaintiffs' Statement of Undisputed Material Facts ("PSOMF ¶59")

---

[4] To the extent Defendant argues that there are unidentified sporadic instances where a driver is completely relieved of duty while on a tour of duty and is permitted to pursue his own personal interests without significant restriction, Defendant's failure to maintain accurate records of compensable work, in violation of 29 U.S.C § 211(c) time makes identifying such periods with precision impossible. As nearly 75 years of FLSA precedent demands, where an employer fails to maintain accurate records of working hours, an employee meets his burden by establishing, to a just and reasonable inference, the amount of hours worked. *Anderson v. Mount Clemens Pottery Co.,* 328 U.S. 680, 687 (1946); *Perez v. Contingent Care, LLC*, 820 F.3d 288 (8th Cir. 2016). The burden then shifts to the employer to provide a precise showing of hours worked or to negate the reasonableness of the employees' estimates. Here, even if sporadic interruptions occasionally provide moments of duty-free time during multi-day tours (a premise the evidence does not establish), it is Defendant's burden to identify with specificity such instances to negate the reasonableness of Plaintiffs' estimates.

As part of their duties at PAM, drivers take possession of loads for several days and are responsible for getting the load to its destination safely and securely.  Drivers haul freight of significant financial value. PSOMF ¶66.  While the loads have "seals," management agreed the seals do not prevent theft and are more akin to the seal on a water bottle; while a broken seal means someone was in the truck, the seal itself is plastic and can be cut with scissors. Killian Dep., Ex. 1-AK at 26:12-28:5 (testifying that the plastic seal on the trailers were similar to water bottles); Deposition of Sharon Oxley ("Oxley Dep."), attached to Swidler Decl. as Ex. 1-O at 80:25-81:15 (testifying that she could remove the plastic seal with her finger).

Management and drivers alike testified regarding the significant security duties drivers have while on a tour in a truck's sleeper berth.  First, the driver manual of PAM instructs drivers that they should "avoid leaving the truck or trailer unattended in a non-Secure Area." PSOMF ¶60. PAM's designee explained that a secure area is an area with a guard and fencing.  Some of the drop yards of PAM constitutes such secure areas, but not all.  Truck stops are not secure areas; neither are parking lots. PSOMF ¶61.  Thus, when a driver shuts down for the night at a truck stop or fueling station, the driver may not leave the truck or trailer unattended.

The manual further instructs drivers to pay attention and observe "suspicious people around your vehicle" and on a separate page informs drivers that they must "**_always_** be alert to tampering or suspicious activity around your tractor or trailers whenever you are parked." (PSOMF ¶56) (Emphasis in Original).  PAM admitted in designee deposition that the instructions provided to drivers are "just part of security …  if there is a suspicious vehicle they may be there to hijack you, rob you, so again, [the driver must] be aware of [his] surroundings." PSOMF ¶ 63.  PAM instructs its drivers in writing that truck stops are not great places to rest and may be dangerous.  PAM

advises that drivers should "turn noise sources down such as the radio and the CB" and should "roll down your windows partially [to] hear any warning signals." PSOMF ¶58.

Defendants' management admitted that such security duties are "important job duties" of drivers and admitted that drivers' primary duties at PAM included not just driving but also "protecting the load and getting it safely from Point A to Point B." PSOMF ¶70.

