## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**DAVID BROWNE, ANTONIO
CALDWELL, and LUCRETIA HALL, on
behalf of themselves and others similarly situated**                     **PLAINTIFFS**

**V.**                                    **CASE NO. 16-CV-5366**

**P.A.M. TRANSPORT, INC., et al.**                                **DEFENDANTS**

## OPINION AND ORDER

Before the Court is Plaintiffs' Motion for Partial Summary Judgment (Doc. 160),

which is fully briefed and ripe for decision.[1] Also ripe for decision is Plaintiffs' Motion to

Strike the Declaration of Dustin Mixon (Doc. 187).[2] Because the Declaration of Dustin

Mixon was offered in support of Defendants' Response in Opposition to Plaintiffs' Motion

for Partial Summary Judgment (Doc. 167-12), the Court will first address Plaintiffs' Motion

to Strike and then turn to the Motion for Partial Summary Judgment. For the following

reasons, the Court **GRANTS IN PART AND DENIES IN PART** the Motion to Strike the

Declaration of Dustin Mixon (Doc. 187) and **GRANTS IN PART AND DENIES IN PART**

the Motion for Partial Summary Judgment (Doc. 160).

## I. MOTION TO STRIKE

Plaintiffs have filed a Motion to Strike the Declaration of Dustin Mixon, a risk

supervisor at PAM. The initial Declaration was filed by Defendants in support of their

---

[1] Plaintiffs also filed a Memorandum Brief (Doc. 162) and Statement of Facts (Doc. 161)
in support of their motion. Defendant P.A.M. Transport, Inc. ("PAM") and Defendant John
Does (collectively, "Defendants") filed a Response in Opposition (Doc. 167) and
Statement of Facts (Doc. 168). Plaintiffs filed a Reply Brief (Doc. 186) and Statement of
Facts (Doc. 185). Plaintiffs later provided a Notice of Supplemental Authority (Doc. 215).
[2] Plaintiffs also filed a Brief in Support (Doc. 188). Defendants filed a Response to the
Motion to Strike (Doc. 205), and Plaintiffs filed a Reply (Doc. 212).

Motion to Decertify (Doc. 157-3) and their Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Doc. 167-12). Mr. Mixon's Declaration offers testimony on three main topics: the findings of an audit he conducted after the commencement of this litigation (the "expanded audit"), the PAM Passenger Program, and PAM's yards and facilities. Plaintiffs moved to strike the Declaration, arguing that because it did not lay a foundation for Mr. Mixon's personal knowledge of these topics, it constituted untimely and impermissible expert testimony. (Doc. 187). In their Response to the Motion to Strike (Doc. 205), Defendants included a Supplemental Declaration (Doc. 205-1) offering the same factual testimony but intended to cure the foundational issues raised by Plaintiffs by expounding the basis for Mr. Mixon's lay opinions. Plaintiffs' Reply (Doc. 212) argues that the Court should still strike Mr. Mixon's Supplemental Declaration because Defendants failed to timely produce the documents that Mr. Mixon claims to have reviewed as the basis for his testimony, in violation of Rule 26(a)(1)(ii) of the Federal Rules of Civil Procedure, and that his testimony contradicts Defendants' other discovery responses, disclosures, and designee testimony.

The deadline for expert witness disclosures in this case is long past, so the Court must first determine if Mr. Mixon's Declaration may be considered opinion testimony by a lay witness rather than testimony of an expert witness. Pursuant to Rule 701 of the Federal Rules of Evidence, the testimony of a witness who does not testify as an expert must be "rationally based on the witness's perception" and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Expert testimony, pursuant to Rule 702, is permitted so long as it meets the following four criteria:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

2

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"Determining whether a witness is offering an expert or lay opinion requires a case-by-case analysis of both the witness and the witness's opinion." *United States v. STABL, Inc.*, 800 F.3d 476, 486 (8th Cir. 2015). The decision whether or not to admit such testimony is "within the district court's considerable discretion." *In re Air Crash at Little Rock Ark.*, 291 F.3d 503, 516 (8th Cir. 2002). "Although lay witnesses may not testify about scientific knowledge within the scope of Federal Rule of Evidence 702, perceptions based on *industry experience* are a sufficient foundation for lay opinion testimony." *STABL, Inc.*, 800 F.3d at 487 (internal quotation marks omitted and modifications adopted) (emphasis in original). "Personal knowledge or perception acquired through review of records prepared in the ordinary course of business, or perceptions based on industry experience, is a sufficient foundation for lay opinion testimony." *Burlington N. R.R. Co. v. Nebraska*, 802 F.2d 994, 1004–05 (8th Cir. 1986).[3]

---

[3] Plaintiffs correctly note that *Burlington* was decided before Rule 701 was amended to add the final clause underscoring the distinction between lay and expert testimony. However, the Eighth Circuit continues to recognize that industry experience can inform lay opinion. *See, e.g., STABL, Inc.*, 800 F.3d at 847 (decided in 2015); *United States v. Smith*, 591 F.3d 974, 982 (8th Cir. 2010); *U.S. Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 690 (8th Cir. 2009). The Court does not believe that this aspect of the holding in *Burlington*, which refers only to personal knowledge and perception, is called into question by the subsequent amendment to Rule 701, nor have the parties cited to Court to any authorities interpreting *Burlington* in such a manner.