The depositions of drivers confirmed that drivers engaged in these security duties and were thus not relieved of duty when in a truck's sleeper berth. Named Plaintiff David Browne testified that "the responsibility to take care of the equipment and the load never disappears while we're in charge of that truck and while we're driving or parked or whatever it is we're doing, while the equipment is in our possession, we're responsible for it." Browne Dep., Ex. 1-U at 70:2-70:7. Named Plaintiff Caldwell testified that he kept "a little eye out just in case somebody [was] walking around my truck or something like that. I was always on the up and up with that." Caldwell Dep., Ex. 1-V at 64:8-64:10. Other drivers reiterated this reality in their depositions. *See, e.g.* Deposition of Kenneth Harding ("Harding Dep."), attached to Swidler Decl. as Ex. 1-X at 91:23-92:20 (testifying that pan handlers, prostitutes, and other people knock on doors of trucks and walk near the truck and cargo and that he has to keep a vigilant eye over the equipment during his 10-hour sleeper berth "break"); Deposition of Eli Lee ("Lee Dep."), attached to Swidler Decl. as Ex. 1-Y at 89:8-89:10 ("[W]e couldn't leave the truck unattended because, you know, it was a truck stop. It's not necessarily a safe area."); Deposition of Daniel Gonzalez ("Gonzalez Dep.") attached to Swidler Decl. as Ex. 1-Z at 39:14-39:19 ("You'd hear a lot of stuff out there [at a truck stop]. Or it seemed like the trailer would move or somebody would back into your trailer or something and you'd get woken up, and you'd have to go check your load and check the trailer for damage and do a lot of stuff like that. It was pretty bad at the truck stop parking too, or anywhere

14

else."); Deposition of Martin Garcia ("Garcia Dep."), attached to Swidler Decl. as Ex. 1-AA at 39:2-39:23 (testifying that he was working when in the sleeper berth by providing security  and checking on the trailer when he heard unusual noises); Deposition of James Escobedo ("Escobedo Dep."), attached to Swidler Decl. as Ex. 1-AB at 125:10-126:20 (testifying that he kept his window cracked so he could hear sounds and that he had to check on his truck and/or trailer multiple times a night); Deposition of Billy Palmer ("Palmer Dep."), attached to Swidler Decl. as Ex. 1-AC at 26:18-26:21 (testifying that he was required to be aware of what was going on around the truck when in the sleeper berth); Deposition of Jamal Johnson ("Johnson Dep."), attached to Swidler Decl. as Ex. 1-AD at 97:14-99:7 ( "I'm not relieved of any type of duties period whether in sleeper berth, off-duty… [b]ecause I still owe a responsibility to the truck. It's like being a security guard."); Deposition of Lee Appelt ("Appelt Dep.") attached to Swidler Decl. as Ex. 1-AE at 102:18- 103-14 (testifying that while logged in "sleeper berth," he was required to check on noises and respond when people knocked on the door to ask him to move the truck); Deposition of Melody Acreman ("Acreman Dep.") attached to Swidler Decl. at 32:1-33:1 (testifying that she provided security for the truck and the load); Deposition of Robert Chapman ("Chapman Dep."), attached to Swidler Decl. as Ex. 1-AG at 92:22-93:8 (testifying that he was not relieved of responsibility in the sleeper berth because he was providing security); *Id.* at 35:21-36:7 ("You just basically sleep with one eye open, you know, for people messing with your truck, you know, sitting there, looking out the mirrors all the time, opening – getting up and opening the curtains for strange noises. It's just not a safe environment. You're not home in your bed. You're out – you know, you're out on the road in a strange environment; you're not really sure of your surroundings."); Deposition of Robert Lark ("Lark Dep."), attached to Swidler Decl. as Ex. 1-AH at 73:7-73:11 ("There's a lot of stuff I'm doing in the sleeper berth during that time. I'm also listening, making sure – listening for

15

noises, warning signs, anybody messing with my truck. If that happens I'm still in sleeper berth. I'm responsible.); Deposition of Nicholas Ricotta ("Ricotta Dep.") at 72:13-72:23, Ex. 1-AI (testifying he would get up and check on the truck when the truck moved or when he heard noises); Deposition of Remigio Galvan ("Galvan Dep."), attached to Swidler Decl. as Ex. 1-AJ at 105:4-108:3 (testifying that he get out of the truck and walked around when he heard noises).