The paragraphs of Mr. Mixon's Supplemental Declaration addressing the number and nature of PAM's yards and facilities across the country and the headquarters in Tontitown specifically (Doc. 205-1, ¶¶ 21–23) will not be stricken. The Supplemental Declaration asserts that these opinions are based on Mr. Mixon's "personal knowledge and a review of information and documents maintained in the normal course and scope of PAM's business operations." Id. at ¶ 21. The Court concludes that the opinions offered in these paragraphs are "rationally based on [Mr. Mixon's] perception" from his physical presence at the headquarters in Tontitown and his review of information and documents produced in the normal course of business.

The paragraphs of Mr. Mixon's Supplemental Declaration regarding the expanded audit, however, will be stricken. His testimony on this topic cannot be considered lay testimony even with the additional foundation provided in the Supplemental Declaration. The conclusions offered in paragraphs 15 through 19 of the Supplemental Declaration cannot be reached by a simple review of records created in the ordinary course of business or "mere tabulation" of data in such records. See STABL, Inc., 800 F.3d at 487 (permitting lay testimony as to the number of violations where the witness simply counted the occurrences as recorded in the ordinary course of the defendant's business). Defendants acknowledge that the expanded audit was not conducted in the regular course of PAM's business but was initiated "[i]n connection with this lawsuit." (Doc. 205, p. 6 n.2). Furthermore, neither review of the log records nor of the location histories alone would create the perception that drivers were engaged in personal activities while in an "on duty" status. Mr. Mixon had to perform a technical or specialized process using the data from driver logs, GPS coordinates, and information as to what physically existed at

4

those GPS coordinates in order to identify times that a driver was logged "on duty" while parked, for example, at home or at a casino. Thus, Mr. Mixon's testimony is based on the application of "methods" to "data," exactly the kind of testimony that is guided by Rule 702. This kind of data analysis distinguishes expert from lay testimony, and the conclusions in paragraphs 15 through 19 must therefore be considered expert testimony. In fact, Defendants' designated expert, Dr. Matthew Thompson, did exactly the same thing that Mr. Mixon did: he analyzed driver logs and GPS data to poke holes in Plaintiffs' theory of damages by identifying times that drivers claim are compensable but did not perform compensable work. (Doc. 167-13). Defendants may not supplement Dr. Thompson's expert findings now under the guise of lay opinion testimony.

Furthermore, even if Mr. Mixon's Supplemental Declaration offered only lay opinions, his testimony regarding the expanded audit would still be excluded because Defendants failed to disclose it during discovery, and the Court finds that failure is not substantially justified or harmless. Rule 26(a)(1)(ii) requires that a party disclose anything it "may use to support its claims or defenses, unless the use would be solely for impeachment." Rule 37(c)(1) provides that the consequence for a failure to disclose is that "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Defendants rely on the expanded audit to demonstrate that Plaintiffs are not always on duty and to challenge Plaintiffs' calculation of damages. Defendants therefore had an affirmative obligation to disclose their findings from the expanded audit, even if it did not technically fall within any particular request for production by the Plaintiffs, and have offered no justification for their failure to do so. Nor can the failure to disclose be

5

considered harmless; on the contrary, it results in significant prejudice to Plaintiffs. Though Mr. Mixon was identified as PAM's Rule 30(b)(6) designee for several deposition topics, none of those topics appear to be most relevant to the topic of the expanded audit.[4] Furthermore, the individuals who testified about log audits not only did not disclose the expanded audit now described by Mr. Mixon but indicated that it was not possible for PAM to check the accuracy of a driver's representation as to the use of his time.[5] Presumably, Plaintiffs developed their litigation strategy in light of this testimony, and to permit Defendants to introduce new and conflicting testimony at this juncture would be significantly prejudicial to Plaintiffs.

By asserting that these "examples of personal activities . . . can be determined in some instances by closely analyzing the drivers' log records, load records, location histories, and Qualcomm messages, which have been provided to Plaintiffs during

---

[4] For example, Mr. Mixon was not the designee on the topic of "all actions taken by Defendant to maintain accurate records of each class members' working hours" nor "the number of hours PAM contends each class member worked each workweek." (Doc. 205-2, ¶¶ 4, 8).