It is not just security duties that drivers have when logged in sleeper berth status while on a multi-day tour.  Drivers also must remain with the truck when at a shipper, receiver, or terminal so that they can move the truck and load immediately when assigned.  Drivers on a tour must accept load assignments when they are sent, and drivers are expected to immediately respond if the load so requires.  PAM's designee and management admitted that when a driver is on a multi-day tour without a load assignment, he is expected to remain with the truck in an on-call status so that he can accept an assignment and begin driving immediately if the load requires it. PSOMF ¶¶76-83. During such periods, PAM instructs its drivers to log such time as "sleeper berth" or, if they are out of the truck, "off duty." *Id*.

Similarly, PAM's designee testified that when a driver gets to a shipper or receiver, the driver waits for the customer either in an "off duty" status (if the driver is able to get off the truck wait in a waiting area at the customer) or in "sleeper berth" status if the driver is required to stay in the truck. PSOMF ¶72-76.  Drivers must stay in or near the truck because they must be ready to move the truck immediately once loading/unloading is complete, or once a dock becomes available, and the driver is not aware of when that will occur.  PAM's designee admitted such restrictions mean the driver cannot go home, go to the movies, or otherwise leave.

Likewise, long-haul drivers at PAM are required to wait at drop yards for cargo, usually car parts, to cross the border.  PAM needs the drivers to wait in an off duty or sleeper berth status

to conserve hours so that the driver will have a full clock when the trailer comes through.  Nick Humphrey, PAM's zone planner for the Laredo border crossing, testified that drivers are required to wait at the Laredo yard for hours with their trucks, and that neither PAM nor the driver knows precisely when the trailer will be ready.  Humphrey Dep., Ex. 1-R at 15-18.  Drivers could not just leave the yard to engage in personal pursuits; car part loads are critical, and a delay in shipment may result in a factory shutting down.  PAM has paid fines to its customer of $100,000 for delivering a load even a few hours late. Killian Dep., Ex. 1-AK at 23-24.

Such realities mean that with few and far exceptions, drivers on a multi-day tour are continuously on duty per 29 C.F.R. § 785.22.  Drivers are not relieved of all responsibilities, even when they are not performing active tasks, such as driving or fueling.  Providing security and waiting are inherent parts of the job and drivers are expected to provide security and remain on-call and responsible to PAM during their entire tour.

PAM did not accurately track work time of its drivers or the precise time a tour started and ended.  Thus, Plaintiffs have relied on reasonable conservative estimates provided by Dr. Speakman to estimate when drivers were on a tour of duty.  Dr. Speakman utilized location, load, and log information to determine when a tour started and ended. Defendant's expert, Dr. Thompson, did not disagree that Dr. Speakman correctly calculated the tour beginning and end times, and agreed that Dr. Speakman's damages calculations were accurate if the Court found that drivers were entitled to pay for 16 hours per day when on a tour of duty which extended more than 24 hours.  *See* Deposition of Dr. Matthew Thompson ("Thompson Dep."), attached to Swidler Decl. as Ex. 1-AL at 61:2-62:9.

Thus, the undisputed factual record shows that drivers are continuously "on duty' pursuant to 29 C.F.R. § 785.22 while on a tour of duty, and accordingly are entitled to compensation, at

minimum wage levels, for 16 hours each day.  Dr. Speakman's calculation of damages, which are undisputed by Defendant, provide that Defendant failed to pay the minimum wages of $30,288,140 for the Arkansas Class and $5,780,183 for the FLSA opt-in Plaintiffs under federal law, of which all but $222,414 is subsumed by the damages sought under Arkansas law.  Report of Dr. Speakman, Ex. 1-J at 19.

> **3.      Defendant failed to pay minimum wage for driving and on duty not driving time.**

Should the Court not grant Plaintiffs and the Class Summary Judgment providing that they are entitled to 16 hours of compensation per day for each day on a tour, Plaintiffs seek the Court hold that: all "driving" and DOT "on duty" time constitutes work.