[5] Amy Frazier, a log supervisor, was identified by PAM as having personal knowledge of "PAM's practices and procedures related to logs and also deals with drivers regarding log-related issues." (Doc. 188-1). During her deposition, Ms. Frazier testified that the purpose of auditing logs was "making sure [drivers] get their work on duty, stay within their hours of service regulations, logging all their drive time, performing pretrips, utilizing sleep and work and off duty accurately." (Doc. 185-6, 10:20–23). However, when asked if her review of the logs included "looking at how the driver logged his time and trying to determine if that's actually an accurate assessment of what the driver was doing," id. at 12:1–4, she responded, "I wouldn't say so much of that. We can't really determine that just by looking at their logs if they were logged accurately." Id. at 12:5–7. When asked if she had any way of verifying the accuracy of logs, Ms. Frazier replied that "the driver is the one that certifies and provides us his logs." Id. at 13:13–14. Andrew Christensen, the associate vice president of safety at PAM and a Rule 30(b)(6) designee, also testified that the accuracy of the logs "is up to the driver and when he certifies his logs, he says that is a true and correct entry. Other than that, I don't know what more we can do." (Doc. 162-12, 63:19–22).

discovery," Mr. Mixon seems to imply that Plaintiffs had the information they needed to conduct this analysis for themselves. (Doc. 205-1, ¶ 19). The Federal Rules of Civil Procedure, however, do not require Plaintiffs to imagine what defenses Defendants *might* raise and what evidence Defendants *may* marshal to support those defenses. Quite the opposite: Rule 26 *requires* Defendants to disclose their defenses and supporting evidence, and Rule 37 provides for the exclusion of evidence that has not been disclosed. The portions of Mr. Mixon's Supplemental Declaration that refer to the expanded audit (Doc. 205-1, ¶¶ 11–19) are therefore stricken.

For the same reason, the paragraph and spreadsheet addressing PAM's Passenger Program will also be stricken. (Doc. 205-1, ¶ 20; Doc. 157-3). To the extent that PAM now wishes to offer these documents to support their contention that drivers are not on duty the entire time they are on a tour or that drivers engage in personal activities while logged "on duty," the data had to be disclosed in compliance with Rule 26(a)(1)(ii). PAM offers nothing to suggest its failure to disclose was substantially justified, and allowing Defendants to introduce new evidence in support of a defense regarding a central dispute of the case after the close of discovery and only two months before trial cannot be considered harmless. Therefore, any reference to PAM's Passenger Program is also stricken.

In summary, Mr. Mixon's initial declaration, appearing at Doc. 157-3 and Doc. 167-12, is stricken. The Court also strikes paragraphs 11 through 20 of Mr. Mixon's Supplemental Declaration, Doc. 205-1.

## II. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs seek summary judgment on some of their claims for minimum wage violations[6] under the Fair Labor Standards Act ("FLSA") and Arkansas Minimum Wage Act ("AMWA")[7] as well as claims under the Arkansas Wage Payment Collection Law. The standard for summary judgment is well established. Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

---

[6] Plaintiffs have not asked the Court to differentiate between solo and team drivers.

[7] The pertinent provisions of the AMWA, both statutory and regulatory, are substantively identical to the FLSA. *Compare, e.g.*, Ark. Admin. Code 010.14.1-108(D)(3)(a) *with* 29 C.F.R. § 795.22 (duty of 24 hours or more); Ark. Admin. Code 010.14.1-108(F)(7) *with* 29 C.F.R. § 785.41 (work performed while traveling); Ark. Admin. Code 010.14.1-102 *with* 29 C.F.R. § 516.2 (record-keeping requirements); Ark. Admin. Code. 010.14.1-108(C)(1) *with* 29 C.F.R. § 785.18 (compensability of short rest periods); Ark. Admin. Code 010.14.1-108(B)(3) *with* 29 C.F.R. § 785.16 (off duty time). Additionally, the Arkansas Department of Labor is expressly authorized in the Arkansas Administrative Code to "rely on the interpretations of the U.S. Department of Labor and federal precedent established under the Fair Labor Standards Act in interpreting and applying the provisions of the [Minimum Wage] Act and [implementing rules], except to the extent a different interpretation is clearly required." Ark. Admin. Code 010.14.1-112. The Court's analysis will therefore focus on the FLSA and relevant case law but applies equally to Plaintiffs' claims under the AMWA.

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, in order for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## A. Minimum Wage Law Violations

### 1. Sixteen Hours Daily or Sleeper Berth Time in Excess of Eight Hours

First, Plaintiffs seek summary judgment on their claim that class members are entitled to minimum wage for sixteen hours per day when they are on a tour of duty. The Court previously held that, per Department of Labor ("DOL") regulations, if a driver is on duty for a 24-hour period or longer, no more than eight hours of sleeping time may be excluded from the employee's compensation.[8] (Doc. 82, p. 10). Upon careful review of the record, the Court finds that there remain genuine disputes of fact as to whether PAM's drivers are on duty at all times while on a tour. Plaintiffs offer testimony from drivers and supervisors that while drivers are logged as "off duty" or "sleeper berth," PAM still requires

---

[8] The Court is aware that DOL has issued an Opinion Letter revising its interpretation of the relevant DOL regulations and disagreeing with the Court's prior holding. As will be addressed more fully in a subsequent opinion, the Court finds no reason to revisit its conclusions of law in this case.

9

that they be responsible for the security of the truck, trailer, and cargo, and drivers are therefore always on duty for the purposes compensability. Similarly, while cargo is loaded or unloaded from the trailer or when a driver is waiting for a new assignment, PAM requires that drivers remain in the immediate vicinity of the truck to ensure that they are ready to go at a moment's notice for the convenience of PAM's customers. These restrictions suggest that such time cannot be considered off duty time as described in 29 C.F.R. § 785.16.