Defendant generally does not dispute that time a driver logged as "driving" or "on duty not driving" is compensable work time which must be paid at minimum wage.  Indeed, Defendant has bound itself in sworn interrogatory response to this very position.  Defendant's Supplemental Responses Plaintiffs' Second Set of Interrogatories, Ex. 1-E at Interrogatory 1 ("assuming that a Class Member accurately logged his or her time and duty status, the number of hours he or she worked each week can be determined by adding the On Duty, Driving and On-Duty, Not Driving hours logged each week").

PAM paid its Named Plaintiffs and Class Members on a piece-rate basis that did not consider the hours worked when determining payments due.  Because PAM paid its employees on a piece-rate basis which did not consider compensable hours worked, the pay system failed to pay minimum wages even for hours logged in duty statuses which PAM itself does not dispute constitute hours worked.

Plaintiffs' expert Robert Speakman produced his expert report, and concluded that, if **only** time logged as "driving" and "on duty not driving" is considered compensable, Defendant failed

to pay the minimum wages of $3,336,094 for the Arkansas Class and $634,548 for the FLSA opt-in Plaintiffs under federal law, of which $611,010 is subsumed by the Arkansas claims.  Report of, Dr. Speakman at 19, Ex. 1-J.

> **4.**   **Defendants failed to pay Plaintiffs the minimum wage for short rest breaks logged on line 1 (off-duty) and line 2 (sleeper berth).**

Plaintiffs also regularly logged short periods of 20 minutes or less on Line 1 (off-duty) and Line 2 (sleeper berth). Department of Labor regulations make clear that short rest periods of 20 minutes or less are hours worked and must be paid. 29 C.F.R. §785.18; AR DOL Rule No. 010.14.108(c)(1). Moreover, this is neither a new regulation nor one that courts have declined to follow; the law as to the compensability of short rest periods is not in dispute: they constitute work time and must be paid. *See Mitchell v. JCG Indus.*, 745 F.3d 837, 850 (7th Cir. Ill. 2014) (Posner. J.) ("rest periods of short duration, running from 5 minutes to about 20 minutes . . . must be counted as hours worked"); *Rother v. Lupenko*, 515 Fed. Appx. 672 (9th Cir. 2013) ("it is the general rule under federal law that breaks of less than thirty minutes are compensable"); *Sec. U.S. Dept. of Lab. v. Am. Future Sys., Inc.*, 873 F.3d 420, 426 (3d Cir. 2017), *cert. denied sub nom. Am. Future Sys., Inc. v. Acosta*, 138 S. Ct. 2621 (2018) (rest breaks of 20 minutes or less are per se compensable under the FLSA); *Petrone v. Werner Enterprises, Inc.*, 121 F. Supp. 3d 860, 869 (D. Neb. 2015) (short rest breaks of 20 minutes or less logged as "off duty" or "sleeper berth" by over-the-road truck drivers constitutes compensable work time); *Herman v. Palo Group Foster Home*, 976 F. Supp. 696 (W.D. Mich. 1997) ("Rest periods from five to twenty minutes long….are also compensable"); *Reich v. Cole Enters.,* 901 F. Supp. 255 (S.D. Ohio 1993) ("any 'cigarette breaks' an employee may have taken are compensable time under 29 C.F.R. §785.18"); *Bauer v. Singh*, 2011 U.S. Dist. LEXIS 14193 (S.D. Ohio Feb. 14, 2011) (same).

Because Defendant did not consider short rest breaks as compensable work time and because Defendant generally paid on a piece rate basis, Defendant did not take into account such short rest breaks when considering compensation due.  As a result, in many workweeks, Defendant failed to pay drivers minimum wage for such time.

Plaintiffs' expert, Dr. Speakman calculated that Defendant failed to pay Named Plaintiffs and the Class $256,972 in minimum wages as a result of its failure to consider short rest breaks as compensable.  Similarly, Defendant failed to pay Named Plaintiffs and the Opt-in Plaintiffs minimum wages due under the FLSA totaling $36,149 due to short rest breaks, of which $33,675 is subsumed by the AMWA claims. Report of Dr. Speakman at 19, Ex. 1-J.