Mr. Christensen, speaking for PAM as a Rule 30(b)(6) designee, however, testified that PAM does not require a driver to be responsible for the security of his truck at all times and that sometimes the driver's "off duty" time should not be compensable. For example, Mr. Christensen described a driver's obligation to provide security while stopped as follows: "He is responsible in the sense of if something happened while he was asleep or in the sleeper or away from the truck, he is responsible to report that to the company once he becomes aware of it." (Doc. 162-12, 46:15–18). Mr. Christensen also testified that "if a driver parks the vehicle in a safe area such as . . . a truck stop, that's a typical example, they are relieved of responsibility for that vehicle as long as it's safely parked." *Id.* at 51:12–16. Additionally, when asked if it was PAM's policy that a driver should remain with his truck while waiting for notification of his next assignment, Mr. Christensen responded that "[w]e do have an application that drivers can put on their phone that gives them freedom to be away from their truck. . . . Q: He still stays close to the truck, doesn't he, so you can move it when there is a load, correct? A: Within reason." *Id.* at 57:13–19. The Court finds that PAM has made a sufficient showing of specific facts establishing a genuine dispute for trial regarding its driver policies. Therefore, Plaintiffs are denied

10

summary judgment on their claim that drivers must be paid minimum wage for 16 hours of every day they are on tour.

In the alternative, Plaintiffs seek summary judgment on a claim for minimum wage for sleeper berth time in excess of 8 hours. Like the claim discussed above, this claim relies on 29 C.F.R. § 785.22, which applies "[w]here an employee is required to be on duty for 24 hours or more." Thus, the same disputed facts discussed above require that summary judgment on this claim be denied.

## 2. Time Logged as "Driving" or "On Duty Not Driving"

In the alternative, Plaintiffs seek summary judgment on the claim that drivers are entitled to be paid minimum wage for all hours logged as "driving" or "on duty not driving." The Court agrees. It is undisputed that hours correctly logged as "driving" and "on duty not driving" must be considered hours worked. (Doc. 161, ¶ 40). PAM also concedes that Plaintiffs are entitled to at least the prevailing federal minimum wage for all such hours. (Doc. 162-41, 85:24–86:3). And this Court has already held that Arkansas is the applicable state law with regard to the minimum wage claims. (Doc. 102, p. 13). Therefore, Plaintiffs are entitled to summary judgment on their claim to be paid minimum wage for time logged as "driving" and "on duty not driving."

Defendants raise a potential dispute, however, as to whether the drivers' logs are a sufficiently accurate record of the time spent "driving" and "on duty not driving" for the purpose of calculating damages. The source of this contention by PAM is a portion of Mr. Christensen's deposition as a Rule 30(b)(6) designee in which he suggests—without offering specific examples—that some drivers' logs are inaccurate:

Q: . . . is it P.A.M.'s testimony that their records, their driver log records that they produced in this litigation are an accurate way to assess the hours the drivers work?

A: Well, I think that was our basis that the drivers were being honest in their reporting. In reading the depositions, I see now that the information we may have is inaccurate, I mean, by the driver's admission.

Q: So is P.A.M.'s testimony the logs are not an accurate assessment of the hours the drivers worked?

A: Based on what I've seen, yes, I would say they're inaccurate.

(Doc. 162-13, 56:11–22). To the extent that Defendants would assert that this presents a genuine dispute of material fact for trial on the measure of damages, the Court disagrees. Defendants have failed to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).

Under the FLSA, it is the employer's obligation to "make, keep, and preserve such records . . . of the wages, hours, and other conditions and practices of employment." 29 U.S.C. § 211(c). "Where the employer's records are inaccurate or inadequate . . . , the solution is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work." *Perez v. Contingent Care, LLC*, 820 F.3d 288, 293 (8th Cir. 2016) (quoting *Anderson v. Mount Clemens Pottery Co.*, 38 U.S. 680, 687 (1946)) (modifications adopted). Instead, an employee need only provide "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* Plaintiffs provide the expert report of Dr. Robert Speakman, whose calculation of damages is based on the amount of time logged by drivers as "driving" or "on duty not driving," time which, without dispute, constitutes work if logged accurately. (Doc. 162-11, p. 19).

12

When the Plaintiffs have made a "just and reasonable" showing of the hours

worked,

> [t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate. The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [the statute]. Under such circumstances the court should not hesitate to award damages based on the 'just and reasonable inference' from the evidence presented.

*Id.* at 293–94 (internal quotation marks and citations omitted). Defendants' only evidence that the log data may be inaccurate is found in the excerpt from Mr. Christensen's deposition quoted previously, in which he claimed that after reviewing some depositions, he came to believe that the logs are not accurate. However, Defendants do not cite the Court to the deposition testimony Mr. Christensen purports to characterize nor put forward any further evidence in support of this claim. Thus, the Court is left with only Mr. Christensen's bald assertion that depositions exist in which drivers have admitted to inaccurately reporting their duty statuses. The Court is not obliged at summary judgment to accept contentions for which supporting evidence could have been, but was not, provided. Mr. Christensen's unsupported claim that "the information [PAM] may have is inaccurate," (Doc. 162-13, 56:17–18), is insufficient to meet Defendants' evidentiary burden and create a jury question on the measure of damages on this claim.