### 5.    Sleeper Berth Time in Excess of 8 Hours per Day.

If the Court denies Plaintiffs judgment for 16 hours per day of compensation, the Court should grant judgment for Plaintiffs for all sleeper berth time in excess of 8 hours per day while a driver is on a tour of duty.  Though Plaintiffs maintain such calculation would be underinclusive as it would eliminate significant on-call and security time that drivers spend logged as "off duty" (as opposed to sleeper berth), sleeper berth time in excess of 8 hours per day is compensable pursuant to 29 C.F.R. § 785.22 as Plaintiffs are not relieved of duty when they are in the sleeper berth, as discussed in the above sections.

Plaintiffs' expert, Dr. Speakman, calculated that Defendant failed to pay Named Plaintiffs and the Class $11,309,715 in minimum wages as a result of PAM's failure to pay for compensable sleeper berth periods.  Similarly, Defendant failed to pay Named Plaintiffs and the Opt-in Plaintiffs minimum wages due under the FLSA totaling $2,120,349 for sleeper berth time in excess of 8 hours per day, of which $2,043,376 is subsumed by the AMWA claims. Report of Dr. Speakman at 19, Ex. 1-J.

**C.**     **Defendants Minimum Wage Violations Must be Determined on each Pay Day.**

PAM's workweeks run from Friday at midnight to Friday at midnight. PSOMF ⁋88.  PAM

provides pay for the workweek on the following Thursday. PSOMF ⁋89.

Defendant's failure to pay minimum wage to its drivers is, in part, due to the fact that

Defendant's policy was such that it would withhold a drivers' wages until a load was complete and

paperwork was turned in. Stewart Dep. dated May 30, 2019, Ex. 1-AN at 38:11-38L15.  As a result,

if a driver was working on a load that began in one workweek and delivered in another workweek,

the driver would not be paid for that load until the following workweek.  Because PAM failed to

implement any minimum wage protections against shortfalls, the delay in providing payment

meant that drivers at PAM frequently were paid under minimum wage in such circumstances.

Under the FLSA and Arkansas law, an employer may not pay an employee sub-minimum

wage in a workweek simply because the employee had not yet completed an assignment.  Rather,

"[A] cause of action for unpaid minimum wages … and for liquidated damages 'accrues' when the

employer fails to pay the required compensation for any workweek at the regular pay day for the

period in which the workweek ends."  29 C.F.R. §790.21.  In other words, the FLSA requires

employers to pay their employees at least minimum wage on payday. *Biggs v. Wilson*, 1 F.3d 1537,

1539-1540 (9th Cir. 1993) ("'Unpaid minimum wages' have to be 'unpaid' as of some distinct

point . . .The only logical point that wages become 'unpaid' is when they are not paid at the time

work has been done, the minimum wage is due, and wages are ordinarily paid - on payday.");

*Olson v. Superior Pontiac-GMC, Inc.,* 765 F.2d 1570, 1579 (11th Cir. 1985) ("the employee must

actually *receive* the minimum wage each pay period") (emphasis in original), *modified*, 776 F.2d

265 (11th Cir. 1985); *Rogers v. City of Troy*, 148 F.3d 52, 57 (2d Cir. 1998) ("it is clear that the

FLSA requires wages to be paid in a timely fashion"); *Herman v. Fabri-Centers of Am., Inc.*, 308

F.3d 580, 592 (6th Cir. 2002) (same); *McDonald v. Jp Mktg. Assocs., LLC*, 2007 U.S. Dist. LEXIS

27747 (D. Minn. Apr. 13, 2007) (cause of action under FLSA "accrues when the employer fails to pay required compensation for any workweek at the regular pay day for the period in which the workweek ends"); *Mathis v. About Your Smile, P.C.*, 2002 U.S. Dist. LEXIS 15572, 4-5 (E.D. Pa. Aug. 14, 2002) (same). Accordingly, it is not a defense to a minimum wage claim that an employer who failed to pay minimum wage when due on a regular payday paid additional wages the next pay period. *See Rother v. Lupenko,* 515 Fed. Appx. 672, 675 (9th Cir. 2013) ("a late payment [of minimum wage] immediately becomes a violation equivalent to non-payment").