Nor does Defendants' expert, Dr. Thompson, create a material concern that the logs do not permit a "just and reasonable inference" of the measure of damages with regard to time logged as "driving" or "on duty not driving." In his report, Dr. Thompson provided a lone example of a driver who logged all the time spent on a route as "driving"—

13

for which he would be compensated under Plaintiffs' calculation of damages—when he actually deviated from the route between his point of origin and his destination to go to his home. See Doc. 167-13, p. 6. Dr. Thompson pointed out that if this driver were to receive damages based on logged time, he would be paid for 21 minutes of time that he was driving off-route to his home. (Doc. 162-39, 73:9–10). However, when asked if he could say whether the potential inclusion of non-compensable off-route driving makes the log data an unreliable basis for Plaintiffs' calculation of damages, Dr. Thompson acknowledged that he had not assessed how much off-route driving was logged as compensable time on a class-wide basis. Id. at 73:25–74:5. Dr. Thompson also acknowledged that there were other scenarios in which drivers might perform compensable work that was not captured by the "driving" and "on duty not driving" statuses and for which drivers would remain uncompensated by this measure of damages. See id. at 75–78.

Furthermore, Mr. Christensen acknowledged that when a driver logged off duty time as "on duty not driving" in error, the driver would "want to fix it so he can drive again." (Doc. 162-13, 55:25). And in an earlier deposition, Mr. Christensen acknowledged that drivers in fact had an incentive to *underreport* time they were "on duty not driving" because drivers were not paid for that time under PAM's per-mile compensation structure. Time logged as "on duty not driving" reduced the amount of time a driver could spend driving pursuant to Department of Transportation ("DOT") regulations and therefore the driver's compensation. See Doc. 162-12, 61:19–62:12.

It is possible that calculating damages using time logged as "driving" or "on duty not driving" may include some time that was logged inaccurately, just as it will not

14

compensate drivers for any time they were working while in "off duty" or "sleeper berth" status. The reason that there is not a more accurate record of compensable time, however, is that, as PAM acknowledges, PAM's only purpose in having drivers record their duty statuses in these logs was to ensure compliance with DOT regulations. (Doc. 168, ¶ 39). The logs were not intended to serve as a record of hours worked for the purposes of compensability, since PAM paid drivers per mile, not per hour. Having violated the law by not ensuring that it paid minimum wage for hours worked, PAM cannot now use its failure to accurately record hours worked as a defense against paying damages for that violation. The Court finds that the evidence creates, perhaps, some question of accuracy, but does not raise a genuine issue of material fact as to whether drivers' logs allow for a "just and reasonable inference" regarding the measure of their damages for time logged as "driving" and "on duty not driving."[9]

## 3. Breaks of Twenty Minutes or Less

Plaintiffs also seek summary judgment on their claim that they are entitled to be paid for short breaks of twenty minutes or less. The relevant DOL regulation categorically states that "[r]est periods of short duration, running from 5 minutes to about 20 minutes . . . must be counted as hours worked." 29 C.F.R. § 785.18. In support of their claim that PAM is in violation of this requirement, Plaintiffs point to two pieces of deposition testimony. First, Mr. Steve Bruce, a driver manager for PAM, testified that he understood

---

[9] The Court's holding here is supported by the court's opinion in *Julian v. Swift Transp. Co.*, CV-16-00576, filed by Plaintiffs as a supplemental authority (Doc. 215-2). In *Julian*, the district court granted summary judgment for plaintiff truck drivers on the issue of damages. The data provided by the trucking company was significantly less complete than the data available in this case, and the plaintiffs' expert was obliged to extrapolate data to supplement what was available. Nevertheless, the court held that the trucking company "cannot avoid an award of damages merely because of some uncertainty regarding the exact damages Plaintiffs are entitled to recover. The damages need only be 'approximate.'" *Id.* at 9 (quoting *Mount Clemens*, 328 U.S. at 687).

PAM's policy to be that a bathroom break, whether it be ten minutes or thirty, should be logged as "off duty." (Doc. 162-14, 43:18–44:1). Second, Mr. Christensen, testifying as a Rule 30(b)(6) designee, explained that PAM calculated how much time a driver worked in a week by adding the times logged as "driving" and "on duty not driving" and did not include "off duty" periods of any length, including brief periods "like an off duty period of 18 minutes." (Doc. 162-13, 16:22–17:3).