Plaintiffs here seek the Court hold that minimum wage violations must be measured on each payday, in accordance with firmly established law and DOL regulations.

**D.   Defendant's Actions are Willful.**

Under the FLSA, where an employer's actions are willful, the statute of limitations to recover unpaid minimum wages is three years.  For non-willful violations, the law provides for a recovery period of two years.  Willfulness is not relevant to Plaintiffs' Arkansas Minimum Wage Act claims, which are subject to a three-year statute of limitations.  *Douglas v. First Student, Inc.*, 2011 Ark. 172 (Ark. 2011).[5]

The Supreme Court defined a "willful" violation as one where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988).

Here, PAM acknowledges that it was aware that it was required to pay its drivers at least minimum wage for all hours worked each workweek. PSOMF ⁋114.  PAM further was aware that

---

[5] The AMWA was amended in July of 2019 to shorten the statute of limitations to two years.  Because Plaintiffs filed this action in December of 2016, and such claims were tolled as of the date filed, the intervening amendment to the law does not change Plaintiffs' recovery period under the state law, which permits recovery through December of 2013.

its pay system failed to comply with minimum wage even under the most conservative determinations for which hours constituted compensable time.

PAM has known for years that its drivers were subject to sub-minimum wage pay. A lawsuit making substantially similar allegations to the instant one was filed against PAM in August of 2013. *See Dianna Estes, et al. v PAM Transport, Inc.,* et al. (W.D. Ark. 5:13-cv-05199). Though PAM settled the action for several million dollars in April of 2016, it did not take actions to comport its drivers to minimum wage standards.

Thus, in December of 2016, the instant lawsuit was filed. Yet it would be until July of 2018 before PAM began testing a new compensation system designed to pay drivers at least minimum wage (under PAM's conservative contention that it need only pay drivers for time a driver logged as "on duty" or "sleeper berth"). PSOMF ¶116. PAM tested the new compensation system for more than half a year, sending weekly reports to the CFO listing employees that PAM knew made less than minimum wage. PSOMF ¶118. PAM did not supplement wages or provide additional payments. Instead, PAM continued with its chosen course of conduct of depriving drivers minimum wage until at least April of 2019, when it finally implemented its system. PSOMF ¶115.

But even its current system fails to pay drivers for all work time. Though this Court ruled in October of 2018 that PAM must compensate drivers for at least 16 hours of work each workday, the new system only pays drivers minimum wage for each hour logged as "on duty" or "driving." PAM's continued failure to comply with the law, even in the face of this Court's Orders, constitutes continued willful conduct.

Thus, the Court should hold as a matter of law that Defendants' violations of the FLSA were willful.

E.  **Plaintiffs and the Class are entitled to judgment on their Wage Payment Claims.**

Plaintiffs seek summary judgment holding that Defendants violated the Arkansas Wage Payment Collection Law by charging certain fees related to the Comdata card and by failing to pay all wages due at separation.

1.  **The Court should enter judgment against PAM for its unlawful charging of nearly 800% annualized interest for employee advances.**

Pursuant to the Arkansas Wage Payment Law, Ark. Code. § 11-4-402(a) "It shall be unlawful for any milling or manufacturing company, or any other person, corporation, or company employing persons to labor for them in the State of Arkansas, to discount the wages of their employees or laborers when payment is made or demanded before the regular paydays more than at the rate of ten percent (10%) per annum from the date of payment to the regular payday."