PAM did not respond to this claim in its briefing and does not place in dispute that a short off-duty period is compensable time. At most, PAM asserts that the time is non-work, not that it is not compensable. (Doc. 168, ¶ 43). Similarly, while Defendants maintain that Mr. Bruce does not speak for PAM and testifies only as to his personal understanding of PAM's policy, *id*. at ¶ 44, Defendants do not offer any evidence that PAM's actual policy is somehow different from Mr. Bruce's description or that when drivers log short periods of time as "off duty" or "sleeper berth" they are actually doing something that is not compensable. Therefore, the Court finds that there is no genuine dispute as to the compensability of breaks of twenty minutes or less logged as "off duty" or "sleeper berth," and Plaintiffs are entitled to summary judgment on this claim.

## 4. Willfulness

Plaintiffs seek a determination at summary judgment that Defendants' violations of the FLSA were willful. In general, there is a two-year statute of limitations for claims brought under the FLSA. 29 U.S.C. § 255(a). If a plaintiff can demonstrate, however, that the employer's violation was willful, the statute of limitations is extended to three years.[10]

---

[10] This analysis does not impact Plaintiffs' claims under the AMWA because the statute of limitations for those claims is not affected by whether a violation was willful.

*Id.* The Supreme Court has held that an FLSA violation is willful where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1986). Negligence or a good-faith error by the employer is insufficient to establish willfulness. *Id.*

Plaintiffs argue that the Court should find that Defendants' violations of the FLSA are willful as a matter of law. In August 2013, a collective and class action complaint was filed against PAM alleging that its practice of paying drivers per mile resulted in violations of state and federal minimum wage laws. *See Estes v. PAM Transp. Servs., Inc.*, 5:13-cv-05199 (W.D. Ark. filed Aug. 22, 2013). Ultimately, the case was resolved by a settlement of more than three million dollars, accepted by the Court in April 2016. Plaintiffs argue that continuing to pay over-the-road drivers per mile without regard for minimum wage requirements after being sued for exactly that policy demonstrates at least reckless, if not knowing, disregard for the law. It was not until July 2018 that PAM began testing a new computer program for identifying drivers who were not receiving minimum wage for hours logged as "driving" or "on duty not driving" through the per-mile compensation system, and PAM did not begin using this information to actually pay drivers the minimum wage for such hours until April 2019. (Doc. 161, ¶¶ 117, 115).

However, when Plaintiffs deposed PAM's vice president of accounting, Lance Stewart, a Rule 30(b)(6) designee, about the steps PAM took to ensure its compliance with minimum wage laws after settling the *Estes* case, he testified that the company did review its compensation practices and concluded that "the rate of pay that [over-the-road drivers] received, in theory, should be way more than enough to be minimum wage," (Doc. 162-41, 111:23–25), and that drivers, on average, made about $43,500 per year. *Id.* at

113:3. Mr. Stewart testified that in doing its review, PAM looked at driver pay on an annual basis but did not do a week-by-week assessment of whether drivers were being paid minimum wage. *Id*. at 112:17–25. Mr. Stewart also testified that though he personally provided input in PAM's decision after the *Estes* settlement that its pay practices complied with minimum wage laws, PAM had not provided him with any training in minimum wage compliance including, for example, that minimum wages must be paid each workweek. *Id*. at 114:19–115:6.

Therefore, while Plaintiffs have offered evidence indicating that PAM's violation of minimum wage law was willful and Defendants have failed to address the issue in their briefing, the Court cannot conclude as a matter of law based on the record before it that PAM's violation of the FLSA was willful and not the result of good-faith error. Plaintiffs' motion for summary judgment on this claim is therefore denied.

## 5. Date of Calculation

Finally, Plaintiffs seek a holding at summary judgment that minimum wage violations must be measured on each pay day. It is undisputed that PAM's workweeks begin at 12:01 a.m. on Saturday and run until midnight on Friday and payroll is issued on Thursday. (Doc. 161, ¶¶ 88 & 89). It is also undisputed that it was Defendant's policy to pay wages for miles driven once the paperwork for completed trips was submitted. (Doc. 162-41, 102:15–16). This sometimes resulted in drivers being paid less than the minimum wage on the Thursday immediately following the workweek in which the miles were driven. *Id.* at 39:5–7. The wages owed would be paid on a subsequent Thursday. *Id.* at 38:12–14.

18

For the purposes of the statute of limitations, violations of the FLSA accrue on the date "the employer fails to pay the required compensation for any workweek at the regular pay day for the period in which the workweek ends." 29 C.F.R. § 790.21(b). Therefore, it is logical to calculate damages from the regular pay day on which minimum wage was not paid for the hours worked in the corresponding workweek. *See Biggs v. Wilson*, 1. F.3d 1537, 1539 (9th Cir. 1993) ("The only logical point that wages become 'unpaid' is when they are not paid at the time work has been done, the minimum wage is due, and wages are ordinarily paid—on payday."). *Accord Herman v. Fabri-Centers of Am., Inc.*, 308 F.3d 580, 591 (6th Cir. 2002). This is also the longstanding position of the DOL. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter (July 20, 1998); DOL Field Operations Handbook § 30b04 at https://www.dol.gov/whd/FOH/FOH_Ch30.pdf (last visited Jan. 17, 2019) ("Payment of both minimum wage and overtime compensation due an employee must ordinarily be made at the regular payday for the workweek."). Neither the FLSA nor the AMWA require a specific frequency of pay, so an employer is free to set his own regular pay day intervals, and violations of either statute are measured from the regular pay day on which an employer fails to pay at least minimum wage for every hour worked during the corresponding pay period.