Here, PAM admits that it provided employee advances of up to $65 and charged a $10 fee for each personal advance.  The advance is paid back on the next payday, provided the driver has enough in his paycheck to cover the fee and the advance.  Thus the $10 service charge is to pay for a loan that is paid back in less than seven days. Stewart Dep. dated May 30, 2019, Ex. 1-AN at 73:13-75:7.  Such an amount is drastically higher than the 10% per annum permitted by statute. Even where an employee takes the largest loan possible ($65) and takes the loan on the first day of the payroll (thereby providing seven days to pay back the loan), the per annum rate on such a loan calculates to: 15.3% per week ($10 charge/$65 loan), or **795.6%** per annum.

Pursuant to the Ark. Code § 11-4-402(c), an employer who violates §11-4-402 is guilty of usury and is to be fined no less than $10 and no more than $500 for each violation.  Defendants' payroll data shows the Defendant charged the Class $265,440 in advance fees (each fee being $10), meaning that Defendant violated Ark. Code §11-4-402(a) 26,544 times during the class period.

*See* Speakman Report at 17.  Thus, the Court should enter judgment against PAM by holding that each advance violated the Ark. Code § 11-4-402.

### 2. The Court should enter judgment against PAM for its failure to pay all wages at separation.

Pursuant to Ark. Code § 11-4-405(a), an employee is entitled all wages due by the next regular pay day.  Here, PAM violated the Arkansas Code by denying all drivers who were discharged all wages due, in violation of Ark. Code § 11-4-405(b).

Defendant has failed to provide all wages due at time of discharge.  "Wage" means "compensation due to an employee by reason of his or her employment, payable in legal tender of the United States or checks on banks convertible into cash on demand at full face value, subject to such deductions, charges, or allowances as may be permitted by this subchapter or by regulations of the director under this subchapter." Ark. Code Ann. § 11-4-203.

In addition to not paying all wages due to drivers because of Defendant's minimum wage violations (as discussed above), Defendant also failed to pay all wages due at the time of separation because Defendant, per its written policies, deducted from the last paycheck up to the full amount of the paycheck to fund an escrow account, and because Defendant failed to reconcile the escrow account and provide the unpaid wages which Defendant unlawfully retained until 90 days following discharge. PSOMF ¶105.  Moreover, because Defendant retained the escrow for unlawful reasons, *i.e.* damages to tractor/trailer, discharging within one year of hire, etc., much of the final wages due to class members were never paid.

Dr. Speakman analyzed Defendant's payroll data and determined that during the class period, Defendant withheld $3,765,366 for escrow deductions and returned $2,026,821 to drivers 90 days after their discharge while PAM retained $1,738,545 without returning such funds. Speakman Expert Report, Ex. 1-J at 17. In both instances, PAM's conduct violates §11-4-405(b).

Specifically, with respect to funds returned to drivers, those funds were not provided within seven days of the next regular payday, but instead 3 months after their separation.  Because the law mandates that an employer who fails to make payment within seven days of the next regular payday is liable for "double the wages due," PAM is liable to the class members as follows: $2,026,821 to Class Members who were discharged and had their escrow returned 90 days after discharge, and $3,477,090 to drivers who were discharged and whose escrow monies were not refunded.

Thus, Plaintiffs respectfully request the Court enter judgment in the above amounts on Plaintiffs' and the Class's claims for unpaid separation wages.

## III.   <u>CONCLUSION</u>

For the aforementioned reasons, Plaintiffs respectfully request the Court enter judgment in Plaintiffs' and the Class's favor.

Respectfully submitted,

<u>/s/ Justin Swidler</u>
Justin L. Swidler, Esq.
Joshua S. Boyette, Esq.
Travis B. Martindale-Jarvis, Esq.
**SWARTZ SWIDLER, LLC**
1101 Kings Highway N, Ste. 402
Cherry Hill, NJ 08034
Telephone: (856) 685-7420
Facsimile: (856) 685-7417
E-mail: jswidler@swartz-legal.com

*Attorneys for Plaintiffs*

Date: November 5, 2019