Although there is no explicit statement of when claims under the AMWA accrue, state courts would most likely follow the FLSA in applying the state law. The Arkansas Department of Labor is instructed to "rely on the interpretations of [DOL] and federal precedent established under the [FLSA] in interpreting and applying the provisions of the [AMWA] and [implementing rules], except to the extent a different interpretation is clearly required." Ark. Admin. Code 010.14.1-112. Furthermore, "[i]n instances where a state

statute was silent on an issue, [the Arkansas Supreme Court] typically looked to analogous federal statutes and federal precedent." *Gerber Prods. Co. v. Hewitt*, 492 S.W.3d 856, 865–66 (Ark. 2016) (Wood, J. dissenting), *superseded by statute*, Act of Apr. 5, 2017, sec. 5. In *Gerber*, the Arkansas Supreme Court declined to "engraft" a provision of the FLSA into the AMWA where the state statute was silent on the matter. *Id.* at 863. In the next legislative session, the General Assembly explicitly overturned the Court's holding so that the AMWA would remain consistent with the FLSA. The Court finds no indication that a different interpretation is required by the language of the AMWA and therefore concludes that violations of the AMWA accrue the pay day for the period, as they do under the FLSA.

## B. Wage Payment Collection Law Violations

Plaintiffs also seek summary judgment on their claims under the Wage Payment Collection Law. First, Plaintiffs claim that PAM's practice of charging a $10 fee for a $75 wage advance violates Ark. Code Ann. § 11-4-402(a). Second, Plaintiffs allege that PAM's practice of holding monies deducted from wages in an escrow account for 90 days after a driver is discharged is a violation of Ark. Code Ann. § 11-4-405(b).

### 1. Wage Advance Practices

Section 11-4-402(a) provides:

It shall be unlawful for any . . . company employing persons to labor for them in the State of Arkansas, to discount the wages of their employees or laborers when payment is made or demanded before the regular paydays more than at the rate of ten percent (10%) per annum from the date of payment to the regular payday.

Section 11-4-402(c) continues:

Any evasion or violation of this section shall be usury and a misdemeanor. The person, company, or corporation, or his, her, or its agents, violating this

20

section shall be fined in any sum not less than ten dollars ($10.00) nor more than five hundred dollars ($500), and the entire property of the person, company, or corporation shall be subject to the payment of the fine and costs.

Defendants do not deny that it is their practice to charge a $10 fee for an advance up to $75 per pay period, which is then deducted from the driver's next paycheck.[11] Nor do they dispute that their practice violates § 11-4-402(a). Instead, Defendants suggest that the legislature's use of the terms "unlawful," "misdemeanor," and "fine" indicate that § 11-4-402 is a criminal statute. Therefore, Defendants argue, Plaintiffs do not have the authority to enforce the statute and are not entitled to the fine provided for in § 11-4-402(c).

The Arkansas Supreme Court has not yet had an opportunity to interpret this statute but has established the following standard of review for issues of statutory interpretation:

The basic rule of statutory construction is to give effect to the intent of the legislature. Where the language of a statute is plain and unambiguous, we determine legislative intent from the ordinary meaning of the language used. In considering the meaning of a statute, we construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. We construe the statute so that no word is left void, superfluous or insignificant, and we give meaning and effect to every word in the statute, if possible.

---

[11] Plaintiffs' Brief in Support states that PAM provides advances up to $65 (Doc. 162, p. 24), but the Statement of Facts indicates that advances are available up to $75 (Doc. 161, ¶ 107). Since Defendants do not dispute this paragraph of Plaintiffs' Statement of Facts, see Doc. 168, ¶ 107, the Court will assume that $75 is the correct figure. Regardless, this discrepancy does not introduce a genuine issue of material fact since PAM does not deny that it has such a policy, and the value of the advance is ascertainable by reference to objective records. The inconsistency here is not such that a reasonable jury could find for Defendants on this matter.

*City of Little Rock v. Rhee*, 292 S.W.3d 292, 294 (Ark. 2009) (quoting *Great Lakes Chem. Corp. v. Bruner*, 243 S.W.3d 285, 291 (Ark. 2006)). This Court agrees with Defendants that the statute creates criminal liability for a violation of § 11-4-402(a). However, to treat the violation *only* as a misdemeanor would be to render "void, superfluous, or insignificant" the first part of the phrase "*usury and* a misdemeanor." (Emphasis added). The Court is bound to give weight to the legislature's use of the word "usury," which the Court concludes was intended to invoke the prohibition of usury contained in the state's Constitution and the accompanying civil remedies.

Protections against usury have a long history in Arkansas—the state Constitution has prohibited usury since 1874. Currently, Amendment 89, § 3 sets the limit beyond which a loan is considered usurious and § 6 of the Amendment establishes that contracts in violation of § 3 "shall be void as to principal and interest." Ark. Const. Amend. 89, § 6. The legislature has passed laws invoking this Constitutional provision in other specific situations. For example, Ark. Code Ann. § 4-57-104 provides that "parties to a contract may agree in writing to the payment of interest not exceeding the applicable rate of interest, if any, set forth in Arkansas Constitution, Amendment 89, on money due or to become due." Similarly, the Court reads § 11-4-402(c) to invoke the usury provisions of the Constitution while setting a more protective maximum interest rate for a wage advance from an employer. Therefore, the Court concludes, while § 11-4-402(c) *also* establishes criminal fines for violations of the statute, the reference to usury demonstrates the legislature's intent to invoke and make available the remedies for usury available under the state Constitution as well. PAM's practice of charging a $10 fee for a wage advance up to $75 violates § 11-4-402 and constitutes usury. Therefore, any agreement

22

between PAM and any Plaintiff to that effect is "void as to principal and interest" and the

Plaintiff is entitled to damages in the amount of the advance and the $10 fee.

## 2. Last Payment Rule

Plaintiffs also assert that PAM did not timely pay the wages due at the time of

separation pursuant to Ark. Code Ann. § 11-4-405. The current version of the statute

became effective on July 24, 2019, and provides that:

(a) An employer that discharges an employee is required to pay all wages
due by the next regular payday.

(b) An employer that fails to make the payment required under subsection
(a) of this section within seven (7) days of the next regular payday shall owe
the employee double the wages due.

Ark. Code Ann. § 11-4-405 (2019). Prior to this amendment, the statute read, in relevant

portion:

(a)(2) Any servant or employee may request of his or her foreman or the
keeper of his or her time to have the money due him or her, or a valid check
therefor, sent to any station where a regular agent is kept. If the money or
a valid check therefor does not reach the station within seven (7) days from
the date it is so requested, then, as a penalty for the nonpayment, the wages
of the servant or employee shall continue from the date of the discharge or
refusal to further employ at the same rate until paid. However, the wages
shall not continue more than sixty (60) days unless an action therefor shall
be commenced within that time.

(b) . . . Any servants or employees who shall hereafter be discharged or
refused further employment may request or demand the payment of any
wages due and, if not paid within seven (7) days from discharge or refusal
to longer employ, then the penalties provided in subdivision (a)(2) of this
section for railway employees shall attach.

Ark. Code Ann. § 11-4-405 (1905).

Plaintiffs argue that the current version of the statute should apply to all class

members, extending back to December 9, 2013, because they made their demand for

damages under the statute in August 2019, after the effective date of the amendment,

23

and "such a demand is an element of the claim." (Doc. 186, p. 7). It is not clear what the Plaintiffs mean by this. The version of the statute that was effective in August 2019 does not require a demand by the employee, and the version of the statute effective before cirAugust 2019 required a valid demand to be made within seven days of termination. *See McCourt Mfg. Corp. v. Rycroft*, 322 S.W.3d 491, 496 (Ark. 2009).

In the alternative, Plaintiffs argue that the amended statute is appropriately given retroactive effect as remedial legislation. Under Arkansas law, "[r]etroactivity is a matter of legislative intent. Unless it expressly states otherwise, we presume the legislature intends for its laws to apply only prospectively." *Bean v. Office of Child Support Enf't*, 9 S.W.3d 520, 526 (Ark. 2000). However, "[t]he strict rule of construction does not apply to remedial statutes which do not disturb vested rights, or create new obligations, but only supply a new or more appropriate remedy to enforce an existing right or obligation." *Id.* Here, the amended statute does provide a new remedy, but it also changes the nature of the employer's obligation: While the previous version of the statute only required the employer to provide wages within seven days of discharge upon demand of the employee, the amended statute imposes the seven-day requirement regardless of the employee's demand. Therefore, the Court concludes that the amended statute creates new obligations for employers and cannot be considered purely remedial nor applied retroactively.

Plaintiffs have not provided any facts to establish that there are class members who: 1) were discharged by PAM before July 24, 2019; 2) made a valid demand for their wages within seven days of termination; and 3) did not receive those wages with seven days of their demand. These are the necessary elements of a claim under the prior

24

version of the statute. Plaintiffs also have not provided any facts to establish that there are class members who: 1) were discharged by PAM on or after July 24, 2019 and 2) did not receive the wages owed them within seven days of the next regular payday, which are the necessary elements for a claim under the current version of the statute. Therefore, Plaintiffs are not entitled to summary judgment on their claim under either version of § 11-4-405.

## IV. CONCLUSION

For the reasons set out above, Plaintiffs' Motion to Strike the Declaration of Dustin Mixon (Doc. 187) is **GRANTED IN PART AND DENIED IN PART**. The Clerk is directed to strike Doc. 157-3 and Doc. 167-12, along with paragraphs 11 through 20 of the Supplemental Declaration appearing at Doc. 205-1. Plaintiffs' Motion for Partial Summary Judgment (Doc. 160) is also **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED** on this 17th day of January, 2020.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE